UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


ANTONIO PARRILLA,


                Plaintiff,


vs.                         Case No. 6:08-CV-1967-ORL-31GJK


ALLCOM CONSTRUCTION AND
INSTALLATION SERVICES, LLC,


                Defendant.

------------------------------------------------------------

**JULY 23, 2009**

**Transcript of Proceedings**
**TRIAL**

**Before The Honorable GREGORY A. PRESNELL**
**United States District Judge**


APPEARANCES:

For the Plaintiff:     Konstantine E. Pantas
                       Pantas Law Firm
                       250 N. Orange Avenue, 11th Floor
                       Orlando, FL  32801

For the Defendant:     John Liebman
                       Mark O. Cooper
                       O'Neill, Liebman & Cooper
                       2699 Lee Road, Suite 320
                       Orlando, FL  32860


Proceedings recorded by mechanical stenography, transcript
produced with computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning, everyone.  Be seated.

 3    All right.  Anita, call the case, please.

 4              (CASE CALLED.)

 5              THE COURT:  All right.  Appearing for the

 6    plaintiff.

 7              MR. PANTAS:  Konstantine Pantas, Your Honor.  I

 8    have with me my law clerk, Jon Rankin.  We also have with us

 9    the three plaintiffs.

10              THE COURT:  And for the defendant.

11              MR. LIEBMAN:  Your Honor, John Liebman, and my

12    law partner, Mark Cooper, and Mr. John Muller, the managing

13    member of the defendant corporation -- company.  I'm sorry.

14              THE COURT:  Okay.  We're here today pursuant to

15    notice for a, I guess what you'd describe as a mini trial or

16    Rule 42 trial on the merits of the particular issue, and to

17    the extent a jury trial is appropriate, it's been waived, so

18    we'll try this as a bench trial.

19              Do you want to give some brief openings?

20              MR. PANTAS:  I don't have a preference, Your

21    Honor.

22              THE COURT:  Go ahead and give me a sense of what

23    you're --

24              MR. LIEBMAN:  Your Honor, there's several

25    witnesses in the room and the rule has been invoked.
```

1           THE COURT:  Okay.  Well, they shouldn't be here

2    then.  They can be here during openings.

3           MR. PANTAS:  These are plaintiffs, Your Honor.

4    Parties.

5           THE COURT:  There's only one plaintiff.

6           MR. PANTAS:  Well, they filed opt-ins.

7           THE COURT:  I don't care.  We're not trying a

8    class.  They're not plaintiffs, so they're going to have to

9    be excused.

10          Okay.  Why don't you tell me what you plan on

11   proving?

12          MR. PANTAS:  Yes, Your Honor.  Thank you.

13          Basically, Your Honor, I don't want to take up

14   too much of the court's time.  It's a fairly simple issue,

15   whether or not Mr. Parrilla is an employee or independent

16   contractor for Allcom.  Basically I'm going to go through all

17   the criteria that seem to be important under the case law

18   within the Eleventh Circuit.  I'm going to call a couple

19   witnesses, two gentlemen that just stepped out, to

20   corroborate some of the evidence that is going to be elicited

21   from Mr. Parrilla.  At that point we're going to call the

22   manager, which is Clint Vigus, he's going to basically verify

23   that they do all the scheduling and how the inner workings of

24   their office basically works.  And I'm also going to call the

25   corporate representative who's also the owner, Mr. Muller,

1    and he will basically testify to why, when he initially set

2    up the business, why he chose to go the independent

3    contractor route versus the employee route.  And I think when

4    all the evidence is in, I think you're going to find, under

5    the economic realities test you're going to find that they're

6    employees rather than independent contractors.

7              THE COURT:  Okay.  Mr. Liebman.

8              MR. LIEBMAN:  Mr. Cooper will open, Your Honor,

9    with the court's permission.

10             THE COURT:  Sure.

11             MR. COOPER:  May it please the court.  I think

12   the ultimate issue before the court is clear, and the legal

13   standard has been set in the Freund case that we cited to the

14   court in our trial brief.  The facts, the evidence is going

15   to show that Allcom has an agreement with Bright House

16   Networks, and Allcom is responsible under that contract for

17   the installation of cable for cable televisions, cable for

18   high speed Internet access, and cable for telephone usage,

19   all for Bright House customers.

20             The evidence will show that Allcom elected to

21   meet that election through the adoption of a business model

22   that utilizes independent contractors who perform those

23   services, that those people are in that position freely,

24   voluntarily and actually at their own choice.  We believe

25   that the evidence will show that there is not economic

1    dependence of the plaintiff with respect to Allcom.  He is,

2    in law and in fact, an independent contractor, and we request

3    that the court rule accordingly at the close of the case.

4              THE COURT:  Okay.  Thank you, sir.

5              Call your first witness.

6              MR. PANTAS:  Thank you, Your Honor.  If it please

7    the court, I call Antonio Parrilla to the stand.

8    Whereupon:

9                   ANTONIO PARRILLA,

10   called as a witness, having been first duly sworn according

11   to law, testified as follows:

12                  DIRECT EXAMINATION

13   BY MR. PANTAS:

14   Q.    Mr. Parrilla, could you please start by stating your

15   name, spelling it for the record?

16   A.    Yes, sir.  My name is Antonio Parrilla.

17   Q.    How do you spell your last name?

18   A.    P A R R I L L A.

19   Q.    And your first name?

20   A.    Antonio.  A N T O N I O.

21   Q.    Did you ever work for Allcom Construction and

22   Installation Services, LLC?

23   A.    Yes.

24   Q.    Do you remember the time periods that you worked with

25   them?

1    A.      From September '06 to January 2008.

2    Q.      What position did you hold when you worked for them?

3    A.      An installation technician.

4    Q.      What does that mean for the court?

5    A.      We had to install TV, Internet and phone services.

6    Q.      Basically for Bright House?

7    A.      Yes.

8    Q.      Did you have a supervisor?

9    A.      Yes.

10   Q.      Who was your supervisor when you worked with Allcom?

11   A.      The supervisor was Freddie Colon.

12   Q.      Did Mr. Vigus have any kind of supervisory authority

13   over you?

14   A.      Yes.  He was the manager there.

15   Q.      All right.  So there was a manager and a supervisor?

16   A.      Yes, sir.

17   Q.      When you worked for Allcom, were you ever instructed

18   to be at work at a certain time?

19   A.      Yes, sir.

20   Q.      What time did you have to be at work?

21   A.      Before 7:30.

22   Q.      And who told you that?

23   A.      Clint Vigus.

24   Q.      Was that rule enforced?

25   A.      Yes.

1   Q.      Were you ever instructed you would be subject to

2   discipline or termination if you failed to arrive at work at

3   that particular time?

4   A.      Yes, sir.

5   Q.      And who told you that?

6   A.      Clint Vigus and also Freddie Colon.

7   Q.      Was that one time or various times throughout the --

8   A.      Multiple times throughout the week.

9   Q.      Were you able to take days off whenever you wanted?

10  A.      Not whenever I wanted, no.

11  Q.      Were you ever threatened with discipline or

12  termination if you failed to come to work?

13  A.      Yes.

14  Q.      Were you required to wear a uniform?

15  A.      Yes.

16  Q.      What was the uniform?

17  A.      It was a shirt that says Allcom Construction Services.

18  Q.      Were you required to wear your shirt tucked in?

19  A.      Yes, sir.

20  Q.      Did you utilize a vehicle -- did you have a vehicle?

21  A.      Yes, sir.

22  Q.      Did you use that vehicle at least in part to go to

23  customer's homes?

24  A.      Yes.

25  Q.      Was there a sign on the vehicle?

1      A.      Yes.

2                      THE COURT:  Whose vehicle was it?

3                      THE WITNESS:  It was my own vehicle, Your Honor.

4                      THE COURT:  And you just stick one of those

5      magnetic signs on it?

6                      THE WITNESS:  Yes, sir.

7      BY MR. PANTAS:

8      Q.      What does the magnetic sign say?

9      A.      Allcom Construction Services, and it also says

10     contractor for Bright House.

11     Q.      Did you also use that vehicle for your own personal

12     use?

13     A.      Every now and then, yes.

14     Q.      Were you subject to discipline or termination if you

15     didn't have the sign on your car?

16     A.      Yes.

17     Q.      Who told you that?

18     A.      Clint Vigus.

19     Q.      Was that told to you once or throughout your

20     employment?

21     A.      Throughout the employment.

22     Q.      Did the supervisor and or manager at Allcom ever

23     perform an inspection of that vehicle?

24     A.      Yes.

25     Q.      Were you ever informed that you were subject to

```
 1    discipline or termination if you did not maintain your
 2    vehicle within their parameters?
 3    A.      Yes.
 4                 THE COURT:  What kind of vehicle was it, a pickup
 5    truck?
 6                 THE WITNESS:  It had to be a mini van.  I had a
 7    mini van.
 8    BY MR. PANTAS:
 9    Q.      While you were working for Allcom, were you ever
10    directed to train anyone else?
11    A.      Yes.
12    Q.      What was the purpose of you training other people for
13    Allcom?
14    A.      So they can do the same thing that I was doing,
15    installing the cable TV and phone and Internet.
16    Q.      Did other installers like you also train?
17    A.      Yes.
18    Q.      So it wasn't, you weren't a trainer of some type?
19    A.      No, sir.
20    Q.      During your employment with Allcom, were you ever
21    contacted and instructed to leave a job --
22    A.      Yes.
23    Q.      -- or some location that you were working and go to
24    another job?
25    A.      Yes.
```

1    Q.      Who would give you those instructions?

2    A.      Either would come from Clint Vigus, Freddie Colon or

3    their secretary, which is a dispatcher.

4    Q.      Let's talk about that.  Are there dispatchers also

5    working for Allcom?

6    A.      Yes, sir.

7    Q.      How many dispatchers?

8    A.      When I was working there, there was two.

9    Q.      So the office I guess we'll call it is comprised of

10   Mr. Vigus, Mr. Colon, and the two dispatchers?

11   A.      Yes, sir.

12   Q.      Anybody else?

13   A.      Sometimes they also had a guy there that was doing the

14   inventory every now and then, too, I didn't see him that

15   often, but maybe a couple times a week he would show up to

16   the inventories and set up the equipment and all that stuff.

17   Q.      How often would you be instructed to leave a

18   particular job that you were already at and go to another

19   job?

20   A.      Could happen once or twice a week.

21   Q.      Could you refuse to comply with that directive?

22   A.      No, I couldn't refuse.

23   Q.      Were you required to wear an identification card?

24   A.      Yes, sir.

25   Q.      What did the card look like?  What did it say?

1    A.      It had my picture and my name and it said Allcom

2    Construction Services and also the Bright House logo on it.

3    Q.      Any other company names?

4    A.      No.

5    Q.      During your working relationship I guess we'll call it

6    with Allcom, did you ever receive work orders for the work

7    you performed?

8    A.      Yes, sir.

9    Q.      Could you explain to the court what a work order is?

10   A.      Your Honor, what the work order looks like, it's a

11   pretty much a sheet of paper with the customer address, the

12   services that they're getting, timeframe that you had to go

13   to the customer's house, and also had a work order number and

14   account number and had Bright House logo on it.

15          THE COURT:  When you showed up in the morning at

16   7:30, they gave you your work orders for the day?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  And did they tell you what order you

19   were to provide the services?  In other words, did they

20   dispatch you and tell you which ones you would do first,

21   second, third, that sort of thing?

22          THE WITNESS:  Yes, sir.  They have a database on

23   the phone where it has the jobs in order where you have to,

24   the specific timeframe for each job where you had to show up

25   within that time.

1          THE COURT:  And if for some reason you got behind

2     and you were not able to meet that timeframe, was there a

3     procedure for you to call the customer and let them know you

4     were running late?

5          THE WITNESS:  Well, a lot of times a dispatcher

6     from Allcom will call us and she will call the customer

7     before we show up there and let them know if we're stuck in

8     traffic or anything.

9          THE COURT:  And what kind of a time window were

10    you working for for the customers; two hours, four hours?

11         THE WITNESS:  Two hours, Your Honor.

12         THE COURT:  Okay.  Go ahead.

13         MR. PANTAS:  Thank you, Your Honor.

14    BY MR PANTAS:

15    Q.    Could you refuse to provide any of the work on the

16    work orders provided to you by Allcom?

17    A.    No, sir.

18    Q.    So you basically were just handed your schedule for

19    the day on a daily basis?

20    A.    Yes, sir.

21    Q.    Now, I remember from some of the testimony in

22    discovery that there were on occasions circumstances where

23    there were work orders that basically piggybacked within the

24    same two hour timeframe?

25    A.    Yes, sir.

```
 1        Q.      How often did that occur?

 2        A.      Not that often, but we were instructed to go to the

 3   first one.

 4        Q.      On the list?

 5        A.      On the list, yeah.

 6        Q.      Now, if you refused to do a particular piece of work

 7   that was scheduled for you to do, were you subject to

 8   discipline or termination?

 9        A.      Yes, sir.

10        Q.      Who told you that?

11        A.      Clint Vigus, and every now and then Freddie Colon will

12   say the same thing, too.

13        Q.      So did someone actually tell you that you would be

14   terminated if you refused a particular work order?

15        A.      Either terminated or suspended.

16        Q.      Did the work orders provide a timeframe for which you

17   were to actually arrive, meaning not a timeframe, a

18   particular time or a window of time?

19        A.      A window of time.

20        Q.      And that was true for every single work order?

21        A.      Yes, sir.

22        Q.      It wasn't like some of them had a timeframe and other

23   ones had a particular time?  They all had a timeframe?

24        A.      They always had a timeframe.

25                THE COURT:  Typically how many work orders would
```

1      you get each day?

2                  THE WITNESS:  Your Honor, you get anywhere from

3      five to the most I got, it was ten.

4      BY MR. PANTAS:

5      Q.      Did you work solely for Allcom --

6      A.      Yes, sir.

7      Q.      -- during that period of time?

8      A.      Yes, sir.

9      Q.      Were you allowed to have someone else working for you

10     at the same time you were working for Allcom?

11     A.      Not at any time, no.

12     Q.      Were you allowed to have someone else work in your

13     stead, meaning replacing you?  Do you understand my question?

14     A.      Yes.  If I go out on vacation or something, anything

15     like that?

16     Q.      Let me rephrase it.  Were you allowed to hire someone

17     of your choosing, have them do the work orders that were

18     assigned to you, and you just sit at home and collect, I

19     don't know, ten percent?

20     A.      No, sir.  No.

21     Q.      Were you even allowed to have someone in your vehicle

22     while you were working for Allcom?

23     A.      No, sir.

24     Q.      Were you able to perform work for other cable

25     contractors?

1    A.    No, sir.

2    Q.    Have you ever worked for other cable contractors

3    during the timeframe that you worked for Allcom?

4    A.    No, sir.

5    Q.    Were you allowed to select which jobs you would prefer

6    to perform?

7    A.    No, sir.

8    Q.    Were you required to accept whatever was on your

9    schedule?

10   A.    Yes, sir.

11   Q.    Were you allowed to perform additional services for

12   customers without Allcom's permission?

13   A.    No.

14   Q.    So when you went to a customer's house, if they said,

15   we really like you, I want you to install the stereo

16   equipment in the house, what would you tell them?

17   A.    They had to call to put an order for it.

18   Q.    Call to Allcom?

19   A.    Bright House.

20   Q.    Bright House.  Okay.

21         Did Allcom ever charge or back-charge, I guess

22   the proper word is, you for work that you actually performed?

23   A.    Yes.

24   Q.    How much would you estimate, let's make it per week,

25   that you occurred in back-charges?

1    A.      I'll say an estimate between 50 and a hundred dollars

2    a week.

3                THE COURT:  I don't understand that.  How were

4    you paid?  Let's start at the beginning.

5                THE WITNESS:  Your Honor, we got paid on a weekly

6    basis, and the back-charges were for quality assurance that

7    was done and they said the criteria didn't meet for the job

8    and that's how the back-charges will come into effect.

9                THE COURT:  So let me see if I understand you.

10   You were paid on a salary basis, that is, a certain amount

11   per week?

12               THE WITNESS:  It was on a, on the jobs you

13   performed per work order.

14               THE COURT:  So it's so much per work order?

15               THE WITNESS:  Yes, sir.

16               THE COURT:  And there was a system where if

17   quality control determined that you had not done a good job,

18   they could back-charge you the following pay period and take

19   some of that back?

20               THE WITNESS:  Yes, sir.  And also if the customer

21   called complaining to Bright House that one of their services

22   is not working, they still went ahead and back-charged you

23   because there's a service call generated since your last

24   visit and they will still back-charge you.

25               THE COURT:  Okay.

BY MR. PANTAS:

1    Q.    While we're on the back-charges, did you have the
2    ability to dispute a particular back-charge that Allcom
3    charged?

4    A.    No.

5    Q.    Now, let's just move back to create a foundation for
6    some of the information that's probably missing.  When you
7    initially started working for Allcom you got paid on a per
8    piece base, correct?

9    A.    Yes, sir.

10   Q.    So you worked -- were you handed a list that told you
11   for this particular thing that we do, you would get X amount?

12   A.    Yes.

13   Q.    Were you able to negotiate those rates at all with
14   Allcom?

15   A.    No.

16   Q.    When you're talking about back-charges, when Allcom
17   would back-charge you, would they take the entire amount back
18   or a portion for the particular line item that you were
19   performing?

20   A.    They had a charge-back could be for the whole job or
21   it could be a standard fee that they had.

22   Q.    So there's a back-charge that could be for the
23   particular line item that you're doing, a back-charge for the
24   entire job, or they would just charge you some amount based

1    on some flat rate of some type?

2    A.    Correct.

3    Q.    Do you have any idea what that flat rate is?

4    A.    I think it was $75.

5    Q.    Do you know how Allcom came to the conclusion that the

6    proper thing to charge you was $75?

7    A.    I think they set up just to pay somebody to go back

8    and fix it and like paperwork they are to do.  I really don't

9    have an exact definition for it.

10   Q.    So it was something other than, that flat back-charge

11   was something other than what the amount that they were

12   paying you for that particular job?

13   A.    Yes.

14   Q.    In other words, the job could have been $60 and the

15   back-charge could have been $75?

16   A.    Yeah.  There's some jobs that pay 50 and you still get

17   a back-charge for 75.

18   Q.    When were you at Allcom, did you ever receive any

19   training yourself?

20   A.    Yes, sir.

21   Q.    Were you required to attend weekly meetings while you

22   were at Allcom?

23   A.    Yes.

24   Q.    Who were the meetings with?

25   A.    Clint Vigus and also Freddie Colon.

1    Q.     And what was discussed at these meetings?

2    A.     They discussed the way you have to be dressed, how the

3    customer service with the customer.  A lot of times they went

4    over training with the new equipment, specifications on how

5    the job had to be done.  That's about it.

6    Q.     How often would these meetings occur?

7    A.     On Fridays.

8    Q.     Every Friday?

9    A.     For the most part, yes, every Friday.

10    Q.     Were these meetings held just for you or for everybody

11    or for some other people or what?

12    A.     Everybody that was working there.

13    Q.     All the installers?

14    A.     Yes.

15    Q.     Were these meetings mandatory?

16    A.     Yes.

17    Q.     Did someone tell you that these meetings were

18    mandatory?

19    A.     Clint Vigus told us that.

20    Q.     So were you subject to discipline if you failed to

21    attend these meetings?

22    A.     He said to us that if we don't show up to the

23    meetings, then we will not have any work for two or three

24    days.

25    Q.     Did you purchase any tools while you worked with

1    Allcom?

2    A.      Yes, sir.

3    Q.      What tools did you actually purchase?

4    A.      Cable crimper.  It was like a fishing stick to run

5    wires through the wall, too.  Just a couple.

6    Q.      Are these little tools or big tools?

7    A.      They're little tools.

8    Q.      Were you required to purchase the tools from Allcom or

9    one of its selected vendors or could you go out and just get

10   them from anywhere?

11   A.      We had to get it from one of their vendors or from

12   them and they'll deduct it from a check.

13   Q.      So the tools that you actually purchased were directly

14   from Allcom?

15   A.      The cable crimper, yes, because we had to use a

16   standard one.

17   Q.      And some of the other tools like a fishing --

18   A.      I got it from a different place I was referred from

19   Clint Vigus to go there.

20   Q.      Now, you said you would get charged from Allcom.  The

21   crimper you got charged from Allcom?

22   A.      Yes.

23   Q.      The other one, did you get charged from Allcom?

24   A.      No.  I paid them directly.

25   Q.      Did Allcom have specifications or parameters for the

1     work that you were doing?

2     A.     Yes.

3     Q.     Now, do you know if those parameters came from Bright

4     House or from Allcom or a combination?

5     A.     I think they came from Bright House, but Allcom also

6     added some additional ones there.

7     Q.     All right.  So they're a combination of Bright House

8     and Allcom as far as you know?

9     A.     As far as I know, yes.

10    Q.     Did you understand that in order to keep working with

11    Allcom that you had to follow those particular parameters?

12    A.     Yes.

13    Q.     Did someone tell you that?

14    A.     Clint Vigus told us that.

15    Q.     When you initially started working with Allcom, did

16    you have the ability to negotiate whether or not you would be

17    an employee or an independent contractor?

18    A.     No.

19    Q.     Who did you have the meeting, that initial interview I

20    guess we'll call it, who did you have it with?

21    A.     Clint Vigus.

22    Q.     And that's the manager for Allcom?

23    A.     Yes, sir.

24    Q.     What was discussed at that meeting?

25    A.     Pretty much that they were going to start and the

1    amount of work orders that he's going to give us and the, how

2    much is the piecework, the amount he was going to pay us.

3    Q.    You mean the list?

4    A.    The list, yes.

5    Q.    Was it a written list or did he just say it verbally?

6    A.    It was a written list.

7    Q.    So during that meeting you received some paperwork

8    that, the list being one of them?

9    A.    Yes, sir.

10   Q.    Did you receive any other paperwork?

11   A.    Not that I recall, no.

12   Q.    Were you required to have or to start up some type of

13   corporate entity in order to work for Allcom?

14   A.    No, sir.

15   Q.    In fact, when you started working for Allcom, you were

16   paid directly, correct?

17   A.    I got a couple checks that he paid me directly, yes.

18   Q.    At some point after that were you told you have to

19   have a corporation in place in order to continue working for

20   Allcom?

21   A.    Yes.

22   Q.    Who told you that?

23   A.    Clint Vigus.

24   Q.    What did he say to you, if you remember?

25   A.    That it was mandatory that we had to get it done that

1    way, otherwise he'll terminate us.

2    Q.    Did he explain to you why?

3    A.    No, he never explained why.

4    Q.    There was a document called an independent contractor

5    agreement.  Do you know if you ever signed an independent

6    contractor agreement with Allcom?

7    A.    Not to my knowledge, no, sir.

8    Q.    When you were working with Allcom, what communications

9    would you have during the day with Allcom, employees or

10   managers or anybody working for them?

11   A.    They will call me to assign more work, to get my

12   status where I was, tell me that I had to show up at a

13   customer's house by X amount of time, or if the customer is

14   not there, they will instruct you to go back, you know, at a

15   different time.  Let's say if it was eight to ten and the

16   customer wasn't there, then the customer will call and the

17   dispatcher will tell me, well, the customer is going to be

18   back at three and you got to go back at three.

19              THE COURT:  This was on a cellphone?

20              THE WITNESS:  Yes, sir, a cellphone.

21              THE COURT:  Who owned the cellphone?

22              THE WITNESS:  It was my cellphone, sir.

23   BY MR. PANTAS:

24   Q.    Now, that particular cellphone also had the ability to

25   run or connect to the Internet for a particular program that

1   Allcom was using, correct?

2   A.   Yes, sir.

3   Q.   Do you remember the name of that program?

4   A.   If I'm not mistaken I think it was called TOA.  They

5   used a standard abbreviation for it.

6   Q.   What information did that TOA program provide to you?

7   A.   It provided me with the jobs for the day to put a

8   connect, finish up the work, I had to log into that and put

9   the time that I got done with that job, and if I was running

10   late they will, the dispatcher will call me, just tell me to

11   log in on the TOA to start a job.  Even if I was running

12   late, they will instruct me to put in that time before I get

13   to the job.

14   Q.   Okay.  So would you, when you closed out a job, would

15   you have to log into that TOA to close it out?

16   A.   Yes.

17   Q.   If you know, would that communicate to Allcom that you

18   were finished with one job and en route to the other?

19   A.   Yes.

20   Q.   Were there any other forms of communication with

21   Allcom other than the cellphone via the program that it was

22   running and verbal communications with yourself?

23   A.   No.  That's it.

24   Q.   Would the supervisors come out and help you on a

25   particular job if you didn't know how to do something?

1    A.     Yes.

2    Q.     Did you ever have to call Allcom's supervisor or the

3    manager in order to get instructions on how to do something?

4    A.     Yes.

5    Q.     And how would that work?  Did you have access to the

6    manager and supervisors directly or would you have to call

7    dispatch or what?

8    A.     Sometimes you call the dispatcher or sometimes you can

9    call them directly on their phone and, you know, either Clint

10   Vigus or Freddie Colon to assist you.

11   Q.     Now, you at some point had a corporation prior to

12   working with Allcom, correct?

13   A.     Yes.

14   Q.     What was the name of that corporation?

15   A.     Computer Solutions and Consulting.

16   Q.     Now, that doesn't sound like a cable installing outfit

17   to me.  When did you actually start up that corporation, for

18   what purpose?

19   A.     Well, it was to do computer work, like networking and

20   just computer support.

21   Q.     All right.  So you were doing some computer work prior

22   to your work for Allcom?

23   A.     Yes.

24   Q.     Do you have a degree of some type?

25   A.     Yes.

1    Q.      What degree do you have?

2    A.      Computer information systems.

3    Q.      What types of, what type of work would you do when you

4    opened that computer corporation?

5    A.      Computer networking, troubleshooting a computer, that

6    kind of work.

7    Q.      Now, after Allcom told you that you had to have a

8    company in place in order to continue working for them, did

9    you keep up that company, i.e., did you follow whatever

10   requirements of law with regard to the licensing, worker's

11   compensation, general liability insurance, etcetera?

12   A.      Yes.

13   Q.      And you kept that up for what purpose?

14   A.      Well, when they told me that they needed a company set

15   up, so I already had one and I just got up to date and got

16   all the, everything that I was instructed to do.

17   Q.      How did you know to, for instance, get an occupational

18   license?

19   A.      When I was -- can you rephrase the question?

20   Q.      Yeah.  Did you have an occupational license after

21   Allcom instructed you that you had to have a company in order

22   to continue to work for them?

23   A.      Yes.

24   Q.      Here's my question.  Did you have one before that

25   point or did you get one after that point?

1    A.      I had one before that point.

2    Q.      Okay.  What about a work comp exemption, did you have

3    one before or did you get one after?

4    A.      After.

5    Q.      After?

6    A.      Yes.

7    Q.      How did you know how to go about getting a worker's

8    compensation exemption?

9    A.      Clint Vigus instructed us to come here downtown to get

10   that, the waiver, worker's comp exemption.

11   Q.      Did you have to get general liability insurance?

12   A.      Yes.

13   Q.      Did Mr. Vigus or anybody else at Allcom instruct you

14   where to go to get the general liability insurance?

15   A.      No.

16   Q.      That was just something that you got from some agent

17   someplace?

18   A.      Correct.

19   Q.      Was there anything else you had to do other than those

20   things that we already talked about?

21   A.      No.  That sounds correct.

22   Q.      Pretty much it as far as you remember?

23   A.      Yes.

24           THE COURT:  How long did you work for them

25   personally before you began to be paid through your

1     corporation?

2               THE WITNESS:  I started getting paid for the

3     corporation a few weeks after I started working there, Your

4     Honor.

5     BY MR. PANTAS:

6     Q.      The TOA database, did you have to pay for that?

7     A.      Yes, sir.

8     Q.      You paid Allcom directly or Bright House or who?

9     A.      Allcom will deduct it from our paychecks on, I believe

10    it was a weekly, yes, weekly basis.

11    Q.      You didn't get -- well, you may not know this, but if

12    you didn't get the work comp exemption, would Allcom charge

13    you?

14    A.      I don't know that.

15    Q.      You went ahead and got the exemption so you never got

16    charged?

17    A.      Yes.

18               MR. PANTAS:  May I have a second, Your Honor?

19               THE COURT:  Yes.

20               MR. PANTAS:  No further questions for this

21    witness, Your Honor.

22               THE COURT:  All right.  Cross.

23               MR. LIEBMAN:  May it please the court, John

24    Liebman for the defendant, Allcom.  And, Your Honor, Mr.

25    Pantas has made no objection to the defendant's exhibits 1

```
 1    through 12 and 14, and I know it's out of order, but I would
 2    move them in so we can refer to them in this cross.
 3                MR. PANTAS:  No objection.
 4                THE COURT:  All right.  Defendant's 1 through 12
 5    and 14 will be admitted.
 6                MR. LIEBMAN:  Thank you, Your Honor.
 7                          CROSS EXAMINATION
 8    BY MR. LIEBMAN:
 9    Q.    Good morning, Mr. Parrilla.
10    A.    Good morning, sir.
11    Q.    When I took your deposition you informed me that you
12    have a college degree in computer information systems, is
13    that correct?
14    A.    Yes, sir.
15    Q.    And you informed me that you were trained as a cable
16    installation technician when you were employed by a company
17    named 180 Connect, is that correct?
18    A.    Yes, sir.
19    Q.    And you called it 180 Connect, is that correct, sir?
20    A.    Yes, sir.
21    Q.    And I'm asking you to tell the court how you were
22    employed by 180 Connect and how you were trained as a cable
23    technician.
24                MR. PANTAS:  Object to the compound, Your Honor.
25                THE COURT:  We'll sort it out.  Overruled.
```

1           THE WITNESS:  Your Honor, I was hired by 180

2    Connect and I performed the services of cable installation

3    and Internet and also phone services.

4    Q.      And were those installations being done for customers

5    of a company named Bright House Networks?

6    A.      Yes, sir.

7    Q.      And after a certain period of training, did you go

8    from being a trainee to being a cable installer?

9    A.      Yes.

10   Q.      And did your rate of pay increase at that time?

11   A.      No, sir.

12   Q.      And when you were employed by 180 Connect as a cable

13   installer, did they provide you with a truck?

14   A.      Yes.

15   Q.      Did they provide you with tools?

16   A.      Yes.

17   Q.      And did they pay you as an employee?

18   A.      Yes.

19   Q.      And when they paid you, were you paid a paycheck from

20   which they deducted income tax, Social Security and Medicare

21   withholding?

22   A.      Yes.

23   Q.      All right, sir.  And did there come a time when you

24   changed employers and left 180 Connect?

25   A.      Yes.

1    Q.      And with whom did you go to work at that time?

2    A.      After that time to Knight Enterprises.

3            THE COURT:  To what?

4            THE WITNESS:  It's called Knight Enterprises.

5            MR. LIEBMAN:  With a K, Your Honor.

6    Q.      And at Knight Enterprises, what was your job?

7    A.      Installing cable.

8    Q.      And were their customers, and were the installations

9    done for customers of a company named Bright House Networks?

10   A.      Yes.

11   Q.      All right.  And at Knight Enterprises, were you an

12   employee?

13           MR. PANTAS:  Objection.  Calls for a legal

14   conclusion, Your Honor.

15           THE COURT:  Well, I don't think so.  I mean I

16   think everybody here knows that we're talking about the

17   difference between an employee and an independent contractor,

18   and if there's any confusion about that, you can handle it on

19   redirect.  Overruled.

20           THE WITNESS:  Can you repeat the question?

21   Q.      Yes.  When you changed from 180 Connect where you were

22   an employee to Knight Enterprises, did you become an

23   independent contractor there?

24           MR. PANTAS:  Same objection, Your Honor.  I think

25   the question was is how he was treated versus what he was.

1          THE COURT:  Well, you understand the difference

2   in terms of being paid as an employee where the employer

3   deducts withholding, etcetera, as opposed to an independent

4   contractor where you're responsible for that yourself,

5   correct?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.  The question is pretty

8   simple.  With Knight Enterprises, how were you compensated,

9   as an employee or as an independent contractor?

10          THE WITNESS:  Well, they'll pay me the same,

11   piecework on each job that was completed.

12          THE COURT:  Yes.  But when you got your pay, did

13   they withhold and that sort of thing?

14          THE WITNESS:  No, sir, they wouldn't withhold.

15          THE COURT:  Okay.

16   BY MR. LIEBMAN:

17   Q.     There was no withholding at Knight Enterprises,

18   correct?

19   A.     Correct.

20   Q.     All right.  And at Knight Enterprises, did they

21   provide you with a truck like 180 Connect did?

22   A.     No, sir.

23   Q.     Did you have to supply your own?

24   A.     Yes.

25   Q.     And did they provide you with tools to be a cable

1     installer?

2     A.      Some tools, yes, sir.

3     Q.      Did you have to provide your own?

4     A.      Some I was, yes.

5     Q.      And was that different from 180 Connect?

6     A.      That was one of the difference, yes.

7     Q.      And during the time you were employed by Knight

8     Enterprises, did you form the corporation Computer Solutions

9     and Consulting, LLC?

10    A.      Yes, sir.

11    Q.      And was that done by someone who did it there for you

12    at Knight Enterprises?

13    A.      Yes, sir.

14    Q.      And was it done at their request?

15    A.      No.  Actually they told us to go to set it up downtown

16    here.

17    Q.      Okay.  And you did that, is that correct?

18    A.      Yes.

19    Q.      All right, sir.  And did they pay you in the name of

20    Computer Solutions and Consulting, LLC --

21    A.      Yes, sir.

22    Q.      -- at Knight Enterprises?

23    A.      Yes, sir.

24    Q.      And did you open a bank account in the name of

25    Computer Solutions and Consulting, LLC, and deposit those

1    checks in that account?

2    A.      Yes, sir.

3    Q.      And did there come a time when you chose to leave your

4    employment with Knight Enterprises?

5    A.      Repeat the question one more time.

6    Q.      At some point did you leave Knight Enterprises and not

7    work there any more?

8    A.      Yes, sir.

9    Q.      Can you tell me, is it true that you said you made a

10   trip to Spain for a while and then when you came back you

11   thought you didn't work there any more?

12   A.      That's correct.

13   Q.      And did you seek other employment after you came back

14   from Spain?

15   A.      Yes.  Well, when I came back from Spain, I believe I

16   worked there for a couple weeks, and then when Clint

17   contacted us through Freddie Colon and that's how I started

18   working at Allcom.

19   Q.      All right.  Would it be safe for me to say that, as

20   you recall it, Mr. Freddie Colon recruited you and some

21   others who were at Knight Enterprises to come to work at

22   Allcom?

23   A.      Yes.

24   Q.      All right.  And what did he say to you about what the

25   Allcom system and business was?

1    A.      He just didn't say much, just said where he was

2    located and to meet up with Clint Vigus.

3    Q.      And did he tell you that the pay scale was the same as

4    at Knight Enterprises?

5    A.      He didn't tell me that, no.

6    Q.      Did you tell me on the deposition that it was?

7    A.      I believe, I mean I don't recall the numbers from

8    Knight Enterprises.  The pay scale numbers?

9    Q.      The list of pay scale numbers at Knight Enterprises

10   and the list of pay scale numbers at Allcom at the time that

11   you changed the companies, was that the same?

12   A.      I'm not sure about that, sir.

13   Q.      Were you told that the other terms of employment were

14   the same at, if you left Knight and went to Allcom?

15   A.      I wasn't told anything about that, no.

16   Q.      Do you recall asking Mr. Freddie Colon if they were

17   independent contractor based or employee based?

18   A.      We never asked that question.

19   Q.      Do you recall finding that out before you went to

20   Allcom?

21   A.      We were treated like employees when we were at Allcom.

22   I mean that's how, when we started working there, that's how

23   everything started.  He will tell us what time we got to be

24   there.  With Knight Enterprise we didn't have to do that.

25   Q.      Okay.  So there were more rules and regulations at

1    Allcom than there were at Knight Enterprises?

2    A.      Yes.

3    Q.      But the work itself was the same?

4    A.      There's a difference where I was able to pick the jobs

5    that I wanted.

6    Q.      The work that you did when you went in on jobs, was it

7    the same work?

8    A.      Yes, same work.

9    Q.      It was for customers of Bright House Networks, it was

10   for installation of cable for TV and Internet and telephone,

11   is that correct?

12   A.      Yes, sir.

13   Q.      And to the best of your knowledge, sir, did the work

14   you did when you changed to go to work for Allcom get done

15   the same way that it was done when you were doing it for

16   Knight?

17              THE COURT:  The same way from his standpoint or

18   the same way from the employer's standpoint?

19              MR. LIEBMAN:  No.  His work on the job site of

20   the customers.

21              THE COURT:  I think he just said he did the same

22   thing.

23              MR. LIEBMAN:  All right.  Thank you, Judge.

24              THE COURT:  I mean that's my understanding.  If

25   that's wrong, tell me.

```
1              THE WITNESS:  That's correct, Your Honor.
2    BY MR. PANTAS:
3    Q.     And did you get paid by Allcom with checks payable to
4    Computer Solutions and Consulting, LLC?
5    A.     After a few weeks of starting working there, yes.
6    Q.     All right, sir.  And did you deposit them into a bank
7    account in the name of Computer Solutions and Consulting,
8    LLC?
9    A.     Yes.
10   Q.     And are you the sole owner and managing member of
11   Computer Solutions and Consulting, Incorporated?
12   A.     Yes.
13   Q.     I believe you testified that you started work at
14   Allcom in October of 2006, is that correct?
15   A.     It was September, October, yes, sir.
16   Q.     And that it continued until January of 2008?
17   A.     Yes, sir.
18   Q.     And that you received between five and ten work orders
19   on any day that you went to work?
20   A.     Yes.
21   Q.     And did you take a vacation your first year and go to
22   Venezuela for Christmas?
23   A.     Yes.
24   Q.     And how long were you gone?
25   A.     I believe about a week or two weeks.
```

1    Q.      Okay.  So you started in October and you had a

2    vacation that you wanted in December of the same year,

3    correct?

4    A.      I informed Clint Vigus before I started working there

5    that I was going to be going.

6    Q.      And you informed him of what days you wanted to get

7    off and you got off, correct?

8    A.      That's the -- not every time because a few times I

9    asked for days off and he will deny it.

10   Q.      Now, in the course of the time you were employed

11   there, your installation work you understood to be, to do it

12   in accordance with a package of specifications that you were

13   given or shown during a meeting on a Friday, correct?

14   A.      Yes.

15   Q.      And it was supposed to be done in accordance with the

16   specifications established by Bright House Networks,

17   Incorporated, correct?

18   A.      Yes.

19   Q.      And in all of the time that you were employed there,

20   how many times did anyone from Allcom ever come and observe

21   you doing the work?

22   A.      Multiple times.

23   Q.      All right.  Do you recall telling me on your

24   deposition that it happened maybe three times?

25   A.      Yeah, but on roughly every other week that you'll have

1    somebody that shows up when you're there or when you leave

2    the job they can still show up.

3    Q.      And when you were there, is it your job to talk to and

4    discuss matters with the customer?

5    A.      As far as like what kind of matters?

6    Q.      Ask them which parts of the equipment are working or

7    not working?

8    A.      We usually get a work order from Allcom and it says

9    what needs to be done.

10   Q.      Right.  And if the customer asks you how is this going

11   to work, did you have a duty to show them how it worked?

12   A.      Yes.

13   Q.      And did you have a duty to talk to them and answer

14   their questions?

15   A.      Yes.

16   Q.      And I believe you testified that you -- there was a

17   system where you entered when you arrived and when you left,

18   correct?

19   A.      Yes, sir.

20   Q.      And that when you got the work orders, each work order

21   had a window of two hours, and at some time during that two

22   hours you were supposed to get to that customer's house,

23   correct?

24   A.      Yes.

25   Q.      And if you had more than one for the same two hours,

1    do you recall telling me that it was up to you which one you

2    went to first?

3    A.     We were instructed to go to the nearest one first and

4    then move on to the next one.

5    Q.     So you would drive to the nearest one?

6    A.     Yes.

7    Q.     And when you finished that you'd drive to the other

8    one?

9    A.     Yes.

10   Q.     And were you instructed on what to do if you got there

11   and no one was home?

12   A.     Yes.

13   Q.     And you had responsibilities then if no one's home,

14   correct?

15   A.     I had to call the dispatcher, yes.

16   Q.     And if no one was home, you couldn't do the work,

17   correct?

18   A.     That's correct.

19   Q.     And would you then be getting a different assignment?

20   A.     I move on to the next one.

21   Q.     Or move on to the next one.  All right.  And do you

22   recall, sir, that when you went to work for Allcom you were

23   required to have certain specific tools in order to do the

24   work that you were going to do for them?

25           Let me rephrase or repeat the question to you.

1    When you first met with Mr. Clinton Vigus before you left

2    Knight and went to work at Allcom, sir, did you have anyone

3    else present in the room when you had that conversation?

4    A.    Yes.

5    Q.    Who was present?

6    A.    Freddie Colon, Walter Pareja, and I believe one of the

7    dispatchers was there, too.

8    Q.    All right, sir.  And did you learn then or shortly

9    thereafter that Allcom required cable installers to have

10   certain types of equipment in order to do the job?

11   A.    It wasn't discussed.

12   Q.    All right.  When did you learn that you needed to have

13   your own truck?

14   A.    I think we already knew.

15   Q.    It was just known when you were applying?

16   A.    Yeah.  It's just that when you do the cable

17   installation, you need to have a vehicle and just a small --

18   Q.    But at 180 Connect they supplied the truck, didn't

19   they?

20   A.    Yes.

21   Q.    So when did you know that you needed to have your own

22   truck to do cable installation for Allcom?

23   A.    I already had one mini van.

24   Q.    But did you know you needed it?

25   A.    Yes.

1    Q.      And did you know that you needed to have an extra tall

2    ladder?

3    A.      Yes.

4    Q.      And did you know that you needed to have a hammer

5    drill?

6    A.      Clint Vigus told us that we had to have a hammer

7    drill.

8    Q.      And did you know that you had to have a cable meter?

9    A.      He told us we had to buy our cable meter.

10   Q.      All right.  Now, you bought a cable meter, correct?

11   A.      Yes.

12   Q.      And how much did it cost?

13   A.      I'll estimate it was about $500.

14   Q.      And you bought a hammer drill, correct?

15   A.      Yes.

16   Q.      And how much did it cost?

17   A.      About 150.

18   Q.      And you already had a ladder?

19   A.      Yes.

20   Q.      And you already had handtools?

21   A.      Some of the tools, yes.

22   Q.      Now, what was your understanding when he told you you

23   had to have all those things and that you went and bought

24   them, why were you buying them?

25   A.      Because he said we were required to have all the

1    specific tools with us.

2    Q.      All right.  And you could have said, no, I don't want

3    to work here, correct?

4    A.      Yes.

5    Q.      All right.  And you could have said I want to be paid

6    as an employee and have taxes and Social Security withheld,

7    correct?

8    A.      We didn't say anything about that.  We didn't talk

9    about that.

10   Q.      You didn't even ask?

11   A.      No.

12   Q.      You didn't even -- but you did know that you had to

13   have your own truck and the tall ladder and anything that you

14   didn't have that was required like a cable meter and hammer

15   drill, you had to go buy it?

16   A.      Yes.

17   Q.      Why did you invest that money to go to work there,

18   sir?

19   A.      The hammer drill and the meter he told us when we were

20   already working there.  As a matter of fact, he lent me one

21   of his drills till I bought mine.

22            MR. LIEBMAN:  May it please the court, Your

23   Honor, referring the witness to the exhibits which are on the

24   witness sheet.  If you would take the rubber band off,

25   please, sir.

PARRILLA - CROSS

1    Q.      Mr. Parrilla, looking at exhibit number 1, on

2    September 30 of 2006 you obtained an occupational license

3    from Orange County, Florida to do cable installation,

4    correct?

5    A.      Yes, sir.

6    Q.      And that was before you applied for or took work at

7    Allcom, is that correct?

8    A.      No, sir.  I believe I started working at Allcom a

9    couple weeks before that.

10   Q.      All right.  And that license you obtained is in the

11   name of Computer Solutions and Consulting, LLC, is that

12   correct?

13   A.      Yes.

14   Q.      All right, sir.  If you turn now to exhibit number 2,

15   Mr. Parrilla, did you file a request to elect to be exempt

16   from worker's compensation requirements in the name of

17   Computer Solutions and Consulting, LLC?

18   A.      Yes.

19   Q.      And does it say you are an officer of the corporation

20   and it says owner, is that correct?

21   A.      Yes.

22   Q.      And that you, Antonio Parrilla, were the applicant for

23   this exemption?

24   A.      Yes.

25   Q.      All right, sir.  And if you would turn, please, to

1      exhibit number 4, can you tell me if exhibit number 4 are

2      printouts of computer information that you put in your

3      computer and then submitted to Allcom requesting payment for

4      those services you rendered to Bright House customers?

5      A.    I don't understand your question.

6      Q.    All right.  Do you see that each document that's part

7      of number 4 is labelled production sheet?

8      A.    I think I'm looking at the wrong --

9      Q.    Okay.  I'm asking you to look at number 4.

10     A.    Okay.

11     Q.    Okay.  Do you want me to restate my question?

12     A.    Yes, please.

13     Q.    Looking at number 4, are these printouts from your

14     computer?

15     A.    Yes.

16     Q.    And did you input the information that's in them in

17     your computer?

18     A.    Yes.

19     Q.    And did you submit them to Allcom?

20     A.    Yeah, that's what we were instructed to do to keep

21     track of everything that got done.

22     Q.    And did they pay you from these production sheets?

23     A.    They pay us from what Bright, supposedly from what

24     Bright House paid them.

25     Q.    And you submitted them in the name of Computer

1    Solutions and Consulting, LLC, is that correct?

2    A.    Yes.

3    Q.    And did you submit them for every week that you worked

4    at Allcom?

5    A.    Yes.

6    Q.    And if the first one that's dated that's in the record

7    says October 12, 2006 through October 14, 2006, sir, is it,

8    to the best of your recollection, true that your first day of

9    work as a cable installer on behalf of Allcom was on October

10   12, 2006?

11   A.    No.  Because when we were there at the beginning we

12   didn't have to do these ones.  He changed that.

13   Q.    So this didn't start until one or two weeks after you

14   started there?

15   A.    A few weeks later, yes.

16   Q.    If you'd look at exhibit number 5, please.  Mr.

17   Parrilla, did you obtain from the State of Florida a

18   certificate of election to be exempt from worker's

19   compensation law in the name of Computer Solutions and

20   Consulting, Incorporated?

21   A.    Yes.

22   Q.    All right, sir.  And in order to obtain that, did you

23   fill out and sign forms under oath stating that you were

24   working as the owner or officer of Computer Solutions and

25   Consulting, LLC?

1     A.     Yes.

2     Q.     All right, sir.  And did you, if you look at exhibit

3     6, did you file a statement of ownership attesting to the

4     fact that you are the owner of 100 percent of the units

5     issued of that company?

6     A.     Yes.

7     Q.     And if you would look now at exhibit number 9, please,

8     the first document, application for occupational license in

9     the name of Computer Solutions and Consulting, is that your

10    signature on it, sir?

11    A.     On exhibit number 9?

12    Q.     Number 9.  I'm sorry.  Exhibit 7.  I misread.  That

13    was the deposition one, not the one today.  Exhibit 7.

14    A.     Okay.  What was the question again?

15    Q.     Is that your signature applying for the occupational

16    license in the name of the company, Computer Solutions?

17    A.     Yes.

18    Q.     And the nature of the business is cable installation?

19    A.     Yes.

20    Q.     Look at the next page of that exhibit, the exemption

21    application receipt, and look at the second page of that

22    document.

23    A.     Okay.

24    Q.     Do you see at the top of the second page, section 9,

25    fraud notice?  Did you sign under that that you had read the

1    fraud notice?

2    A.      Yes, sir.

3    Q.      And below that the affidavit, did you sign the

4    affidavit, sir, that this was true and correct?

5    A.      Yes, sir.

6    Q.      And it represented to the state of Florida that you,

7    Mr. Parrilla, were employed by Computer Solutions and

8    Consulting, LLC, is that correct?

9    A.      Yes.

10   Q.      If you'd look at exhibit 8 for a second, please.  Did

11   you obtain a certificate of liability insurance, exhibit 8,

12   naming Allcom Communications as an additional insured on your

13   liability insurance?

14   A.      Exhibit 8?

15   Q.      Number 8, yes.

16   A.      Yes.

17   Q.      Turning you now to exhibit number 9, sir, you told me

18   when you were deposed that you know what a 1099 M I S C form

19   is, correct?

20   A.      I believe so, yes.

21   Q.      Exhibit number 9, did you receive that 1099 M I S C in

22   2006?

23   A.      I received this --

24   Q.      For the work you did for Allcom in 2006.  I'm sorry.

25   A.      Yes.  I actually received this from Clint Vigus in

1    about May 2007.

2    Q.    Yes.  After the year was over it was for 2006,

3    correct?  And you see the name of the recipient of the money

4    that is reflected there, correct?

5    A.    Yes.

6    Q.    And that's the company which you own 100 percent of,

7    correct?

8    A.    Yes.

9    Q.    And just above that name do you see the block that

10   says recipient's identification number?

11   A.    Yes.

12   Q.    And do you know what that number is?

13   A.    That's the ID number.

14   Q.    The tax ID number of the company Computer Solutions

15   and Consulting, LLC, is that correct?

16   A.    That's correct.

17   Q.    And that is not your personal Social Security number,

18   is it, sir?

19   A.    No, sir.

20   Q.    All right.  When Mr. Vigus gave you this, did you tell

21   him it was wrong?

22   A.    No, sir.

23   Q.    Did you, in fact, deliver it to the company that

24   prepares tax returns for you?

25   A.    Yes.

ROLLAND - CROSS 07/29/09

1    Q.      If you would turn, please, to exhibit number 10.  The

2    top half of that page, sir, do you see the 2007 1099 M I S C

3    form for Computer Solutions and Consulting, LLC, from Allcom

4    Construction and Installation Services, LLC?

5    A.      Yes.

6    Q.      And do you see the taxpayer ID number for Computer

7    Solutions and Consulting, LLC, on that form?

8    A.      Yes.

9    Q.      And did you receive this form from Allcom?

10   A.      Yes.

11   Q.      And did you tell them it was wrong?

12   A.      No, sir, I didn't say anything, no.

13   Q.      Did you tell them that they shouldn't pay that company

14   and report that income to the Internal Revenue Service under

15   that taxpayer ID number?

16   A.      I didn't inform.  That's how he had everything set up.

17   Q.      And did you, in fact, after receiving this form,

18   present it to the person or company who prepared tax returns

19   for you?

20   A.      Yes, sir.

21   Q.      And turning to the exhibit 11, sir, do you recognize

22   that as the 1099 M I S C for the work you did for Allcom in

23   2008?

24   A.      Yes.

25   Q.      And, again, it's in the name of Antonio Parrilla,

1   Computer Solutions and Consulting, LLC, is that correct?

2   A.      Yes.

3   Q.      And it has a taxpayer identification number of

4   Computer Solutions and Consulting, LLC, it does not have your

5   Social Security number on it, does it?

6   A.      Correct.

7   Q.      All right, sir.  And if you would, please, look at

8   exhibit number 12, the letter from the Internal Revenue

9   Service to Computer Solutions and Consulting, LLC,

10  determining the taxpayer identification number for that

11  company; you received that, correct?

12  A.      Yes, sir.

13  Q.      And if you look in the upper right-hand corner, you

14  received that on February 28 of 2006?

15  A.      Yes.

16  Q.      And that was eight or nine months before you applied

17  to become a cable installer with Allcom, is that correct?

18  A.      Yes, sir.

19  Q.      And how did Allcom get that taxpayer identification

20  number to put it on the 1099?

21  A.      A few weeks after I started working there he went

22  ahead and proceeded telling us what he had to set up for pay

23  and we had to turn in all paperwork, everything that he

24  required us to turn in.

25  Q.      All right, sir.  So you provided it to them?

1    A.    Yes.

2    Q.    You gave it to them?

3    A.    Yes.

4    Q.    At any time did you tell them you should be paying me

5    individually and you should be withholding taxes and Social

6    Security?

7    A.    We didn't talk about that, no, sir.

8    Q.    You never did that?

9    A.    Never did what?

10   Q.    Did you ever tell Allcom when they gave you a paycheck

11   in the name of Computer Solutions and Consulting, LLC, that

12   it was wrong, that it should withhold taxes?

13   A.    That was just the way he told us that he will pay us.

14   Q.    And you knew that when you went to work there?

15   A.    Initially he paid to our names and then he --

16   Q.    But he didn't withhold taxes or Social Security, did

17   he?

18   A.    No.

19   Q.    So the very first check you received didn't withhold,

20   correct?

21   A.    Right.

22   Q.    And did you tell him that was wrong?

23   A.    No.

24   Q.    And the very first check you received two or three

25   weeks later in the name of Computer Solutions and Consulting

1    LLC, did you tell him that was wrong?

2    A.      No, sir.

3    Q.      Did you tell them that they should be withholding and

4    paying you individually and not this company?

5    A.      That was never discussed, no.

6    Q.      How did you come to leave your position as a cable

7    installer with Allcom in January of 2008?

8    A.      How I left Allcom?

9    Q.      Yes.

10   A.      He gave me a letter saying that I couldn't work there

11   any more and pretty much terminate me saying that I charged,

12   I billed -- I did some work that was never actually done.

13   Q.      All right, sir.  If you would look for a moment at

14   exhibit number 13 -- which is not in evidence, Your Honor.

15   Is that a copy of the letter you just mentioned that you got

16   saying you couldn't work there any more?

17   A.      Yes.

18   Q.      There is no question in your mind, sir, that you

19   didn't choose to leave there, they chose to have you not do

20   the work any longer, correct?

21   A.      Right.

22   Q.      Do you know whether you ever asked if you could hire a

23   cable installer to work for you on this Bright House work

24   while you were employed at Allcom?

25   A.      If I ever asked Clint Vigus?  No.

```
 1     Q.      Did you ever ask for more work in order to make more

 2     money?

 3     A.      No, sir.

 4     Q.      Did you ever ask for less work because you didn't want

 5     to work as much?

 6     A.      Sometimes if I had something to do, then I will say

 7     that I need less work.

 8     Q.      All right, sir.  And was that request for less work

 9     honored?

10     A.      Not really.

11     Q.      No.  And you told me that there were ways in which you

12     could make more money if you did different types of jobs and

13     less money if you did different types of jobs that were on

14     these work orders, correct?

15     A.      The work that was specified in the work order, that's

16     what had to be done.

17     Q.      Right.  But different jobs pay different amounts?

18     A.      Yes.

19     Q.      And on some of the jobs you could do the jobs more

20     quickly and still make more money than you could on other

21     jobs?

22     A.      Yes.

23     Q.      And you told me that it was not within your control to

24     pick and choose the jobs, correct?

25     A.      That's correct.
```

1    Q.      Was it within your control to say I want more of these

2    jobs and less of these jobs?

3    A.      No.

4    Q.      Did you ever ask?

5    A.      It was his statement that we had to do the jobs that

6    he assigned to us, no questions asked.

7    Q.      And that was different from the way it was at Knight

8    Enterprises?

9    A.      Yes.

10   Q.      Is that the only way it was different between there

11   and Knight Enterprises?

12   A.      There is other things that were different, too.

13   Q.      Okay.  Do you recall telling me that when you were

14   doing cable installations for Knight Enterprises for the

15   customers of Bright House Networks, Incorporated, that you

16   were an independent contractor?

17              MR. PANTAS:  Objection.  Relevance, Your Honor.

18              THE COURT:  Well, it could be relevant.  We'll

19   have to see where it goes.  Overruled.

20              THE WITNESS:  I'm sorry.  Repeat the question one

21   more time.

22   Q.      Yes.  I'm asking you if you recall when your

23   deposition was taken in this case on June 23 of this year

24   that I asked you about your work at Knight Enterprises and

25   you said you worked there as an independent contractor?

1    A.       That was my understanding, but I think that's actually

2    determined by the law.  I mean after coming, looking --

3    Q.       Yes.  And when you worked at 180 Connect you worked

4    there as an employee, correct?

5    A.       Yes.

6    Q.       And that when you met with Mr. Vigus and decided to

7    become a cable installer for Allcom, you didn't ask about

8    that?

9    A.       He said he was, he'll pay us in piecework and that

10   wasn't really discussed, no.

11   Q.       Did you ask how much per piece they were going to pay?

12   A.       He had a sheet of paper what he'll pay us.

13   Q.       And you reviewed that before deciding to become a

14   cable installer for the customers of Bright House through

15   Allcom, correct?

16   A.       Right.  Yes.

17   Q.       And did they ask you, answer any questions you asked

18   them before you chose to go to work there?

19   A.       We only met with Clint Vigus a couple times and we

20   only talked about the work, not really about details of, you

21   know, when we will start, because he was still opening the

22   shop.

23   Q.       Did you ask?

24   A.       I didn't ask, no.

25   Q.       Okay.  You asked about the piecemeal pay scale, right?

1   A.     Yes.

2   Q.     Did you ask about anything else?

3   A.     About the piece, what he was paying, Freddie Colon was

4   the one that gave us the paper and he said this is it.  But

5   with Clint never got into details about that.

6   Q.     All right.  And is it -- I'm sorry.  Excuse me.

7          If you look at exhibit number, look at exhibit

8   number 10, please.  Yeah.  Look at section 7 on the first

9   half.

10   A.     Okay.

11   Q.     Non-employee compensation paid by Allcom to Computer

12   Solutions and Consulting, LLC, during 2007, sir.  Do you see

13   that?

14   A.     Yes.

15   Q.     Is that after these chargebacks you were mentioning?

16   A.     I'm not sure of that.

17   Q.     If something was charged back, it wasn't included in

18   the next check, correct?

19   A.     Right.

20   Q.     And it was not paid to you then because it was

21   deducted from the next check, correct?

22   A.     Right.

23   Q.     So to the best of your knowledge, the figure in

24   section 7 on exhibit number 10 reflects what was actually

25   paid to Computer Solutions and Consulting after taking into

1    consideration those chargebacks?

2    A.      I don't know about that.

3    Q.      Did you ask anybody about that?

4    A.      I haven't asked anybody, no.

5             MR. LIEBMAN:  May I have a brief moment, Your

6    Honor?

7             THE COURT:  Sure.

8             MR. LIEBMAN:  Your Honor, subject to the

9    possibility of calling the plaintiff during our case in

10   chief, the examination is concluded.

11            THE COURT:  All right.  Any redirect?

12            MR. PANTAS:  Just a couple questions, Your Honor.

13                     REDIRECT EXAMINATION

14   BY MR. PANTAS:

15   Q.      Mr. Parrilla, I want to get an idea of what any other

16   major differences were while you worked at Knight

17   Enterprises.  When you were at Knight Enterprises, were you

18   able to come and go when you pleased?

19   A.      Yes.

20   Q.      All right.  So if you didn't show up for two or three

21   days, was that a reason they would terminate you or --

22   A.      No, sir.

23   Q.      You could do that?

24   A.      Yes.

25   Q.      When you were there, you said you could pick the type

1    of work.  I think it's common sense, but let me just ask you

2    anyway.  Some jobs paid more than others, correct?

3    A.    That's correct.

4    Q.    Some jobs took more time than others, correct?

5    A.    Yes.

6    Q.    From your perspective, when you worked at Knight

7    Enterprises, what were the best jobs?

8    A.    The telephone installations.

9    Q.    Why were they the best jobs, from your perspective?

10   A.    They were, you got done quick and it was a lot easier,

11   a lot easier than the other jobs.

12   Q.    More money?

13   A.    Yes, sir.

14   Q.    More money, less time?

15   A.    Yes.

16   Q.    When you were at Knight Enterprises, could you just go

17   in and see if they had available those particular jobs and

18   just take those jobs?

19   A.    Yes.

20            MR. PANTAS:  That's all I have, Your Honor.

21            THE COURT:  All right.  Thank you.  You can step

22   down.

23            Let's take a ten minute recess.

24            (BRIEF RECESS.)

25            THE COURT:  Mr. Pantas, do you have another

VIGUS - DIRECT

```
1    witness?

2              MR. PANTAS:  Yes, Your Honor.  I call to the

3    stand Mr. Clinton Vigus.

4              MR. LIEBMAN:  He's in the witness room.  I'll be

5    happy to get him for you.

6    Whereupon:

7                        CLINTON VIGUS,

8    called as a witness, having been first duly sworn according

9    to law, testified as follows:

10                      DIRECT EXAMINATION

11   BY MR. PANTAS:

12   Q.      Mr. Vigus, could you please state your name for the

13   record?

14   A.      Clinton Vigus.

15   Q.      Spell your first name and the last name?

16   A.      C L I N T O N, V I G U S.

17   Q.      How are you connected up with the defendant in this

18   case?  Do you work there?

19   A.      Yes.

20   Q.      What type of job do you have with them currently?

21   A.      I'm the project manager.

22   Q.      What type of job did you have when my client, Mr.

23   Parrilla, was working for Allcom?

24   A.      I was project manager.

25   Q.      Did your job duties change throughout any point in
```

1    time --

2    A.      No.

3    Q.      -- from then to now?

4            You basically run the day to day, do you not?

5    A.      I'm sorry.

6    Q.      You run the day to day there?

7    A.      Yes.

8    Q.      Allcom is in the business of doing what?

9    A.      We do installs for Bright House Networks.

10   Q.      And my client was doing the actual installations,

11   correct?

12   A.      Yes.

13   Q.      Among other installers that worked there?

14   A.      Yes.

15   Q.      Now I'm going to touch a couple different things.  The

16   first thing I want to touch on with you is when my client was

17   initially hired, you were the one interviewing him, correct?

18   A.      Yes.

19   Q.      What was discussed at that interview?

20   A.      Basically when he wanted to start.  Very little as far

21   as the terms.

22   Q.      Just miscellaneous things in the beginning?

23   A.      Yes.

24   Q.      At some point he was required to have a corporation in

25   place, correct?

DOCUMENT 60-1   Filed 07/29/09

62

```
1     A.      Yes.

2     Q.      That didn't happen on the first day he started, that

3     happened sometime thereafter, correct?

4     A.      It was a requirement prior to him starting.

5     Q.      Right.  But he actually worked there without having a

6     corporation in place where Allcom paid the corporation

7     directly, correct, I think the first couple weeks or whatever

8     it was?

9     A.      I'm not aware that he did.  I believe that he was

10    incorporated prior to coming to work for us.

11    Q.      That's not what I'm asking.

12    A.      Okay.

13    Q.      I'll rephrase it.  The first two weeks of my client

14    working with Allcom, Allcom paid my client directly, not

15    through the corporation?

16    A.      I don't remember.

17    Q.      You don't know one way or the other?

18    A.      No.

19    Q.      Isn't it true that part of your duties is scheduling

20    the installers?

21    A.      Yes.

22    Q.      Let's talk about how that actually works on a day to

23    day basis.  Isn't it true that there is a particular program

24    out there that's provided to you all through Bright House

25    Networks?
```

A.      Yes.

Q.      That is the program where Bright House Networks

communicates to Allcom and whoever else their particular work

orders for the day?

A.      Yes.

Q.      Now, what Bright House basically tells Allcom is the

hundreds of work orders or however many there are per day,

all under Allcom's, I guess it's called a technician number?

A.      That's correct.

Q.      So all the work orders from Bright House just come in

in bulk, they go to you electronically?

A.      Yes.

Q.      And at that point you would assign, you look at the

schedule and figure out who's good for this job and who's

good for that job in terms of the installers and you assign

those particular work orders to particular installers,

correct?

A.      That's correct.

Q.      And that's how you --

            THE COURT:  Can I?

            MR. PANTAS:  Yes, sir.  Going too fast?

            THE COURT:  Bright House has numerous contractors

who provide installation services for them.

            THE WITNESS:  That's correct.

            THE COURT:  I mean how is your business assigned?

1    Is it a geographic location that you have?

2                   THE WITNESS:  Yes.

3                   THE COURT:  What is that area?

4                   THE WITNESS:  It's referred to as region two,

5    which is from Mount Dora all the way over to Oviedo.

6                   THE COURT:  Okay.  Thank you.

7    BY MR. PANTAS:

8    Q.      Allcom has the contract with Bright House for region

9    two?

10   A.      Yes.

11   Q.      And any orders in region two, Bright House will assign

12   Allcom's particular contractor number, whatever you want to

13   call it, to those particular bulk orders?

14   A.      Yes.

15   Q.      What do you take into account when you assign a

16   particular work order to a particular installer?

17   A.      Basically the geographic location of the job.

18   Q.      Anything else?

19   A.      No.

20   Q.      How about if somebody's brand spanking new and you're

21   not sure whether they know how to do the work or not, do you

22   take that into account?

23   A.      Generally I don't put anybody in the field unless

24   they're capable of doing everything.

25   Q.      Well, isn't it true that you guys provide training?

1    A.      If need be, yes.

2    Q.      All right.  So if the person requires training, would

3    you go ahead and assign a complicated job to them?

4    A.      I try not to release anybody into the field until

5    they're capable of doing everything.

6    Q.      All right.  So, well, how do you train them then?  Are

7    they not training out in the field?

8    A.      They're training with somebody else.

9    Q.      I see.  You don't assign work orders while they're

10   training?

11   A.      No.

12   Q.      Well, no, you agree with me?  You don't assign work

13   orders while they're training?

14   A.      I don't assign work orders to them while they're

15   training.

16   Q.      So what you're doing is assigning the work orders to

17   the already trained installer, and then you have the trainee

18   installer ride along with the trained worker?

19   A.      Yes.

20   Q.      Until you're sure that they can do the job?

21   A.      Yes.

22   Q.      And then you start assigning work orders to that

23   particular person that was the trainee?

24   A.      Yes.

25   Q.      How do you know if they're trained or not?  How would

DOCUMENT CORRECTED 07/29/09

66

1   you know if they're at the point, you know, the trainees are

2   at the point where they're completely trained and you can

3   trust that they can do the job?

4   A.      The person that has trained them will report to me

5   that they believe they're ready.

6   Q.      I got you.  Do you have a trainer or how does one get

7   trained or with whom I should say?

8   A.      A senior or an experienced person.

9   Q.      One of the other installers that is senior?

10  A.      Yes.

11  Q.      There's no special training guy or anything like that?

12  A.      No.

13  Q.      How about when you have an already trained installer

14  but they're out in the field and they have questions, is that

15  part of your duty, to answer those questions?

16  A.      Yes.

17  Q.      So if somebody doesn't know how to do a particular, I

18  don't know, modem connection of some type, they would call

19  you first or someone else first?

20  A.      They can call myself or a supervisor for support, yes.

21  Q.      There's only one supervisor there, right?  You're

22  calling yourself a manager?

23  A.      Yes.

24  Q.      There's one supervisor.  Who is that person?

25  A.      Fred Colon.

1    Q.     Is that the same supervisor that was the Fred Colon

2    that brought my client to Allcom in the first place?

3    A.     Yes.

4    Q.     Have there been any other supervisors?

5    A.     No.

6    Q.     You call yourself a manager because you are basically

7    the top level person in that location, correct?

8    A.     Yes.

9    Q.     You are not just a supervisor, you are a supervisor

10   and something more?

11   A.     Yes.

12   Q.     You agree that you share overlapping supervisory

13   duties with Mr. Colon over the installers and anybody else

14   that works for Allcom?

15   A.     Yes.

16   Q.     Now, when these work orders would come in from Bright

17   House to you on that computerized system, what is the detail

18   that comes over?  I mean the informational detail.

19   A.     I receive a total printout on the screen of the

20   computer of what the job is, how many lines might need to be

21   ran, what type of services the customer is getting.

22   Q.     And it's also got the customer name and address?

23   A.     Yes.  Everything.

24   Q.     Does Bright House communicate to you when, the window

25   of when they need that particular job to be done?

68

1    A.     Yes.

2    Q.     Is that something that you also take into

3    consideration when assigning or routing the jobs to the

4    individual installers?

5    A.     Yes.

6    Q.     So in other words, you're not going to give one

7    installer 17 different jobs in the same timeframe?

8    A.     Exactly.

9    Q.     Those timeframes are two hour increments?

10   A.     Yes.

11   Q.     When does the first increment start?

12   A.     Eight to ten.

13   Q.     Eight to ten in the morning?

14   A.     Yes.

15   Q.     Then you got a ten to twelve, twelve to two, two to

16   four?

17   A.     And four to six, right.

18   Q.     I remember from your deposition so I'm just going to

19   phrase it this way.  Isn't it true that the last timeframe is

20   less used than all the other ones in terms of assigning to

21   installers?

22   A.     I'm not sure I understand.

23   Q.     Let me just phrase it the way I probably should have

24   done in the first place.  How do you go about assigning work

25   within the timeframes?  Bright House gives you the

1    information, correct?

2    A.      Yes.

3    Q.      Is it more common to have more work done in the first

4    five timeframes versus the last one timeframe?

5    A.      Not necessarily.

6            THE COURT:  Wait a minute.  Your question, I

7    think, is is it more common for Bright House to have more

8    work within that time.

9            MR. PANTAS:  Yes, sir.

10           THE WITNESS:  It varies on a daily basis.

11   Q.      Okay.  Isn't it a fact that there's only one -- well,

12   back up.  Mr. Colon is not only a supervisor but he also is

13   an installer, correct?

14   A.      Yes.

15   Q.      So he has his own route of work orders to do for

16   particular days?

17   A.      Yes.

18   Q.      Isn't it true that he is the only installer that can

19   pick and choose which jobs he wants?

20   A.      Yes.

21   Q.      All the other installers, you basically tell them

22   which jobs to do?

23   A.      Based on their availability, yes.

24   Q.      You would agree that the truck signs, uniforms, and

25   the ID badges that the installers are required to carry and

ROLLAND DIRECT 07/29/09

70

1    keep all have Allcom as the identifying company along with

2    Bright House on occasion?

3    A.      Not on occasion.  Always.

4    Q.      So it's Allcom and Bright House on every identifiable

5    piece of --

6    A.      Except for the shirts.

7    Q.      Okay.  Let's go back.  How about we do it this way?

8    What forms of identification are there?  There's an

9    identification badge?

10   A.      Yes.

11   Q.      What does that say on it?

12   A.      Bright House and Allcom.

13   Q.      I got you.  There's a magnetic truck sign?

14   A.      Yes.

15   Q.      What does that say on it?

16   A.      Bright House and Allcom.

17   Q.      There's a shirt that the installers must wear,

18   correct?

19   A.      Yes.

20   Q.      What does that shirt say?

21   A.      Allcom.

22   Q.      It doesn't say Bright House on it?

23   A.      No.

24   Q.      Would you agree that Allcom holds out the installers

25   to the general public as employees?

1    A.      I don't understand the question.

2    Q.      All right.  If someone comes, theoretically -- well,

3    not theoretically.  When the installers go to someone's

4    house, all their identification says Allcom and or Allcom and

5    Bright House, correct?

6    A.      Yes.

7    Q.      There is no identification of their particular

8    company, if they have one?

9    A.      Right.

10   Q.      Why is that?

11   A.      We operate under Bright House's requirements.  That's

12   the identification is their requirement, not Allcom's.

13   Q.      Whose requirement?

14   A.      Bright House's.  We operate under what their contract

15   requirements are.

16   Q.      And their contract requirement is for Allcom to hold

17   out the installers as being employees of Allcom?

18   A.      I don't understand the word hold out, the term.

19   Q.      Would you agree that the person receiving the services

20   would have a reasonable basis to believe that that installer

21   is someone from Allcom?

22   A.      Actually they would be more likely to believe that

23   they're somebody from Bright House.

24   Q.      Even though the shirt says Allcom, the truck says

25   Allcom, their identification says Allcom?

```
 1     A.      The identification on the truck and on the signs are

 2     purposely, Bright House's logo is purposely larger than

 3     Allcom's by Bright House's requirements.

 4     Q.      Okay.  There was some talk of sheets called production

 5     sheets.  What are production sheets?

 6     A.      You can call it a production sheet or an invoice.

 7     Q.      Well, what are they?

 8     A.      It's a requirement on our contract that each

 9     subcontractor turns in an invoice to us weekly for the

10     production that he's done.

11     Q.      Okay.  Now, isn't it true that the only thing that

12     happens to those particular production sheets or invoices is,

13     let me make sure I got this exactly correct, is that they

14     simply, when they come into Allcom, the only thing that

15     Allcom does is store them in their files, which is the

16     installer file?

17     A.      Yes.

18     Q.      Nothing else happens to them, correct?

19     A.      No.

20     Q.      Okay.  So when Allcom gets the particular production

21     sheet or invoice from the installer, they take it, they look

22     at it, they put it in the file, nothing else happens?

23     A.      We verify it against what Bright House pays us on.

24     Q.      You do it at your level?

25     A.      Yes.
```

DOUGLAS DIRECT EXAMINATION

```
 1     Q.     Does that, does anything else happen with those

 2     production sheets or invoices, whatever you want to call

 3     them, on any other level other than at your level?

 4     A.     No.

 5     Q.     So you're the person that, that is what I'm getting

 6     at, you're the person that kind of matches it up and does

 7     whatever Allcom does with those sheets?

 8     A.     Yes.

 9     Q.     They don't go any other place?

10     A.     No.

11     Q.     Now, the installers must be at work at a particular,

12     within a particular timeframe in the mornings, correct?  You

13     give them a range of time to show up?

14     A.     We're available to check in their paperwork up until a

15     certain time.  Generally we're there until the last person

16     gets there.  I'm required to be at Bright House to check in

17     their paperwork from the day before by ten o'clock every

18     single morning.

19     Q.     That's what I'm getting at.  So the work orders,

20     basically the way the work orders, the way it happens is

21     Bright House electronically communicates to Allcom what work

22     orders there are, you route them to particular installers,

23     then Allcom prints them out physically?

24     A.     Yes.

25     Q.     And then hands them every morning to the individual
```

1     installer?

2     A.     Yes.

3     Q.     And then in order for Allcom to be paid, you must

4     physically get back those particular work orders and

5     physically go down to Bright House, wherever they're located,

6     and turn them in?

7     A.     That's correct.

8     Q.     And it's fairly important to get back the work orders

9     that were done the prior day because otherwise Allcom doesn't

10    get paid from Bright House?

11    A.     Of course.

12    Q.     So what time do you physically have to be at the

13    Bright House location?

14    A.     My check-in time for Allcom is ten o'clock.

15    Q.     How long does it take you to get there?

16    A.     Fifteen minutes.

17    Q.     All right.  So it's fairly close to where you work?

18    A.     Sure.

19    Q.     By the way, where is that location where Allcom's

20    management location, whatever you want to call it?

21    A.     Our office?

22    Q.     Yes.

23    A.     The address is 2578 Clark Street, unit four, in

24    Apopka.

25    Q.     And that's where all the installers gather in the

1    morning?

2    A.    Yes.

3    Q.    That's where all the weekly meetings occur?

4    A.    Yes.

5    Q.    That's where all the computers are?

6    A.    Yes.

7    Q.    Is that where all the equipment is stored that you get

8    from Bright House in order to give to the installers for them

9    to do a particular job?

10    A.    Yes.

11    Q.    There is one other place that Allcom operates out of

12    and that would be the home of Mr. Muller, correct?

13    A.    Yes.

14    Q.    What happens -- do you know what happens at the home

15    of Mr. Muller?

16    A.    No.

17    Q.    Okay.  Does Mr. Muller come to the Allcom office in

18    Apopka?

19    A.    If he needs to.

20    Q.    How often does he come?

21    A.    Very rarely.

22    Q.    What's that?

23    A.    There's no frequency or infrequency, just he has other

24    business that -- I run the company for him.  I, you know --

25    Q.    Let's give the judge an idea.  In a year how many

1    times --

2              THE COURT:  Why does that -- I don't care about

3    that.  What's that got to do with it?

4              MR. PANTAS:  You don't care, I don't care.

5              THE COURT:  You may have a reason to do it that

6    you need to enlighten me on.  I may care.

7    BY MR. PANTAS:

8    Q.    How often during a year?

9    A.    Maybe once or twice.

10             MR. PANTAS:  May I have a moment, Your Honor?

11             THE COURT:  Sure.

12             MR. PANTAS:  I have no more questions for this

13   witness, Your Honor.

14             THE COURT:  Let me ask some to fill in some gaps

15   and maybe save some time.

16             When was the plaintiff's contract or whatever

17   terminated?

18             THE WITNESS:  I believe it was in January of '08.

19             THE COURT:  Okay.  So let's take the year of 2007

20   then.  He was installing for you that entire year?

21             THE WITNESS:  Yes.

22             THE COURT:  How many installers did you have?

23             THE WITNESS:  Anywhere between 10 and 14 at that

24   time.  It fluctuates.

25             THE COURT:  It would fluctuate based on the

1     amount of orders you were receiving from Bright House?

2                THE WITNESS:  Actually we try to keep all of them

3     working.  They come and go.

4                THE COURT:  Just normal attrition.

5                THE WITNESS:  Yes, yes.

6                THE COURT:  And were the ones who were working

7     required to be at the office by a certain time each day?

8                THE DEFENDANT:  No.

9                THE COURT:  So if an installer wanted to come in

10    at two in the afternoon, he just shows up at two?

11               THE WITNESS:  We request that they are there at a

12    certain time every morning to help us report to Bright House.

13    If they have a situation where they can't show up by a

14    certain time, then hopefully, out of respect for us, they let

15    us know that they won't show up and we don't have a problem

16    with that.  If we schedule work for them starting at eight

17    o'clock in the morning, generally they're there to start

18    their first jobs by between eight and 8:30 in the field, so

19    they come in between 7, 7:30, 6:30, seven o'clock to check in

20    their paperwork so they can get a start on their day.

21               THE COURT:  Do they know the day before?

22               THE WITNESS:  They know usually.  It depends on

23    what time Bright House gives me my work.  Sometimes it's

24    early in the day the day before, sometimes it's in the

25    evening the day before, sometimes it's in the morning the day

1      of.  That's their system.  Which doesn't have a lot of

2      regularity.  But generally if they, if an installer has a

3      problem or a commitment due to family, doctor, something like

4      that, they let us know ahead of time and we let them take the

5      time off.  If they can't show up for their morning work and

6      they want just nothing but afternoon work, we try to honor

7      that.  So they can schedule themselves to work anytime that

8      they want, as long as they're letting me know ahead of time.

9      Obviously people's trucks break down, there's family

10     emergencies where they're unable to show up at all.  We just

11     try to distribute the work to other installers.

12                THE COURT:  But an installer can't call -- do

13     they call you by your first name?

14                THE WITNESS:  Sure they can.  Can you call me by

15     my first name?

16                THE COURT:  Can the installers -- is it Clinton?

17     Clinton as in President Clinton.  I mean the same name.

18                THE WITNESS:  Sure, yes.

19                THE COURT:  Can they call and say, *Clinton, I've*

20     *just decided I'm not going to work this morning*?

21                THE WITNESS:  Yes, they can.

22                THE COURT:  Would they be fired?

23                THE WITNESS:  No.

24                THE COURT:  Does that happen.

25                THE WITNESS:  Do I fire people?

```
 1                    THE COURT:  No.  No.  Do the installers just say
 2      I decided to sleep late this morning, I'll see you tomorrow?
 3                    THE WITNESS:  Yeah.  I have no problem with that.
 4      If they do it frequently, I might not use them any more as an
 5      installer.
 6                    THE COURT:  All right.  Go ahead.
 7                    MR. LIEBMAN:  Thank you, Your Honor.
 8                    THE COURT:  I hope I didn't muddle things up.
 9                    MR. LIEBMAN:  No, no.  And I'll try to limit
10      myself to the things that came up on direct because this is
11      part of our case in chief with this witness, Your Honor.
12                    THE COURT:  All right.
13                         CROSS EXAMINATION
14      BY MR. LIEBMAN:
15      Q.      The court asked you about the geographical locations
16      that Allcom services for Bright House.  Is there one or more
17      other company that services region two?
18      A.      Yes.  There's two other companies.
19      Q.      So Allcom is one of three companies that have
20      contractual arrangements with Bright House to do installation
21      in region two?
22      A.      That's correct.
23      Q.      And do these companies compete with one another to
24      hire and maintain good installers?
25      A.      Yes.
```

Rolland - Cross

80

1    Q.      And do installers jump ship all the time and change

2    positions all the time?

3    A.      Yes.

4    Q.      Is it one of your responsibilities to see to it that

5    Allcom has enough good, reliable, experienced installers

6    working for it in order to complete its contractual

7    relationship with Bright House?

8    A.      Yes.

9    Q.      All right, sir.  Now, as you heard the question that

10   the installer comes in to pick up his work in the morning and

11   turns in his paperwork from the day before, correct?

12   A.      Yes.

13   Q.      Isn't it true that they also pick up the things

14   necessary to do what's on the Bright House purchase order,

15   work order, when they come in?

16   A.      Yes.

17   Q.      Can you tell us what that is about?

18   A.      They review the work order and ask for whatever

19   equipment, whether it be set top converters for TVs, modems

20   for Internet service and MTAs for phone service.  If they're

21   low on connectors they can order them at that time.  If

22   they're low on cable or phone wire, they can order it at that

23   time.

24   Q.      Is this equipment the property of Bright House

25   Networks?

1    A.      Yes, it is.

2    Q.      And is Allcom responsible for it being utilized for

3    the purpose of providing service to Bright House customers?

4    A.      Yes.

5    Q.      And does Allcom have to account for this equipment to

6    Bright House?

7    A.      Yes.

8    Q.      And so there's a system by which each installer, after

9    getting his work orders, can check out the equipment that he

10   needs?

11   A.      Yes.

12   Q.      Is there a requirement in Allcom's arrangement with

13   Bright House that equipment be returned after it is picked up

14   from the field?

15   A.      Yes.

16   Q.      When does that occur?

17   A.      During check-in in the morning.

18   Q.      So someone needs to interface with an installer, not

19   just about today's work, but also about yesterday's work?

20   A.      That's correct.

21   Q.      And to see that that person has complied with Bright

22   House's requirements to bring back equipment that's being

23   replaced in the field?

24   A.      Yes.

25   Q.      Or bring back equipment which couldn't be installed

1    for one reason or another?

2    A.     Yes.

3    Q.     All right, sir.  And does Bright House provide that

4    equipment to Allcom's facility on a daily basis?

5    A.     No.

6    Q.     How often does it do that?

7    A.     I order my equipment and my materials from Bright

8    House on a weekly basis and I pick it up on a weekly basis.

9    Q.     All right, sir.  And your job requires you to be at

10   Bright House every day?

11   A.     Yes.

12   Q.     And Mr. Pantas asked you questions about something

13   called production sheets.  In front of you you will see a

14   package of exhibits.  If you will leaf down there to exhibit

15   number 4, please.

16   A.     Am I going backwards or forward here?

17   Q.     They're numbered with white stickers, you're looking

18   for the one with a white sticker that says exhibit number

19   four.

20   A.     Okay.

21   Q.     Are those what you call in your business invoices?

22   A.     Yes.

23   Q.     And who submitted those invoices to Allcom?

24   A.     This particular one, Antonio Parrilla.

25   Q.     And to the best of your knowledge, sir, are these all

1    the invoices that he submitted when he was a cable installer

2    for Allcom?

3    A.      Yes.

4    Q.      And were they maintained in the files of Allcom until

5    they were requested in this court proceeding?

6    A.      Yes.

7    Q.      And are you the custodian of the records of Allcom's

8    records?

9    A.      Yes.

10   Q.      And do you -- I did not understand your answer nor did

11   I understand the question.  Do you pay from these invoices?

12   A.      We pay from them as long as it's approved by Bright

13   House.

14   Q.      All right.  So this is one of at least two items that

15   is referred to by the person who is tasked with determining

16   how much to pay the installer?

17   A.      Yes.

18   Q.      And they are paid once a week, is that correct?

19   A.      Yes.

20   Q.      And does it sometimes occur that they get paid for

21   something that they shouldn't have gotten paid for?

22   A.      Yes.

23   Q.      And how is that accounted for?

24   A.      Six weeks after we receive our pay from our

25   transmittal from Bright House, we receive a final transmittal

1    from Bright House that has deducted codes that might not have

2    been caught at Bright House when they were initially checked

3    in, and if a code shows up on a certain installer, we catch

4    it and we try to take it back away from them.  We deduct it

5    from their invoice.

6    Q.     If they still work for you?

7    A.     Yes.

8    Q.     And are there times when Bright House informs you that

9    it will not pay for installation work which is shown on an

10   invoice because it's determined that it wasn't done

11   correctly?

12   A.     Yes.

13   Q.     And what happens concerning the payment of the

14   installer when that happens?

15   A.     We would deduct it from any monies that the installer

16   might have coming.

17   Q.     All right, sir.  And before you were a management and

18   supervisory person, were you a cable installer?

19   A.     Yes.

20   Q.     Are you still a cable installer?

21   A.     I consider myself to be.

22   Q.     All right, sir.  And how often do you or anyone else

23   who is in a supervisory or managerial role with Allcom go and

24   observe work being done by one of your installers?

25   A.     Not very frequently.

1 Q. All right, sir.  And does Bright House send inspectors

2 to inspect the quality of work?

3 A. Yes.

4 Q. And if they find something wrong, do they inform you?

5 A. Yes.

6 Q. And do you or other supervisors from Allcom make

7 checks of quality of work in the field?

8 A. Yes.

9 Q. But not when the installer is working, it's something

10 you do after they've left?

11 A. We might walk up on a job while a technician is there

12 and just spot check, which Bright House also does.

13 Q. And are there certain specific quality control

14 requirements established by Bright House which Allcom is

15 required to comply with --

16 A. Yes.

17 Q. -- in its installations?  And if you'd look at exhibit

18 number 17, can you tell me if those are the written quality

19 control documents --

20 A. Yes.

21 Q. -- that Bright House insists upon?

22 A. Yes.

23 Q. All right, sir.  And are those requirements made known

24 to the installers?

25 A. Yes.

1     Q.      And are the installers reminded from time to time of

2     those requirements?

3     A.      Yes.

4     Q.      And do installers ever complain about those

5     requirements?

6     A.      No.

7     Q.      And do installers ever say we don't know how to do

8     what this says?

9     A.      They have questions from time to time.

10    Q.      And are those questions answered?

11    A.      Yes.

12    Q.      Are they provided with any assistance that they may

13    ask for in understanding what the requirements are?

14    A.      Yes.

15    Q.      Did there come a time, sir, when it became necessary

16    to terminate Mr. Parrilla's company as an installer for

17    Bright House?

18    A.      Yes.

19    Q.      And was that your responsibility to accomplish that?

20    A.      Yes.

21    Q.      And did you, in fact, write a letter and submit it to

22    Mr. Parrilla's company to inform him that he was no longer a

23    contractor for --

24    A.      Yes.

25    Q.      -- Allcom?

1    A.      Yes.

2    Q.      Sir, if you would please look at exhibit number -- my

3    apologies, Your Honor.  I have to get a different set.

4                    THE COURT:  It should be 13.

5                    MR. LIEBMAN:  Yes, Your Honor.  Exhibit number

6    13.

7                    THE WITNESS:  Okay.

8    Q.      Would you look at 13, please, and tell me if you wrote

9    that letter?

10    A.      Yes, I did.

11    Q.      Did you sign it?

12    A.      Yes, I did.

13    Q.      Did you deliver it?

14    A.      Yes, I did.

15    Q.      And the items which are mentioned in it, were they

16    returned to Allcom?

17    A.      Yes.

18    Q.      All right, sir.  Now, there was a mention when Mr.

19    Pantas was inquiring of you about the employment interview,

20    if you will, the hiring discussion, the first time you met

21    with Mr. Parrilla.  Do you recall that?

22    A.      Yes.

23    Q.      Do you recall if he and you were the only people

24    present?

25    A.      I recall -- I believe the first time that we met with

1    Antonio or that I met with Antonio he came in with a

2    gentleman by the name of Ed Barrero.

3    Q.      All right.  And do you recall a meeting at which he

4    was present along with Mr. Walter Pareja and Mr. Fred Colon?

5    A.      That, I don't remember exactly who was there.  I seem

6    to remember Antonio and Walter coming in together, but I

7    don't know if that was the initial meeting that I had with

8    him.

9    Q.      All right, sir.  And is it true, sir, that you -- you

10   stated to Mr. Pantas's question that very little was said

11   during that meeting?

12   A.      That's correct.

13   Q.      Did you offer him employment as a cable installer with

14   Allcom?

15   A.      We discussed what his start date would be, yes.

16   Q.      His start date.

17   A.      Yes.

18   Q.      So before he even arrived in your office you had

19   determined that he was qualified?

20   A.      I had been informed by Fred that he was a good

21   installer for Knight Enterprises.  He was qualified.  I was

22   looking for experienced people at that time and we were

23   trying to bring people on so that we could start ramping up

24   to do installs for Bright House.

25   Q.      And do you know if he knew that Allcom worked with

1    cable installers as independent contractors or as employees?

2    A.    I believed that he knew that he would be an

3    independent contractor, and I believe that we discussed that

4    he would be an independent contractor at that time.

5    Q.    Did you show him the pay schedule list of what you

6    paid for installer jobs?

7    A.    Yes.

8    Q.    And do you know if it was the same as what Knight was

9    paying at that time?

10   A.    We weren't -- it wasn't the exact same, no.

11   Q.    Was it similar?

12   A.    Yes.

13   Q.    All right, sir.  And were you in the process of

14   attempting to hire as many good, qualified, experienced

15   Knight employees -- Knight independent contractors as you

16   possibly can?

17   A.    Not necessarily just Knight contractors, but I was

18   looking for good, experienced contractors, yes.

19   Q.    Were you seeing to it that the word was put out in the

20   community of cable installers that Allcom was new in town and

21   they were looking to hire and that they were an independent

22   contractor operation?

23   A.    Yes.  We actually ran an advertisement on what's

24   called the cable bar trying to attract independent

25   contractors.

1 Q.  What is the cable bar?

2 A.  It's a community, nationwide community for cable

3 installers, phone installers.  Anything involved with the

4 cable industry, you can go on there and find out technical

5 information, you can look for jobs, you can buy equipment.

6 It's the cable community for the nation.

7 Q.  Okay, sir.  Now, the jobs that Allcom contracted to

8 perform for Bright House's customers concerned telephones,

9 correct?

10 A.  Yes.

11 Q.  They concerned cable television?

12 A.  Yes.

13 Q.  And they concerned high speed Internet connections,

14 correct?

15 A.  Yes.

16 Q.  Now, in the cable industry, are there people who can

17 do one of those jobs but not others?

18 A.  There are companies that allow that, yes.

19 Q.  Were you looking to hire anyone who could not do any

20 one of those three things?

21 A.  No.

22 Q.  So the person who you were looking for knew how to do

23 all those three things, correct?

24 A.  Yes.

25 Q.  And knew how to do them to the Bright House

1      specifications?

2      A.      Yes.

3      Q.      Was that important to you?

4      A.      Yes.

5      Q.      All right, sir.  You were asked if you scheduled the

6      installers.  What system did you use, when Mr. Parrilla was

7      working at Allcom as an installer, what system did you use to

8      make up any individual installer's workload for the day?

9      A.      I used Bright House's electronic system, it's called

10     I-Coms (ph).

11     Q.      Yes.  But how did you put together the group for

12     installer two versus installer 16 or something like that?

13     Did you try to group them by the type of job, did you try to

14     group them by geography?

15     A.      I try to do it mostly by, well, definitely by

16     timeframe and definitely by geographical location.

17     Q.      And from what I heard, the distance between one end of

18     district two and the other is quite large, correct?

19     A.      Yes, it is.

20     Q.      So you wouldn't want to send somebody to the western

21     side and then back to the eastern side, right?

22     A.      We try not to.

23     Q.      You didn't try to group them in some way so that any

24     installer got more easy jobs?

25     A.      No.

1    Q.      Or any installer got more better paying jobs?

2    A.      No.

3    Q.      Okay.  You grouped them for efficiency of geography,

4    is that correct?

5    A.      Yes.  And meeting Bright House's timeframes.

6    Q.      All right.  Bright House's timeframes, when it says

7    eight to ten, it doesn't say you have to be there at eight,

8    does it?

9    A.      No.

10   Q.      You can fulfill their requirements if you're there at

11   9:59?

12   A.      That's correct.

13   Q.      And did you generally give installers two work orders

14   in the same two hour slot or one?

15   A.      Depending on the type of job, I might give somebody

16   two jobs in one timeframe.

17   Q.      And if they were geographically close together?

18   A.      Yes.

19   Q.      All right, sir.  You were asked a question about what

20   happens if somebody can't make it in today or somebody wants

21   to take off half a day or whatever.  Did you have a system in

22   place at Allcom where the contractors could say they wanted

23   more work or less work?

24   A.      They can request time off, if that's what you're

25   asking.  I mean everybody, unless they tell me otherwise, I'm

1    assuming they're available between the -- for the eight to

2    tens all the way up to the four to sixes unless they request

3    time off in between, in the middle of the day, at the end of

4    the day, or in the morning.

5    Q.      And what was the policy concerning their going on

6    vacation?

7    A.      We don't have one.

8    Q.      All right.  They can go when they want to?

9    A.      Sure.

10   Q.      Did Antonio Parrilla go on vacation shortly after he

11   became an installer for you?

12   A.      Yes.

13   Q.      Do you know where he went?

14   A.      I think he went to Venezuela.

15   Q.      Do you recall that he brought you a gift when he came

16   back?

17   A.      Yes, he did.

18   Q.      What was that gift?

19   A.      A bottle of rum.

20   Q.      And that was within the first six or seven weeks of

21   his being an installer there?

22   A.      I think he went around Christmas, and he started in

23   October of '06 and he went to Venezuela at Christmas time of

24   '06.

25                  THE COURT:  Was the rum Anniversario?

1           THE WITNESS:  I don't remember.

2           THE COURT:  The best rum in Venezuela.

3           MR. LIEBMAN:  Your Honor, I'm going to call Mr.

4    Vigus as part of my case in chief and I'm not going to ask

5    any more questions.

6           Let me just check with my partner.

7    BY MR. LIEBMAN:

8    Q.    When you were recruiting -- I assume from what you

9    said probably you're always recruiting installers in this

10   marketplace -- but when you were recruiting these people from

11   Knight, which included Mr. Parrilla, did you understand, did

12   they understand, is cable installation a technical skill

13   which is only held by a certain number of people?

14   A.    Yes.

15   Q.    How did you find out whether or not any particular

16   applicant had that skill?

17   A.    Basically if they show up with the proper equipment

18   already in place and, you know, they've got experience of,

19   you know, two or three years in this business, the training

20   is ongoing in this business as well, every single day there's

21   something new, a new product that comes out, but I assume

22   that if they've been in the field for a certain period of

23   time that they're qualified.

24          MR. LIEBMAN:  All right, sir.  Thank you.

25          THE COURT:  Redirect.

1          MR. PANTAS:  Thank you, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. PANTAS:

4     Q.     Let's continue with that particular thought.  Are you

5     saying that there's a particular skill involved, correct?

6     A.     Yes.

7     Q.     To do cable installation?

8     A.     Yes.

9     Q.     How long would it take to train someone to do cable

10    installation if they don't know anything?

11    A.     When I started in this business I was trained for two

12    weeks, rode with somebody, and was put in the field and

13    developed the skill, and the skill of cable installations

14    through on the job training, it's a different business IN

15    that every house that you go to is different.  You know, if

16    you're good with your hands and you like to work with tools,

17    it doesn't require a lot of training for the video portion.

18    The Internet portion with the computers and the phone portion

19    is a little bit more technical.  It's a, you learn as you go

20    in this business.

21    Q.     Correct.  So it's basically you train them on the

22    basics for a couple weeks and then the more they do it, the

23    better they get?

24    A.     Yes.

25    Q.     I'm a little confused as to something you said.

1    Initially when I asked about what time the installer's

2    supposed to get there your testimony was that Allcom requests

3    that they be there by, I believe you said what, 7:30?

4    A.    Yes.

5    Q.    So now Allcom is requesting the installers to be there

6    by a certain time.  But when opposing counsel was asking you

7    questions about the installers taking time off, you said that

8    the installers request the time off.  So I'm just curious as

9    to who does what.  Are you requesting the installers to show

10   up at a certain time during the day, and if they don't want

11   to be there, they request time from Allcom, or vice versa?

12   A.    It works both ways.

13   Q.    What works both ways?

14   A.    We request that they show up to pick up their work by

15   a certain time because of the way that I have to report to

16   Bright House.  Obviously the earlier that they get there, the

17   more efficient I am at reporting to Bright House.  If they,

18   as an independent contractor, if they request time off, they

19   have every right to do so, so it's just a matter of them

20   communicating with me that they're requesting time off.

21   Q.    Actually, Mr. Vigus, let me ask you, does an

22   independent contractor have to request time off from anybody?

23   Couldn't they just take off if they're truly an independent

24   contractor?

25   A.    Surely they can.

1     Q.      Why are they requesting any time off from Allcom?  Why

2     are they requesting any of it?

3     A.      Why are they requesting it?  I guess we ask that they

4     do so that we can prepare for work the next day.  It's not a

5     requirement.  We're requesting it.  We're not requiring it.

6     Q.      Actually that's not the testimony.  The testimony is

7     that the installers make their request, correct, for the time

8     off?

9     A.      Sure.

10    Q.      Let's just be clear.

11            All right.  I forgot to ask you, what days did

12    Mr. Parrilla actually work, was he like anybody else?

13    A.      Usually six days a week.

14    Q.      That's what I was going to get at.  Is it five or six

15    days a week that you schedule the installer typically?

16    A.      Six.

17    Q.      Friday meetings, what -- I forgot to ask you what

18    actually happens during those Friday meetings.

19    A.      I update the installers on things that are going on

20    with work.  I report to them where we are as far as how we

21    compare on our quality of work compared to other companies.

22    Just give them general information.

23    Q.      Now, you're talking about how Allcom is comparing the

24    quality of work with other companies?

25    A.      No.  How Bright House compares us with other

1     companies.

2     Q.      Who is us the question --

3     A.      Allcom.

4     Q.      So you're having a meeting with the supposed

5     independent contractors on how Allcom is doing?

6     A.      I'm having a meeting in regards to how the installers

7     are doing, and the installers are who make up Allcom.

8     Q.      The installers make up Allcom?

9     A.      Well, sure.

10    Q.      You agree with that?

11    A.      Sure.

12    Q.      Without the installers, there is no Allcom?

13    A.      Sure.

14    Q.      Would you agree with that, the installers do the work

15    that is central to Allcom's business?

16    A.      Sure.

17    Q.      Allcom does not have any installers that are, that it

18    considers employees, correct?

19    A.      No.

20    Q.      Has it ever?

21    A.      No.

22    Q.      Does it have any plans to?

23    A.      We've talked about it before.

24    Q.      Isn't it true you all got together recently and had a

25    meeting with all the installers?

1    A.      Yes.

2    Q.      About this particular issue?

3    A.      Yes.

4    Q.      What happened at that meeting?

5    A.      We discussed the possibility of the installers

6    becoming employees.

7    Q.      Isn't it true that at that meeting one of the items

8    that was brought up is that from now on, or at a certain

9    point, not today, but a certain point going forward that all

10   the installers would be considered employees?

11   A.      No.

12   Q.      Other than possibly in the future calling the

13   installers employees, what other changes will occur?

14                   MR. LIEBMAN:  Objection to relevance, Your Honor.

15                   THE COURT:  Sustained.

16   Q.      The production sheets or what's been called the

17   invoices, I'm a little confused about that, too.  You

18   initially said that you get something from Bright House as to

19   what particular installers, or actually it's not, it's which

20   work orders were accomplished correctly, correct?

21   A.      Accomplished correctly, is that what you said?

22   Q.      Is that what it is?

23   A.      No.  The work that I get on a daily basis from the

24   installers that I take to Bright House gets put, added,

25   checked in by Bright House, and it gets put on what's called

1 a green bar.  You can call it a transmittal, you can call it

2 anything you want.  It is a report back to us from Bright

3 House with the production that the installers have done that

4 is approved by Bright House.

5 Q. Okay.  And how do you know what to pay the installer?

6 Actually, rephrase.  How do you use that green bar in order

7 to figure out what to pay the installer?

8    THE COURT:  I don't see how that has anything to

9 do with what I have to decide.

10    MR. PANTAS:  Well, the only reason that I'm

11 asking it, Your Honor, is because the testimony is a little

12 conflicting.  On the one hand they're saying that the

13 production sheets that the installers are being used in order

14 to produce the payroll.  On the other hand we have the green

15 bar that's coming from Bright House that's confirming

16 everything.

17    THE COURT:  They reconcile the two and if there's

18 a difference they reconcile it.  I'm not confused.  I'm not

19 sure what it has to do with the issue of whether your client

20 is an independent contractor or not.

21    MR. PANTAS:  I think it will, maybe not with this

22 witness, but, okay.

23    THE COURT:  I mean you can ask all the questions

24 you want, but I don't see how it's relevant.

25 Q. One final question just to make complete certainty

1    about this.  You're the only one that actually receives the

2    invoices, correct?

3    A.      Yes.

4    Q.      You're the only one that compares the Bright House

5    invoices with -- I mean the Bright House green bars with the

6    invoice slash production sheet?

7    A.      Yes.

8              MR. PANTAS:  That's all I have.

9              THE COURT:  All right.  Thank you, sir.  You can

10   step down.

11             Who's next?

12             MR. PANTAS:  Call to the stand Walter Pareja,

13   Your Honor.  He's outside, I'll go get him.

14   Whereupon:

15                  WALTER PAREJA,

16   called as a witness, having been first duly sworn according

17   to law, testified as follows:

18                  DIRECT EXAMINATION

19   BY MR. PANTAS:

20   Q.      Good morning, Mr. Pareja.

21   A.      Good morning.

22   Q.      Could you please state your name formally for the

23   record?

24   A.      My name is Walter Antonio Pareja, P A R E J A.

25   Q.      Do you have any middle names or anything?

1   A.      Antonio.

2   Q.      Did you at some point work for Allcom Construction and

3   Installation Services?

4   A.      Yes.

5   Q.      Did you work during the timeframe that Mr. Parrilla

6   worked there?

7   A.      Yes.

8   Q.      When did you start and when did you finish working

9   with them?

10  A.      I worked, I worked maybe from -- you mean like the

11  dates or the time?

12  Q.      You don't have to give me exact dates, but the month

13  and year would probably be sufficient.

14  A.      I think it was September 2007, something like that.

15  Q.      Until when?

16  A.      Until maybe last year.

17  Q.      How many years did you work there?

18  A.      Maybe two or three.

19  Q.      Two or three.  So it couldn't have been '07, maybe it

20  was '06?

21  A.      Yeah.

22  Q.      Did you work there before Mr. Parrilla worked there?

23  A.      No.

24  Q.      Was it about the same time?

25  A.      About the same time.

1    Q.    During your employment, were you required to come to

2    work at a particular time for Allcom?

3    A.    Yes.

4    Q.    What time were you supposed to show up?

5    A.    7:00, no later than 7:30.

6    Q.    Okay.  Who told you that?

7    A.    Clinton.

8    Q.    Mr. Vigus?

9    A.    Yes.  I don't know his last name, but his name was

10   Clinton.

11   Q.    Did anybody from Allcom ever make you aware of what

12   would happen to you if you didn't show up before 7:30?

13   A.    Yes.

14   Q.    Who was that?

15   A.    Clinton.  Or Freddie.

16   Q.    The other supervisor?

17   A.    Yes.

18   Q.    What did they tell you?

19   A.    Well, you will be in trouble and they will either

20   penalize you with your route or will give you very bad work.

21   Q.    When you as an installer had to -- by the way, was

22   that the same for everybody?

23   A.    That was the same for everybody.

24   Q.    Was this conversation or conversations, were they in,

25   were they to you specifically?

1    A.     That was for everybody.  He would make meetings and
2    would tell everybody.
3    Q.     At meetings?
4    A.     Yes.
5    Q.     When you worked there, if you wanted to take time off,
6    how would you go about doing it?
7    A.     I would ask Clinton and he will either say yes or deny
8    it.
9    Q.     Have you ever been denied time off?
10   A.     Yes.
11   Q.     Do you know if Mr. Parrilla had ever been denied time
12   off after he requested it?
13   A.     Yes.
14   Q.     How do you know?
15   A.     Because we talk about it, you know, be upset.
16          MR. PANTAS:  All right.  That's all I have for
17   you.
18          THE COURT:  Okay.  Cross.
19          MR. LIEBMAN:  Thank you, Judge.
20                    CROSS EXAMINATION
21   BY MR. LIEBMAN:
22   Q.     Mr. Pareja, before you went to work at Allcom, where
23   did you work?
24   A.     Knight Enterprises.
25   Q.     Knight Enterprises?

1    A.      Yes.

2    Q.      What was your job there?

3    A.      Installing.

4    Q.      Cable installer.  And did you decide to change jobs

5    from Knight and go to work for Allcom?

6    A.      Yes.

7    Q.      Why did you make that decision?

8    A.      I don't think there was a particular reason, just a

9    different job.

10   Q.      Okay.  At Knight Enterprises were you an independent

11   contractor?

12            MR. PANTAS:  Objection, Your Honor, to the

13   relevancy.

14            THE COURT:  Overruled.  He can ask him what his

15   understanding of his position was, but you just asked him a

16   legal question.

17   Q.      When you worked at Knight Enterprises as a cable

18   installer, did you get paid with a payment where they did not

19   deduct income tax?

20   A.      What do you mean?

21   Q.      Were you paid by Knight Enterprises the gross amount

22   or did they withhold taxes and Social Security?

23            MR. PANTAS:  Let me just object as beyond the

24   scope of direct, Your Honor.  I don't know what it has to do

25   with whether Mr. Parrilla is an independent contractor.

1              THE COURT:  Overruled.

2              At the end of the year when you filed your taxes,

3     did you get a 1099 from your employer or a W-2.

4              THE WITNESS:  1099, sir.

5     BY MR. LIEBMAN:

6     Q.    And when you worked at Allcom, did you also get a

7     1099?

8     A.    Yes.

9     Q.    Did you have an understanding when you changed jobs of

10    what the relationship was between Allcom and cable

11    installers?

12    A.    Between the two, Knight Enterprises?  I don't

13    understand.

14    Q.    When you chose to leave Knight and go to Allcom, did

15    you find out whether they paid on a 1099 there?

16    A.    They paid on a 1099.

17             THE COURT:  His question is you knew that when

18    you left Knight that you were going to be paid on the same

19    basis at Allcom as you were being paid at Knight.

20             THE WITNESS:  That was my understanding, Your

21    Honor.

22             THE COURT:  Okay.

23    BY MR. LIEBMAN:

24    Q.    And in front of you there's a list, a package of

25    exhibits and they have white numbers on them, sir.  And I'd

1  ask you to refer to number 24.

2          MR. PANTAS:  Objection, Your Honor.  Those are

3  only supposed to be used for impeachment.  I'm not sure what

4  he's impeaching him about.

5          THE COURT:  Well, I don't know.  Let me see.

6          MR. LIEBMAN:  Let me do it a different way.

7  BY MR. LIEBMAN:

8  Q.     Mr. Pareja, did you form a company named Good Guys

9  Technology Solutions, LLC?

10 A.     Yes, sir.

11 Q.     And did you get paid in that name when you worked at

12 Allcom?

13 A.     Some checks, yes.

14 Q.     And did you get a 1099 in that name?

15 A.     Yes.  And Walter Pareja as well.

16 Q.     And did you obtain exemption from the requirements of

17 the state of Florida for worker's comp by stating that you

18 were an employee of Good Guys Technologies Solutions, LLC?

19 A.     I was told.

20 Q.     Did you do it?

21 A.     I was told to do it.

22 Q.     But did you do it?

23 A.     I was told to do it.

24         THE COURT:  Wait a minute.  The answer is yes?

25         THE WITNESS:  Okay.

PAREJA - CROSS - LIEBMAN

108

1                    THE COURT:  Okay.

2                    MR. LIEBMAN:  Thank you.

3      Q.      And did you obtain a business license in the name of

4      that company?

5      A.      Yes.

6                    MR. LIEBMAN:  Okay, sir.  I have nothing further,

7      Judge.

8                    THE COURT:  Mr. Pareja, you said when you were

9      working for Allcom, were the checks from Allcom payable to

10     Good Guys Technologies Solutions or payable to you

11     individually?

12                   THE WITNESS:  Your Honor, there was several times

13     that they paid the checks to me.

14                   THE COURT:  Individually?

15                   THE WITNESS:  Yes.  As Walter Pareja.

16                   THE COURT:  Why would they sometimes pay you

17     individually as opposed to the company?

18                   THE WITNESS:  I have no idea.  What I know is

19     that sometimes they will deduct some money from it for, I

20     think it was worker's comp, and sometimes, after they would

21     just pay the checks to the Good Guys Technology.  But I have

22     checks under both.

23                   THE COURT:  Okay.  Yes, sir.

24

25

REDIRECT EXAMINATION

1

2   BY MR. PANTAS:

3   Q.     Mr. Pareja, did you train other installers while you

4   worked for Allcom?

5   A.     Yes.

6   Q.     How long would the training period last?

7   A.     Usually a couple days.

8   Q.     When you received the individual checks, meaning the

9   checks to you versus Good Guys, were they basically the same,

10  for the same type of work that the checks to Good Guys were

11  made for?

12  A.     Yes.

13  Q.     In other words, it wasn't some kind of weird situation

14  where they would make out a check to you personally for

15  expense deduction?

16  A.     No.

17  Q.     It was for the installation work?

18  A.     Yes.

19          MR. PANTAS:  That's all I have, Your Honor.

20          THE COURT:  Thank you, sir.  You can step down.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Let's go ahead and take a lunch

23  break, but tell me what else you've got.

24          MR. PANTAS:  Thank you, Your Honor.  I'm just

25  going to call Mr. Muller and then I'm going to rest.

1            THE COURT:  Let's do that after lunch.  I've got

2     some other work I need to do, so let's be in recess until one

3     o'clock and we'll start promptly at one o'clock.

4            MR. PANTAS:  Can we leave everything the way it

5     is?

6            THE COURT:  Sure.

7            (LUNCH RECESS.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2               THE COURT:  Call your next witness.

3               MR. PANTAS:  Plaintiff calls John Muller to the

4     stand, Your Honor.

5     Whereupon:

6                        JOHN MULLER,

7     called as a witness, having been first duly sworn according

8     to law, testified as follows:

9     BY MR. PANTAS:

10    Q.      Good afternoon, Mr. Muller.

11    A.      Hi.

12    Q.      Could you please state your name for the record, spell

13    out your full name?

14    A.      John Muller, M U L L E R.

15    Q.      First name, middle name?

16    A.      Just John.

17    Q.      John is J O H N?

18    A.      Yeah.

19    Q.      What relation do you have with Allcom?

20    A.      I'm the owner of the company.

21    Q.      Have you always been the owner of the company?

22    A.      Yes.

23    Q.      Are you the one that created the company?

24    A.      Yes.

25               THE COURT:  Pull that microphone closer.  Not too

VOLUME II-DIRECT-DAVIS/S

1    close.

2    Q.     What do you do on a day to day basis for the company?

3    A.     I look for new work.  If there's a situation that

4    would present itself that would be contracts with Bright

5    House, I would get in the middle of that.

6    Q.     In other areas?

7    A.     Yes.

8    Q.     Other geographical areas?

9    A.     Yes.

10   Q.     Do you also do the payroll?

11   A.     Yes, we do.

12   Q.     We do?

13   A.     Yes.

14   Q.     You do?

15   A.     Yes.

16   Q.     You actually don't go to the Allcom office in Apopka

17   too often, do you?

18   A.     No, I don't.

19   Q.     Where do you do all these things?

20   A.     I have an office in my home.

21   Q.     Your home is where?

22   A.     In Tarpon Springs.

23   Q.     Now, when you're running the payroll, what documents

24   do you use in order to run the payroll?

25   A.     Clint receives the invoice from the subcontractor, he

1    takes that, matches it against the green bar, and reconciles

2    it, sends me a pay sheet, and then we cut the checks

3    accordingly.

4    Q.      All right.  So you don't actually do anything other

5    than look at the pay sheet based on the recommendation of Mr.

6    Vigus?

7    A.      Correct.

8    Q.      Are the installers required to set up a corporation

9    before they can do work for Allcom?

10   A.      We don't hire them unless they have that.

11   Q.      So they are required to do that if they want the work?

12   A.      Right.

13   Q.      As part of having the corporation set up, are they

14   also required to continue whatever needs to be done for the

15   company in order to keep the company current?

16   A.      By company you mean their corporation?

17   Q.      Theirs, yeah.

18   A.      Yes.

19   Q.      And that would include the work comp exemptions?

20   A.      Correct.

21   Q.      That would include the general liability insurance

22   with Allcom being an additional insured?

23   A.      Correct.

24   Q.      That would include county, city occupational licenses?

25   A.      Yes.

1    Q.      What else, if anything?

2    A.      I guess that's basically it, yeah.

3    Q.      Pretty much.  Will you agree that the installers did

4    not have the ability to negotiate whether or not they were

5    labelled as employees or independent contractors, correct?

6    A.      I don't know if I understand the question.

7    Q.      I took your deposition a while back, it was one of the

8    questions, but let me rephrase it.

9    A.      Sure.

10   Q.      When they first asked for work, do the installers have

11   the ability to negotiate with Allcom whether or not they're

12   employees or independent contractors?

13   A.      No.

14   Q.      Nor do they have the ability to negotiate the rates at

15   which they're paid?

16   A.      Correct.

17   Q.      Nor do they have the ability on how they're paid,

18   meaning piecework versus some other way?

19   A.      Correct.  They're paid piecework.

20   Q.      Only?

21   A.      Right.

22   Q.      And that's not negotiable?

23   A.      Correct.

24   Q.      They don't have the ability to negotiate when they're

25   paid?

1    A.       Correct.

2    Q.       They don't have the ability to pick and choose the

3    assignments that are assigned to them by Mr. Vigus?

4    A.       Correct.

5    Q.       So what do they have the ability to negotiate, if

6    anything, when they're being hired initially?  Can you think

7    of anything?

8    A.       No.

9    Q.       When you first started the company, you as the

10   managing member would have had to make a decision as to

11   whether or not you're going to have an employee based

12   business or an independent contractor based business or

13   somewhere in the middle, correct?

14   A.       Yes.

15   Q.       That was your decision when you made it?

16   A.       Yes.

17   Q.       From a business model perspective, is it more

18   profitable for Allcom to have subcontractors working for it

19   versus employees?

20   A.       Yes.

21   Q.       Why is that?  Is that a savings of some type in terms

22   of the expenses?

23   A.       Yes.

24   Q.       Basically you don't have to pay, if they're truly

25   independent contractors you wouldn't have to pay them payroll

1    taxes?

2    A.      Correct.

3    Q.      Work comp?

4    A.      Correct.

5    Q.      Liability insurance?

6    A.      Correct.

7    Q.      That would be a savings.  Overtime?

8    A.      Correct.

9    Q.      Other benefits such as unemployment, etcetera?

10   A.      Correct.

11   Q.      Was the additional profit that Allcom ultimately made

12   by labelling the installers independent contractors the sole

13   motivation for setting up the business that way?

14   A.      No.

15   Q.      What other motivation was there?

16   A.      The subcontractor also shares in making more money

17   that way, and it allows us to attract better talent.  Most of

18   the contractors want to come work for the company because

19   they do make more if they work for a company that pays them

20   as an employee, so it enabled us to attract better installers

21   by paying that way.

22   Q.      I'm not understanding that.  Why couldn't you have the

23   exact same pay and just treat them like employees versus

24   independent contractors, wouldn't they make the same?

25   A.      No.

1    Q.    They wouldn't make the same if you paid them exactly

2    the same way, in other words, piece rate for whatever you're

3    paying on a piece rate basis?

4    A.    It would have to be less because I'd have other costs,

5    so they would make less.

6    Q.    Okay.  They would make less in their pocket?

7    A.    Yes.

8    Q.    Would they have to pay taxes by themselves if they

9    were independent -- I mean employees versus independent

10   contractors?  No.  Right?  That would come out of payroll?

11   A.    Yes.

12   Q.    So that would be pretty much the same?

13   A.    I'm not --

14   Q.    In other words, if they're employees, the payroll

15   taxes are the same, whether independent contractors or

16   employees?

17   A.    Well, they get the cash flow to use that, I guess,

18   till they pay the taxes.

19   Q.    But they're better off because when they're 65 you

20   have to make a contribution to them in terms of the, in terms

21   of the Social Security deductions and your matching, correct?

22   A.    Yes.

23   Q.    So that's not a benefit between them being employees

24   or independent contractors, that's a negative?

25   A.    They don't view it that way.

1    Q.      They pay their own work comp or they're exempt from

2    work comp?

3    A.      Correct.

4    Q.      That's only a benefit to Allcom, not to my client,

5    correct?

6    A.      They can buy their own worker's comp policy, if they'd

7    like to.

8    Q.      If they're treated as employees, you would have to get

9    the work comp?

10   A.      Yes.

11   Q.      If they're treated as independent contractors, my

12   clients don't get any benefit from that, only Allcom does?

13   A.      Well, they'd get paid less if I had to supply that

14   insurance to them.

15           MR. PANTAS:  One moment, Your Honor.

16           THE COURT:  Sure.

17   Q.      You had created an affidavit and filed it in this case

18   a while back, correct?

19   A.      Yes.

20   Q.      Specifically the one that was made February 19 of

21   2009.  Do you remember that?

22   A.      I remember doing it.  I don't recall everything in it

23   right now.  I'd need to review it.

24   Q.      I'll put it on the screen for you.

25           One issue, Your Honor.  I marked up my copy.  Is

1  that going to be an issue for the court?  It's just

2  highlighted.

3          THE COURT:  Are you introducing it in evidence or

4  just asking to review it to refresh his recollection?

5          MR. PANTAS:  I have one that's clean that is an

6  exhibit.  I may be moving that into evidence.  I'm just

7  thinking about just showing it to him.

8          THE COURT:  Just show it to him.  I'll ignore the

9  handwritten stuff.

10  BY MR. PANTAS:

11  Q.    Let me show you the handwritten affidavit, Mr. Muller,

12  to refresh your recollection.  Do you see it on the screen?

13  A.    There's nothing on the screen.

14  Q.    Nothing on your screen?

15  A.    No, sir.

16          Okay.  There it is.

17  Q.    Is this the affidavit?  I'll show you the multiple

18  pages of it.

19  A.    Yes, I believe so.

20  Q.    Page two of the affidavit, specifically paragraph

21  three of your affidavit says that the installers basically

22  are required to enter into a written independent contractor

23  agreement, correct, that's what it said?

24  A.    Yes.

25  Q.    That's not true, is it?  Not all of them have a

VOLUME II - DIRECTED EXAMINATION

—120

1    written independent contractor agreement.

2              THE COURT:  It said all are required to.  It

3    doesn't say all of them had it.

4    Q.     Right.  They're all required to.  But it's not true

5    that all of them had a written independent contractor

6    agreement, correct?

7    A.     If you're speaking of Antonio Parrilla, I understand

8    his was not signed.

9    Q.     Okay.  So he doesn't have one?

10   A.     Correct.

11   Q.     Under paragraph 5A at the very bottom, the affidavit

12   basically says there's no minimum amount of payment due from

13   Allcom to LLC, instead LLC was provided with a daily list of

14   activity to be performed and a tentative schedule which had

15   been created by Bright House in conversation with its

16   customers.  That is not true, is it?  The schedule is created

17   by Mr. Vigus?

18   A.     That's right, yes.

19   Q.     So what did you mean when you said that Allcom simply

20   provides a daily list of services to be performed and a

21   tentative schedule that has been created by Bright House?

22   A.     I thought at that time it was done by Bright House.

23   Q.     I got you.  Just a mistake on your part?

24   A.     Yes.  I'm sorry.

25   Q.     It also says Allcom did not participate in the

1    creation of the schedule made by Bright House.  That is also

2    a mistake?  That is not true, correct?

3    A.      Correct.

4    Q.      On paragraph five, subsection C, it says Allcom did

5    not provide LLC with any vehicles, tools, equipment or

6    supplies, but the reality is that Allcom did provide the

7    equipment that was assigned to each particular task from

8    Bright House, given to Allcom, and Allcom would in turn give

9    it to the installers, correct?

10   A.      That's right, yes.

11   Q.      They were provided the equipment?

12   A.      I'm sorry.

13   Q.      They were provided the equipment?

14   A.      Yes.

15   Q.      And as far as supplies, the installers don't go out

16   and get their own supplies, right?  In other words, supplies,

17   the cable?

18   A.      No.  That's all supplied by Bright House.

19   Q.      Supplied to them by Bright House?

20   A.      Supplied to me in which I then give to the contractor.

21   Q.      Okay.  So Allcom gives it to the installers?

22   A.      Yes.

23   Q.      All right.  So that statement is not correct.  Allcom

24   does give supplies to the installers, correct?

25   A.      Correct.

1    Q.      When you created the schedule of the piecework

2    schedule and what prices you were willing to pay, did you

3    take into account how much time each item would actually take

4    a particular person to accomplish?

5    A.      You look at difficulty, how long it takes to complete

6    a task, and you also look at what the market is from your

7    competition.

8    Q.      So when you said in the same affidavit, paragraph

9    five, subsection E, that the amount of compensation was

10   wholly independent from the amount of time it required to

11   perform each particular job, that wasn't correct.  You took

12   that into account when establishing the schedule, correct?

13   A.      I think that's kind of taken out of context.

14   Q.      Put it into context for me.

15   A.      At the time that we're talking about is the time to

16   complete that task, so I look at the time that it takes, how

17   much time it takes to perform, whether it be hooking up

18   cable, telephone or high speed Internet, the difficulty in

19   doing that, and also what the prevailing rate would be from

20   my competitors.

21   Q.      So the amount of compensation that you decided a

22   particular task Allcom was willing to pay for a particular

23   task, you went and took into account how much time you

24   thought someone should take?

25   A.      To do any part of it, but not solely by itself,

1    correct.

2    Q.      With other factors?

3    A.      Correct.

4    Q.      That's what you meant under that paragraph, correct?

5    A.      Yes.

6            MR. PANTAS:  That's all I have, Your Honor, for

7    this witness.

8            THE COURT:  Okay.

9            MR. LIEBMAN:  May it please the court.

10                         CROSS EXAMINATION

11   BY MR. LIEBMAN:

12   Q.      Mr. Muller, you testified that you are the sole owner

13   and managing member of Allcom Construction and Installation

14   Services, LLC, is that correct?

15   A.      Yes.

16   Q.      And was that company formed especially for the purpose

17   of contracting with and performing cable installation

18   services for Bright House Networks, Inc. in division two?

19   A.      Yes, that's right.

20   Q.      All right.  Before you did that, had you been involved

21   in the cable installation industry previously?

22   A.      Yes, I have.

23   Q.      And have you been the owner of cable installation

24   companies before?

25   A.      Yes, I have.

1    Q.     All right, sir.  And are you familiar with the fact

2    that in the industry there are some installation companies

3    which use an employee model for their cable installers and

4    some who employ an independent contractor model for their

5    cable installers?

6    A.     Yes.

7    Q.     And did you personally make a decision which model

8    would be used by Allcom?

9    A.     Yes.

10   Q.     And you mentioned two factors or maybe three while Mr.

11   Pantas was asking you questions, one of which was

12   profitability to you, one of which was the preferences of the

13   cable installers.  Were there other factors which led you to

14   make that determination specifically concerning the contract

15   in division two?

16   A.     Yes.  There was a company that was there working

17   before me who had the contract called Cavo Communications.

18   Q.     Is that spelled C A V O?

19   A.     That's right.

20   Q.     All right.

21   A.     I had known the owner just from being in the industry,

22   we had had a business relationship.  He was based out of the

23   Illinois area and he was here performing these installations

24   in Orlando, and he was having a problem attracting labor.

25   And Bright House was getting very disappointed and upset with

1    the type of work that he was producing.  So he had contacted

2    me and basically gave me that contract, and I had made a

3    decision based on that to use subcontractors.

4    Q.     What was the employment model used by Cavo which was

5    failing in this area?

6    A.     He used employees.

7    Q.     All right, sir.  So in your determination to take over

8    and perform the Cavo contractual responsibilities to Bright

9    House Networks, Inc., did you determine that one of his

10   problems was because of the model he was using?

11   A.     Yeah.  That's why he was, he wasn't able to pay

12   enough, he wasn't getting quality people, and the work was

13   suffering, and Bright House was about to cancel his contract

14   had I have not taken it.

15   Q.     All right, sir.  And were you successful and did

16   Bright House enter into a new contract with Allcom?

17   A.     Yes.

18   Q.     And is that contract still in effect?

19   A.     Yes, it is.

20   Q.     And when Mr. Parrilla first started to be a cable

21   installer with Allcom, were you still performing under the

22   Cavo contract?

23   A.     Yes, I was.

24   Q.     And do you recall when the Cavo contract ended and the

25   Allcom contract was issued?

1    A.      We assumed that contract, I believe our first day was

2    somewhere in September of '06, and it was complete under Cavo

3    about the end of the year, and sometime in January or

4    February a new contract was executed in Allcom's name.

5    Q.      All right, sir.  And did you establish other

6    procedures for the business operations of Allcom when you

7    created it and started to perform this contract that Cavo

8    had?

9    A.      I'm not sure I understand.

10   Q.      Did you sit down and write a list of rules and

11   regulations or a memorandum of any kind that this is how we

12   will do business?

13   A.      I'm not sure if I really understand.  I'm sorry.

14   Q.      Before you formed Allcom, did you -- you did own other

15   companies which did this work?

16   A.      Yes.

17   Q.      And did they use the independent contractor model?

18   A.      Yes.  Yes.

19   Q.      And did you already have a contract that you used in

20   this other company?

21   A.      Yes.  That's right, yes.

22   Q.      Would you refer to exhibit number 15, please?

23   A.      Okay.

24   Q.      Do you recognize exhibit number 15, sir?

25   A.      Yes.

1    Q.      And what is that?

2    A.      That's our independent contractor agreement.

3    Q.      And when you established Allcom --

4    A.      Yes.

5    Q.      -- and it began to hire installers, did you instruct

6    your staff that the installers were to be provided with this

7    agreement?

8    A.      Correct.

9    Q.      And when you signed the affidavit, was it your

10   understanding that everyone had signed it?

11   A.      That's right.

12   Q.      And you since learned that they were given it and

13   returned it and some did not sign it, is that correct?

14   A.      Actually I learned it at the deposition, but, yes.

15   Q.      All right, sir.  And whether it is signed or not, sir,

16   does this agreement contain the terms and conditions of what

17   Allcom wants the rules of the road to be with all of its

18   cable installers?

19   A.      Yes.

20   Q.      Is it true at this time, and was it true at the time

21   that you started the company, that this is what you expected

22   the installers to do and this is what you expected your

23   company would do for the installers?

24   A.      Yes.

25   Q.      Was it your understanding of the relationship between

1    Allcom and the cable installers when you first started the

2    company and to the present time that the installers can hire

3    others to work for them?

4    A.      Yes.

5    Q.      They can hire other subcontractors to work for them?

6    A.      Yes.

7    Q.      They have the sole responsibility to determine the

8    manner in which the work is performed?

9    A.      That's right.

10   Q.      As long as it is consistent with established trade

11   standards and practices?

12              THE COURT:  You're just testifying now, sir.

13   These leading questions of your own client don't do me much

14   good.

15              MR. LIEBMAN:  Understood, Your Honor.  Thank you.

16              (DISCUSSION OFF THE RECORD.)

17   BY MR. LIEBMAN:

18   Q.      In the operations of Allcom since it was started in

19   late '06 to the present, have there been occasions when cable

20   installers have hired employees or other installers to work

21   and be billed with the same billing?

22   A.      Yes.

23   Q.      Can you recall the names of any of those persons?

24   A.      I don't recall the name of the corporation, but I know

25   the two individuals, Jason Richardson and, I think, Lindsey

1   Richardson.

2   Q.      All right, sir.  And have you ever issued any

3   instructions or policy changes that would change anything

4   that's in exhibit 15?

5   A.      No.

6           MR. LIEBMAN:  Thank you, Your Honor.  Subject to

7   direct.

8           THE COURT:  All right.  Redirect.

9           MR. PANTAS:  Yes, Your Honor.

10                     REDIRECT EXAMINATION

11  BY MR. PANTAS:

12  Q.      Mr. Muller, do you actually know whether or not the

13  contract that's been marked as exhibit 15 was ever even

14  communicated to my client?

15  A.      I'm sorry.

16  Q.      Do you have personal knowledge that that contract was

17  ever even communicated, in other words, handed to him?

18  A.      Clint told me he did.

19  Q.      Clint told you that he gave the contract to my client?

20  A.      To all of the installers, correct.

21  Q.      To my client specifically.  Not in general.  I want to

22  know if you have personal knowledge that my client got a copy

23  of that contract.

24  A.      No.

25  Q.      Okay.  You testified that Allcom's policy is that the

1     installers could hire other installers?

2     A.      Yes.

3     Q.      And you mentioned two names.

4     A.      Yes.

5     Q.      They're the only people that have ever had that

6     situation?

7     A.      To my knowledge, there may have been someone else, but

8     Clint would be better to answer that question.  I just know

9     of that one.

10    Q.      That's the only one you know of?

11    A.      That I know of, yes.

12    Q.      Isn't that a husband and wife team?

13    A.      Yes, it is.

14    Q.      And isn't it true that each one was an installer and

15    Allcom gave each one a particular schedule for the day?

16    A.      No.

17    Q.      Are you sure about that?

18    A.      We made one check is all I know from my position.

19    Q.      That's not what I'm saying.

20    A.      I don't know that answer then.

21    Q.      That's not what I'm saying.  Allcom made one check to

22    their company?

23    A.      Yes.

24    Q.      Isn't it true that each one of them had a particular

25    daily schedule as an installer?

1    A.      I don't know.  I don't know.

2    Q.      So if that is true, and we'll confirm it with Mr.

3    Vigus, but if that's true, then your testimony is not

4    correct, that an installer can hire another installer to work

5    in his stead?

6    A.      I don't agree with that.

7    Q.      You don't agree with that?

8    A.      No.

9    Q.      Was there ever a time that an installer hired an

10   employee of his to do whatever installation work Allcom

11   assigned where he would make a profit only and not do any of

12   the work?

13   A.      I don't know.  Could have.  I don't know.

14   Q.      Could have.  You don't know of any circumstances?

15   A.      That's correct.

16   Q.      The only circumstances you know of is the husband and

17   wife team?

18   A.      Correct.

19   Q.      Okay.  When you took over Cavo, the Cavo contract with

20   Bright House, did you also take over any of the assets of

21   Cavo?

22   A.      They had sold me some of their computers, their desks,

23   things like that.

24   Q.      Were you in the same facility?

25   A.      Yes.

```
 1    Q.      So everything pretty much stayed the same?

 2    A.      Yes.

 3    Q.      What was the only difference, the way the installers

 4    were paid?

 5    A.      Actually when he had transferred it over, there were

 6    no more employees.  We started from scratch, so I hired all

 7    new people.

 8    Q.      Were the installers doing the same job after you

 9    hired --

10    A.      There was different people.  It wasn't the same

11    people.  In other words, none of the employees that worked

12    for Cavo worked for me.

13    Q.      Let me ask it a different way.

14    A.      Okay.

15    Q.      Do you know how Cavo treated their employees?

16    A.      I don't know.

17    Q.      You don't know.  So you don't know if there's any

18    difference, real difference in --

19    A.      I just know he paid them as employees and treated them

20    that way, supplied them with trucks, tools, all those things.

21                    MR. PANTAS:  That's all I have, Your Honor.

22                    THE COURT:  Okay.  Thank you, sir.  You can step

23    down.

24                    Do you have anything else, Mr. Pantas?

25                    MR. PANTAS:  No, Your Honor.  We rest.
```

1              MR. COOPER:  Your Honor.

2              THE COURT:  Yes.

3              MR. COOPER:  I'd like to make a motion.

4              THE COURT:  Okay.

5              MR. COOPER:  Your Honor, based upon the evidence

6       that's been presented to the court, the defendant Allcom

7       moves for an involuntary dismissal on the grounds that there

8       has not been a prima facie case established sufficient to

9       justify an award in favor of Mr. Parrilla.

10              Clearly the burden of proof is on the plaintiff

11       to establish that he is an employee at law, and as we've

12       cited in our memorandum, there is a case -- well, the case

13       law is clear that there are predominantly six factors that

14       the courts look at in determining whether or not an

15       individual is an independent contractor or an employee.

16       Those six factors have been considered most recently by the

17       Eleventh Circuit in the Freund case which was decided in 2006

18       and which is cited in our trial brief and stands for the

19       proposition, in our view, that under circumstances

20       surprisingly similar to this, a cable installer is, at law,

21       an independent contractor and not an employee.

22              THE COURT:  Well, I don't know that you can read

23       the case that broadly.  First of all, it was not a published

24       opinion.

25              MR. COOPER:  I'm sorry.  I didn't hear.

1          THE COURT:  This was not a published opinion, so

2     I don't think you can read it as broadly as you're suggesting

3     saying that because of this case, an opinion which was

4     unpublished, any cable installer, no matter how he's treated

5     by his specific employer, is an independent contractor.  That

6     doesn't wash.

7          MR. COOPER:  And I certainly didn't mean to make

8     that suggestion.  I'm not suggesting that, Your Honor.  But

9     what I am suggesting is that based upon the testimony before

10    this court and in considering the six factors that were set

11    forth by the Supreme Court in the Rutherford, case which I've

12    also cited, that there is simply no record before this court

13    at this point in time to establish the proposition that the

14    plaintiff is an employee as opposed to an independent

15    contractor, and plaintiff has failed to meet its burden.

16          The six factors that are set forth by the court

17    in Rutherford and which were discussed by the Eleventh

18    Circuit in Freund are not completely dispositive.  The courts

19    have made it clear that they're to look at all of the

20    circumstances.  But the courts have also said that in

21    analyzing those circumstances, the end lesson, the end goal,

22    so to speak, is to determine to what extent, if any, the

23    individual is economically dependent upon the putative

24    employer.

25          The testimony that has been presented to the

1    court from the plaintiff has dealt almost exclusively with

2    only one of those six elements that were set forth by the

3    court in Rutherford, that was the question of control.  But,

4    Your Honor, the question of control is relevant only to the

5    extent that we're looking at the question of economic

6    dependence or economic independence.

7              I think what the testimony has shown here is that

8    Mr. Parrilla made a choice.  He knew the way he was treated

9    at I80, he knew the way he was treated at Knight.  He then

10   made a choice to proceed with what he understood to be an

11   independent contractor relationship when he got to Allcom.

12   That choice which he made mitigates against, contradicts the

13   notion that he was somehow economically dependent upon Allcom

14   because he knew what he was doing, he voluntarily chose to

15   proceed, he received his income by 1099s, he reported it

16   accordingly, and he elected to be where he was.  But that

17   still is only one of the six factors that's set forth by the

18   court in Rutherford.

19             The other five factors have not really been

20   addressed by the plaintiff at all.  The first factor being

21   control.  The second factor is the alleged employee's

22   opportunity for profit or loss depending upon his managerial

23   skill.  And I think the record before this court shows that

24   he had the ability to ask for more work or less work.  If he

25   was more efficient, he would make more money; if he was less

1      efficient, he would make less money.

2              He had the opportunity --

3              THE COURT:  That's true of anybody that's paid on

4      a piecework basis.

5              MR. COOPER:  Correct, Your Honor.  And, again,

6      it's simply one of multiple factors that the courts look at,

7      but that one factor and the ability that he could have hired

8      employees to work for his own profit center, but he elected

9      not to.  The same situation that we had in the Freund case

10     where the putative employee did not hire people to work for

11     him, but the court found it significant that he could have

12     and that he simply never asked.

13             The third factor set forth by the court in

14     Rutherford is the alleged employee's investment in equipment

15     and materials.  And I think here the testimony is clear.

16     When Mr. Parrilla elected to go to work for Allcom, he

17     provided his own vehicle, he purchased his own tools, he

18     testified that he purchased a computer meter device at a cost

19     of approximately $500.  These were expenses that he incurred

20     in expanding his own business.

21             The next factor considered by the court in

22     Rutherford is to what extent the service rendered requires a

23     special skill, and I think the testimony here has been that a

24     special skill is required to do what these installers do.

25     There is case law which we've cited in our memorandum in

1    which other courts have already determined that individuals

2    who install cable under circumstances such as this are

3    skilled tradesman in skilled trades.

4           The fifth factor is the degree of permanence of

5    the working relationship, and it was clear that there was no

6    permanence.  They could come or go as they elected.  And, in

7    fact, Mr. Parrilla acknowledged that five or six weeks after

8    he began this relationship he took a vacation and went to

9    South America.

10          And the last factor that's set forth by the court

11   in Rutherford is the question of to what extent the work by

12   the putative employee is integral to the company's business.

13   Just as in the Freund case, we acknowledge that what

14   installers do is essential to the business of Allcom, but

15   that's of the six factors.  I believe that the testimony

16   before the court at this point only establishes one of those

17   factors, and, at best, deals with two of them; the integral

18   nature of the work and the extent of control.  Although the

19   extent of control here exercised over this man, the wearing

20   of a shirt, the posting of a sign, all existed in the Freund

21   case and, notwithstanding, the Eleventh Circuit sustained the

22   ruling by the district court that that installer was an

23   independent contractor as opposed to an employee.

24          So in short, Your Honor, four of the six points

25   set forth in Rutherford have simply not been addressed.

1     There's no evidence to support them.  And we believe that the

2     plaintiff has failed to make a prima facie case.

3                    THE COURT:  All right.  Mr. Pantas.

4                    MR. PANTAS:  I'm not sure how much argument I

5     need on this particular point, Your Honor, but as far as the

6     degree of control, in this particular case obviously there's

7     a lot of control exercised by Allcom over the installers.

8     Everywhere from they schedule every single work order, they

9     have to be there, there's evidence that they have to be there

10    at a particular time, there's evidence that they're

11    supervised to some degree, there's evidence that they're

12    required to do training, there's evidence that they've been

13    trained, etcetera.  So I believe the degree of control,

14    there's plenty of testimony, plenty of evidence.

15                   As far as the relative investment, it's the

16    relative investment, it's not just if they made an

17    investment.  The relative investment in this particular case

18    comes down to, I believe the testimony was $500 for a meter,

19    some miscellaneous handtools.  The vehicle he already had

20    prior so he did not have to make an investment for this

21    particular job at all.  And not only that, but he uses it for

22    personal use.  And there's a $150 other tool, I believe some

23    type of drill.  So the relative investment is minor at best.

24    That particular element goes to the side of Mr. Parrilla

25    being an employee.

1          The opportunity of profit and loss is exactly

2     what the court said.  Ultimately each and every piecework

3     type job, you can make the same argument.  The faster and

4     harder the employee works in turning out the pieces, the more

5     money they're going to make.  That is not real significant in

6     terms of this particular case.

7          What is significant is that they don't negotiate

8     the rates, they don't negotiate basically anything is what

9     the testimony of Mr. Muller was.  They do not have, more

10    significantly, they do not have the ability to pick and

11    choose the more lucrative work from some of the testimony.

12    Some of the lucrative work includes the cable modems.  They

13    get paid a lot of money for something that takes less time

14    than taking off a tap, for instance, that they get paid very

15    little and it can take them a whole lot of time.

16          So that, I think, is the most significant part of

17    that particular element, the opportunity for profit and loss.

18    If you can control what work you do and when you can do it,

19    then I would suggest that it probably goes toward a, more

20    toward an independent contractor relation versus employee.

21    When they don't have that ability, they are fundamentally

22    stuck with whatever Allcom or what any other putative

23    employer decides that they should make.  They are assigned

24    for a particular job.

25          As far as the skill required, the testimony has

1     been that the training process for somebody to be let loose

2     out in the field and go to customer's houses and do the work

3     is two weeks.  That's the level of skill required.  So I

4     think in this particular circumstance there has been evidence

5     for that particular element and the evidence is that there is

6     not a whole lot of skill required to do the type of work that

7     installers are doing.

8               Whether or not a particular installer has more

9     skill because they work at it more and more years over time

10    and they're just simply better at it is not the same thing as

11    saying the job itself requires more skill than what they

12    could provide in two weeks worth of training, because that's

13    really what the evidence is in this case.

14              Permanency of the relationships.  There has been

15    no evidence on the permanency of the relationship at all.

16    Depends how you look at it.  An at-will employee, there is no

17    permanency, so if he can leave whenever he wants, that may

18    be, he may be an at-will employee.  I've looked at that the

19    particular issue both ways.

20              THE COURT:  No.  I think permanency goes to, you

21    know, if an entity hires my company to do a particular job

22    and I do that job, and then I go on to do something for

23    someone else, that's what that factor's talking about.

24              MR. PANTAS:  If that's what that factor --

25              THE COURT:  That's my take on it.  Otherwise I

1    mean, really, there is no difference here between an

2    independent contractor, quotes, in this arrangement, and an

3    at-will employee.

4              MR. PANTAS:  Correct.  And that's basically the

5    evidence in this case.  So that factor, if that's the way

6    it's going to be viewed, it really goes to him being an

7    employee.  So I don't think the motion should be granted.  I

8    think it's really up to you under the economic realities

9    test.

10             THE COURT:  Well, as I said in connection with

11   the motion for summary judgment, I think there are issues of

12   fact here that weigh and bear upon all six factors.  I

13   disagree that only one factor's been involved in the evidence

14   thus far.  I think the evidence implicates all of the

15   factors, both the control factor, the employee's opportunity

16   for profit and loss depending on his managerial skill.  I

17   really haven't seen much evidence that a cable installer's

18   managerial skills are going to weigh much, if at all, with

19   respect to how much he makes installing cable.

20             The alleged employee's investment in equipment

21   and materials or his employment of workers.  The evidence

22   before me is that these are primarily, if not exclusively,

23   one employee companies providing services for one employer

24   with minimal investment, relatively speaking.

25             Special skill, I mean, yes, we could say that I

1    couldn't do it.  I have three sons that could.  It's

2    something I think even the defendant admits someone

3    reasonably skilled in the art, so to speak, could learn in a

4    couple weeks.  So there, again, I mean the evidence really

5    cuts both ways.

6           And as far as the permanence and duration of the

7    working relationship, it lasts as long as either side wants

8    it to last, and that, to me, the relationship here is really

9    not much different in connection with that factor than an

10   at-will employee.  The employee can quit whenever he wants.

11   And I mean we really don't have the terms of a contract here

12   because there is no written contract between the parties, but

13   we know that the company here terminated the plaintiff when

14   it felt the plaintiff was not doing his job.

15          So I guess the bottom line is I think there is

16   evidence that relates to all six factors and the evidence

17   certainly is not one sided, so I'm going to have to make

18   findings, and that's going to require me to hear defendant's

19   case and then consider all of the evidence and make findings

20   as I'm required to do under the Federal Rules of Civil

21   Procedure.  So the motion is denied.  I'll be happy to hear

22   defendant's evidence.

23          MR. LIEBMAN:  Your Honor, may it please the

24   court.  As you know, a substantial portion of the defendant's

25   evidence has come in through cross examination, and exhibits

1     1 through 12 and 14 were admitted into evidence before the

2     commencement of the presentation of testimony earlier today.

3     And knowing this court's interest in brevity and economy, I

4     won't attempt to repeat it or do anything that isn't

5     necessary to supplement what's already in the record, if that

6     suits Your Honor.

7               THE COURT:  Sure.

8               MR. LIEBMAN:  Then we would call Mr. Vigus to the

9     stand.  He was on previously.

10              THE COURT:  All right.

11              Mr. Vigus, you're still under oath, okay?

12              THE WITNESS:  Yes, sir.

13     Whereupon:

14                   CLINTON VIGUS,

15     called as a witness, having been previously duly sworn

16     according to law, testified as follows:

17                DIRECT EXAMINATION

18     BY MR. LIEBMAN:

19     Q.    Mr. Vigus, if you would pull the exhibits out that are

20     there on the table in front of you, please, and refer again

21     to exhibit number 13.  And you have testified that that is

22     your signature and that you wrote the letter and that you

23     delivered it to Mr. Parrilla?

24     A.    Yes.

25              MR. LIEBMAN:  Your Honor, we would move exhibit

Document 60   Filed 07/29/09

1    13 into evidence at this time.

2              MR. PANTAS:  No objection.

3              THE COURT:  It's admitted.

4    BY MR. LIEBMAN:

5    Q.    Now, if you would take out exhibit number 15, please.

6    Do you have it?

7    A.    Yes.

8    Q.    Do you know what that document is?

9    A.    Yes, sir.

10   Q.    What is it?

11   A.    It's our independent contractor agreement.

12   Q.    And when you say our, whom are you referring to?

13   A.    It's Allcom's independent contractor agreement.

14   Q.    When you went to work for Allcom and began recruiting

15   cable installers, what were you told about that document?

16   A.    That this was what we were going to use for our

17   procedures for our model of business and to give it to

18   anybody that was coming on board.

19   Q.    And were you told to present it to each cable

20   installer, and if they wished to do installation for Allcom

21   that they were to fill it out and return it?

22   A.    Yes.

23   Q.    All right, sir.  And in your meeting with Mr.

24   Parrilla, did you give him that agreement?

25   A.    Yes.

Volume 5 - CORRECTED 07/29/09

1    Q.      You recall that?

2    A.      Maybe not in the initial meeting, but before he went

3    to work, yes.

4    Q.      And when you gave it to him, did it contain that

5    handwriting on the first page?

6    A.      No.

7    Q.      And did he bring it back to you?

8    A.      Yes.

9    Q.      And when he brought it back to you, did it contain

10   that handwriting on the first page?

11   A.      Yes.

12   Q.      All right, sir.  And when he brought it back to you,

13   did it have the handwriting which is on page nine?

14   A.      I honestly don't remember whether it did or not.

15   Q.      Did it have that written on it when you gave it to

16   him?

17   A.      No.

18   Q.      What did you do with it when you got it back from Mr.

19   Parrilla?

20   A.      I put it in his packet.

21   Q.      And was it maintained in the files of Allcom?

22   A.      Yes.

23   Q.      All right, sir.

24           MR. LIEBMAN:  Your Honor, I move 15 into

25   evidence.

DOCUMENT UNDER SEAL 07/29/09

1        MR. PANTAS:  Objection.  Relevance, Your Honor.

2        THE COURT:  Well --

3        MR. PANTAS:  It's not signed.

4        THE COURT:  Well, the fact that it's not signed

5    doesn't mean it's not relevant.

6        MR. LIEBMAN:  We're not saying it's a contract

7    between the parties, we're saying it's a reflection of the

8    rules and regulations to the contract, and the rules and

9    regulations --

10        THE COURT:  Well, it may be evidence to be deemed

11   of what their rules and regulations were.  Whether it's

12   evidence to what Mr. Parrilla agreed or understood is a bit

13   more questionable.  But the document is admissible for what

14   it is, so I'll admit it.

15        MR. PANTAS:  One other objection, Your Honor.

16   That's the ruling on the independent contractor agreement.

17   However, I noticed that exhibit number 15 also includes other

18   things.  I'm not sure if some or all has been previously --

19        THE COURT:  Well, it shouldn't.

20        MR. PANTAS:  I think we should just move into

21   evidence --

22        THE COURT:  Well, wait a minute.  Let me ask

23   this, this hasn't been established, but did the other parts

24   of this go with the contract somehow?

25        MR. LIEBMAN:  Your Honor, each and every one of

1    those things is already admitted into evidence.  You can take

2    them apart.  But this is the way it was maintained in the

3    file.

4                THE COURT:  Oh, well, anything could have been

5    put in a file.

6                MR. LIEBMAN:  Yes.

7                THE COURT:  I'm going to take that other stuff

8    off then.

9                MR. LIEBMAN:  After page nine, take that other

10   stuff off then.

11               THE COURT:  Can I ask the witness something?

12               MR. LIEBMAN:  Absolutely.

13               THE COURT:  Mr. Vigus, when this was returned to

14   you, you didn't bother to look to see whether it was signed

15   or not?

16               THE WITNESS:  I did not.

17               THE COURT:  Okay.  He gave it to you, you stuck

18   it in his file.

19               THE WITNESS:  Yes.  I made the assumption that it

20   was signed.

21               THE COURT:  Okay.  Go ahead.

22   BY MR. LIEBMAN:

23   Q.     In the course of your employment with Allcom, have

24   there been occasions or at least one occasion when two

25   different installers worked for the same subcontracting

VOLUME 60 — REGIONAL 10/29/09

1    company and they were paid one check for the work done by the

2    employees of that company?

3    A.      Yes.

4    Q.      And what was the name of that company?

5    A.      It's Jason S. Richardson, Incorporated.

6    Q.      All right.  And I believe that Mr. Richardson is one

7    of the installers and that his wife whose name is Lindsey is

8    one of the installers?

9    A.      That's correct.

10   Q.      All right, sir.  And do they have the right and

11   ability to have one go to all the jobs or to split the jobs

12   up?

13   A.      Yes.

14   Q.      And is that up to them?

15   A.      Yes.

16   Q.      Has anyone ever asked you for permission to hire an

17   employee?

18   A.      No.

19   Q.      Your understanding was they're allowed to do that

20   under the rules and regulations of exhibit 15, correct?

21   A.      Yes.

22   Q.      But nobody's brought it up with you?

23   A.      There's been -- to reanswer that, Jason and Lindsey

24   have been the only ones that were interested in doing it, and

25   at that point in time they asked me if they could and I told

1    them they could and told them how to go about it.

2              THE COURT:  Well, let me see if I understand what

3    you're saying here.  I mean this is an arrangement that was

4    proposed to you that you looked at and said they're both

5    qualified, I mean doesn't make any difference to us, that's

6    fine.

7              THE WITNESS:  Yes.  We've never told anybody, no,

8    they can't, as long as they're qualified.  There's certain

9    guidelines that we follow for Bright House.  They still have

10   to, the second person or third or fourth employee has to go

11   through a background check as well to be on Bright House

12   customer's property.  That's our only requirement.  Otherwise

13   they can hire as many people as they want.

14             THE COURT:  But if Mr. Parrilla is scheduled to

15   show up on Friday morning and some guy named Joe Blow says,

16   *by the way, I work for Mr. Parrilla's company, he sent me*

17   *over here to do these installations*, what would you say?

18             THE WITNESS:  If he had the documentation in

19   place that he was worker's comp exempt and he had a badge

20   through Bright House, a badge that we made for him, and he

21   had a background check and he was a qualified installer, he

22   could certainly do that.

23             THE COURT:  Now, with respect to Mr. and Mrs.

24   Richardson, are there occasions when they both are taking a

25   daily sheet, so to speak?  There's work for both of them and

1    you scheduled both of them to do a day's worth of work.

2                THE WITNESS:  Yes.

3                THE COURT:  And are there other occasions when

4    you've only scheduled one and you don't know which one is

5    going to show up to take it?

6                THE WITNESS:  Yes.

7                THE COURT:  Okay.  How do you know whether to

8    schedule for one or both of them?

9                THE WITNESS:  Well, they request a certain amount

10   of work for that day.  If they're both coming in, then I

11   would request two routes.  If one of them is coming in, I

12   would request one route.

13               THE COURT:  So if both of them call, then you

14   necessarily have to take work away from the other installers

15   to give it to the second Richardson?

16               THE WITNESS:  Yeah.  It's all based on

17   availability of the work from Bright House, of course.

18               THE COURT:  Okay.  Go ahead, sir.

19               MR. LIEBMAN:  Thank you, Judge.

20               No further questions, Your Honor.

21               THE COURT:  All right.  Mr. Pantas.

22               MR. PANTAS:  Very briefly, Your Honor.

23

24

25

1                              CROSS EXAMINATION

2       BY MR. PANTAS:

3       Q.      I just want to touch on that husband and wife team for

4       just a second.  I just want to make sure I understand and the

5       court has pretty much asked most of my questions.  I just

6       want to get it straight.  Each one is an installer?

7       A.      Yes, sir.

8       Q.      Each one regularly gets a route of their own, correct?

9       A.      Yes.

10      Q.      If on occasion, let's say one of them is sick, that's

11      what you're talking about when you only schedule the one?

12      A.      Yes.

13      Q.      The only real difference is that instead of having a

14      company and one employee, you know, theoretically one

15      employee under that particular company which is scheduled by

16      you, you simply have one company for the Richardsons and two

17      people underneath that one company that Allcom pays direct?

18      A.      We pay one check to the company, yes.

19      Q.      That's really the only difference?

20      A.      Yeah.  They still have two separate tech numbers with

21      Bright House, they're still in the system with Bright House

22      as two separate people, Jason Richardson, Lindsey Richardson,

23      but we pay one company.

24      Q.      And as we discussed before, when Bright House

25      transmits the daily work schedule, they have Allcom's number

1    on all of them, and then you go back into the system and put

2    in the tech number?

3    A.       Yes.

4    Q.       So in their case, if they're both going to show up and

5    one of them is not sick or something, for some reason they're

6    not going to show up, both of them show up, you schedule

7    their individual tech numbers?

8    A.       That's correct.

9    Q.       Individual schedule for each?

10   A.       Yes.

11              MR. PANTAS:  Thank you, Your Honor.  That's all I

12   have.

13              THE COURT:  Anything further?

14              MR. LIEBMAN:  No, Your Honor.

15              May the witness remain in the courtroom since

16   he's completed his testimony?

17              THE COURT:  If we're done with the testimony,

18   yes.

19              MR. LIEBMAN:  We'd call Mr. Wilfredo Colon, and

20   he's just outside, Your Honor.  I'll get him.

21

22

23

24

25

COLON, DIRECT 12/29/09

1    Whereupon:

2                           WILFREDO COLON,

3    called as a witness, having been first duly sworn according

4    to law, testified as follows:

5                         DIRECT EXAMINATION

6    BY MR. LIEBMAN:

7    Q.     Would you state your full name, please?

8    A.     Wilfredo Colon.

9    Q.     And would you spell your last name for the court?

10   A.     C O L O N.

11   Q.     All right, sir.  And where do you live, sir?

12   A.     308 Northwestern Avenue in Altamonte Springs, Florida.

13   Q.     And are you presently employed?

14   A.     Yes, I am.

15   Q.     And by whom are you employed?

16   A.     Allcom Communications.

17   Q.     In what capacity?

18   A.     I am the field supervisor.

19   Q.     All right, sir.  And have you always been the field

20   supervisor or were you doing other jobs before you became

21   field supervisor at Allcom?

22   A.     I was doing other jobs before I became the supervisor

23   at Allcom.

24   Q.     And what were the other jobs?

25   A.     It was cable technician and subcontracting with

CONDENSED TRANSCRIPT

—154—

1      Allcom.

2      Q.      All right, sir.  And how -- let me take you back to

3      the year 2006.  Were you employed by Knight Enterprises?

4      A.      Yes, I was.

5      Q.      And in what capacity?

6      A.      I was a cable technician as well as performing as a

7      subcontractor with Knight Enterprises.

8      Q.      All right, sir.  And as a subcontractor for Knight

9      Enterprises, did you install cable for customers of Bright

10     House Networks, Incorporated?

11     A.      That's correct.

12     Q.      All right, sir.  And at some point during that year,

13     Mr. Colon, did you decide that you wanted to change the

14     company with which you subcontracted?

15     A.      That is so, yes.

16     Q.      And leave Knight Enterprises?

17     A.      That's correct.

18     Q.      Can you tell us why you made that decision?

19     A.      Well, at the time there was a lot going on with Knight

20     Enterprises.  I just heard the rumors that they were leaving

21     town and the actual place they were going to was a little far

22     for me, and I had one of the ex-employees of Knight

23     Enterprise inform me that there was a company in town now

24     hiring and that was Allcom, at that time Cavo.

25     Q.      All right, sir.  And just before we get to that, at

COURT RECORD TRANSCRIPTION

1    Knight Enterprises, did you work as a subcontractor under a

2    corporation?

3    A.      That's correct.

4    Q.      What was your corporation called?

5    A.      Wilfredo Colon, Inc.

6    Q.      And did you have your own truck?

7    A.      Yes, I did.

8    Q.      And your own tools?

9    A.      Yes, sir.

10   Q.      And equipment?

11   A.      Yes, sir.

12   Q.      And you were paid as a subcontractor, I mean you

13   didn't get a paycheck from which they withheld taxes and

14   Social Security?

15   A.      Yeah, I was paid as a subcontractor.

16   Q.      All right, sir.  And did you then approach Allcom to

17   seek a change of the relationship as a subcontractor?

18   A.      That's correct.

19   Q.      And with whom did you meet?

20   A.      With Clint Vigus.

21   Q.      And what did you understand from your meeting with Mr.

22   Vigus the relationship with Allcom was going to be with cable

23   installers?

24   A.      I was going to be a cable installer as a subcontractor

25   with the company.

1    Q.     And there was no doubt in your mind that you were to

2    be a subcontractor and not an employee?

3    A.     That's correct.

4    Q.     All right, sir.  And was that going to be in the name

5    of your company, Wilfredo Colon?

6    A.     That's correct.

7    Q.     And did that relationship come into existence?

8    A.     Yes.

9    Q.     And as part of that, were you presented with a

10    proposed subcontractor contract?

11    A.     Yep.

12    Q.     In front of you there are certain documents and each

13    one has a white exhibit tag on it on the lower right-hand

14    corner.  If you would find the one which is marked number 15.

15         Sir, but for the names that are on it there

16    handwritten on the first page, is that the same as the

17    contract that you were given when you started working as a

18    subcontractor --

19    A.     Yes, it was, sir.

20    Q.     -- at Allcom?

21    A.     Yes, it was.

22    Q.     And was yours in the name of Wilfredo Colon

23    Enterprises?

24    A.     I wrote it in, yes.

25    Q.     Yes.  But you did write it in and return it?

COURT REPORTING 10/28/10

— 157 —

1    A.      Yes, I did.

2    Q.      All right, sir.  And do you recall when you started to

3    work at Allcom?

4    A.      Could have been anywhere between August and September

5    of 2006.

6    Q.      All right, sir.  And did there come a time when you

7    approached other installers or other installers approached

8    you who were thinking of leaving Knight Enterprises?

9    A.      Yes, sir.

10   Q.      Do you recall if Mr. Antonio Parrilla was one of those

11   people?

12   A.      Yes, he was, sir.

13   Q.      And was Mr. Walter Pareja also one of those people?

14   A.      Yes, he was, sir.

15   Q.      And did you ask Mr. Vigus if he would be interested in

16   having those individuals?

17   A.      Yes, I did, sir.

18   Q.      And what did he tell you?

19   A.      He told me if I would recommend them that he would be

20   more than happy to bring them on board.

21   Q.      All right, sir.  And did you then invite them to come

22   on board at Allcom?

23   A.      Yes, I did.

24   Q.      And do you specifically recall any discussion with Mr.

25   Parrilla about what were the terms of the arrangement between

COURT REPORTING 12/23/10

158

1    Allcom and cable installers?

2    A.    Yeah.  The main concern was whether we were a

3    contractor company or whether we were employee based, and I

4    told them they were a subcontracting company.

5    Q.    Did Mr. Parrilla tell you he needed that information,

6    he was concerned about it?

7    A.    He asked me, yes.

8    Q.    Did he say whether he cared whether the company was

9    subcontractor based?

10   A.    Well, the knowledge, I mean what I had been told was

11   that, you know, he wanted to work for a subcontracting

12   company, not an employee based company.

13   Q.    All right.  So it's your recollection of a personal

14   conversation you had had with Mr. Parrilla before he came to

15   work at Allcom that, without putting words in your mouth, he

16   wanted to work for a company where he could be an independent

17   contractor?

18   A.    That is correct.

19   Q.    And he told you he did not want to work for a company

20   where he would be an employee?

21   A.    That's correct.

22   Q.    All right, sir.  Do you recall whether he told you why

23   he felt that way?

24   A.    Not really, no, sir.

25   Q.    Okay.  Were you in a meeting, present in a meeting in

1   which Mr. Parrilla and Mr. Pareja and Mr. Vigus and yourself

2   discussed them coming to work at Allcom?

3   A.      Personally with them at that same time, no.  When they

4   filled out the application and whatnot, I was actually not

5   the actual field supervisor and I got promoted after a

6   certain amount of time, but, yeah, I wasn't.

7   Q.      All right.  So you don't know what was said by anybody

8   in that meeting where they got hired on?

9   A.      Exactly.

10                  MR. LIEBMAN:  All right, sir.  Thank you.

11                  THE COURT:  All right.  Cross.

12                  MR. PANTAS:  Thank you.

13                      CROSS EXAMINATION

14  BY MR. PANTAS:

15  Q.      Mr. Colon, one quick little question for you.  You

16  said my client came in at one point to fill out an

17  application?

18  A.      Yes.

19  Q.      Did he fill out an application?

20  A.      Well, he said he was going to fill out an application

21  and he did.  I wasn't the supervisor at the time.

22  Q.      My question is do you know if he filled out an

23  application?

24  A.      Yes.

25  Q.      You saw the application?

1    A.    Yes.

2    Q.    That's funny because it's supposed in this the exhibit

3    and it's not in there.  I'm just asking if you know if it

4    exists some place.

5    A.    I seen the application.  Whether he turned it in or

6    not, I seen it with him.

7    Q.    You were at some point a supervisor at the same time

8    you were installing, is that correct?

9    A.    That's correct.

10   Q.    Now, Mr. Vigus already testified about this, I just

11   want to make sure it's correct.  You had the ability or

12   Allcom allowed you to have the ability to pick and choose

13   which jobs you wanted to do?

14   A.    Well, not necessarily, no.  It was just to give and

15   take.  I couldn't just choose.  I was routing at the time,

16   Mr. Vigus would route most of the time, and whenever I had

17   the opportunity to help him out, I would, but I didn't have

18   a, just that particular reason to pick and choose.

19   Q.    So Mr. Vigus, you disagree with Mr. Vigus's testimony

20   because he testified that you could pick and choose?

21   A.    Well, by picking and choosing mean routing and giving

22   the guys, yeah, that.

23   Q.    I'm talking about the cable modem job pays $200 and

24   I'm going to be there for an hour versus this hour tap job

25   that pays ten dollars, I'm going to be there for a half day.

1    You could pick the more lucrative job?

2    A.      Yes, I could do that.

3    Q.      All right.  So you agree with Mr. Vigus's testimony.

4            Did you ever actually have to train anybody?

5    A.      Yes.  Me personally in the field?

6    Q.      Yes.

7    A.      I did in the field, yes, but I didn't have to.

8            I don't understand the question.

9    Q.      I'm not saying whether you underwent training -- maybe

10   I'm just misunderstanding.  I'm not asking you whether or not

11   somebody trained you, I'm asking you whether or not you

12   trained somebody else.

13   A.      No.

14   Q.      Have you ever trained anybody?

15   A.      Yes, I've trained.  Like I said, I've trained other

16   people, but not necessarily demanded by the company.  I

17   trained other people.

18   Q.      For what purpose?

19   A.      Well, to train them, you know, to do the cable.  For

20   instance, I could give you three examples; my son, my nephew

21   and, you know, like that.

22   Q.      I get it.  You trained somebody outside of your

23   employment with Allcom?

24   A.      Uh-huh.

25   Q.      Is that what you're saying?

1    A.        Yeah, yeah.

2    Q.        You never actually had to train anybody while you were

3    at Allcom?

4    A.        No.

5    Q.        Is it true that the installers are assigned training

6    duties?

7    A.        Not assigned training duties.  If they were -- well,

8    they were paid a certain amount of money to, if they had,

9    they brought anybody into the company and trained them, they

10   were paid ten percent, whatever, for training.

11   Q.        No one else has said that.  In fact, the testimony has

12   been that the only compensation given to the installers are

13   the piece rate for the jobs that they do.  Are you sure that

14   they get anything extra for training somebody?

15   A.        That's what, that's the knowledge I had of it, but

16   that anybody got that, no, I don't, I'm not sure.

17   Q.        You're not sure if anybody was actually paid that?

18   A.        Right, right.

19   Q.        Okay.  Who does it benefit for an installer to train

20   another installer that just came on board?

21   A.        Who does it benefit?

22   Q.        Yeah.

23   A.        I don't understand that question.

24   Q.        Does it benefit Allcom?

25   A.        Yeah, obviously it benefits Allcom.

1    Q.      Why does it benefit Allcom?

2    A.      We will have a properly trained technician coming on

3    board and work for us.  But it benefits the tech.

4    Q.      Benefits the tech.  How does it benefit my client to

5    train another tech?

6            THE COURT:  Well, there are two techs involved in

7    the question, so you're going to have to kind of start over

8    again.

9    Q.      Okay.  You said that it benefits my client, an

10   installer.  Let's say, if he was assigned a training job to

11   train another installer that came on board, correct?

12   A.      Well, yeah.  If he's getting paid for it, yes.  If

13   he's not getting paid for it, it doesn't benefit him.

14   Q.      He's not getting paid anything for it.  We'll confirm

15   it later.

16   A.      If he wasn't, there's no benefit to it if he's not

17   getting paid for it.

18   Q.      The only person that benefits is Allcom, correct?

19   A.      Yes.

20   Q.      In fact, it hurts my client to train another

21   installer, doesn't it?

22   A.      I wouldn't know how to answer that.  In what way?  I

23   don't know.

24   Q.      Okay.  Let's figure it out.  Bright House gives Allcom

25   a certain amount of jobs based on the area, correct?

```
1    A.      Uh-huh.

2    Q.      That's a finite amount of jobs per day, correct?

3    A.      Yeah.

4    Q.      In other words, if there's a hundred jobs available,

5    that's what Bright House gives to Allcom?

6    A.      Yeah.

7    Q.      If there's 20 installers trained and ready to go,

8    those X amount of cases get divided up by 20 installers,

9    right?

10   A.      Uh-huh.  Uh-huh.

11   Q.      If everybody trains one person, now it's 40

12   installers, correct?

13   A.      Yeah.

14   Q.      So now each installer gets half the amount of work?

15   A.      Yeah.

16   Q.      So do you agree that for every person that Allcom

17   assigns my client to train, that not only does it not benefit

18   Allcom, but it actually hurts my client, he's actually

19   training his own competition?

20           THE COURT:  Well, that assumes that the amount of

21   work is static.  In the economic analysis, if you don't

22   include all the factors, you're going to get an erroneous

23   answer.  The underlying assumption is the work from Bright

24   House is static and not growing.  In that event, then the

25   logical answer is yes.
```

1          MR. PANTAS:  Let me ask it this way.

2     Q.     Whether the business with Bright House grows or

3     contracts does not really matter, it's a finite number per

4     day, correct?

5     A.     No.  If he, anybody trained a tech, and if we're

6     training a tech, the purpose behind it, we're going to be

7     getting more work.  So the amount of jobs that that

8     particular tech has is going to stay the same because what

9     Bright House is going to do is give us more work, and by

10    giving us more work, then we can provide more.

11    Q.     Maybe it's my misunderstanding.  I thought the

12    testimony was that Bright House has a contract with Allcom

13    for all the work in a particular area.

14    A.     Right.  We're not the only contractor though.

15    Q.     In that area?

16    A.     Yeah.

17    Q.     So there's other contractors in that same area that

18    have other contracts.  All right.

19          MR. PANTAS:  That's all I have, Your Honor.

20                    REDIRECT EXAMINATION

21    BY MR. LIEBMAN:

22    Q.     Mr. Colon, I forgot to ask you, and I apologize to you

23    and I apologize to the court.  When you work as a supervisor

24    at Allcom, are you an employee of the company?

25    A.     Yes.

DOCUMENT-DIRECT 07/29/09

— 166 —

1    Q.      And are you paid as an employee?

2    A.      Yes, sir.

3    Q.      And when you work as a cable installer for Allcom, are

4    you paid as a subcontractor?

5    A.      Yes.

6    Q.      And that was true when you first became a supervisor?

7    A.      That's correct.

8    Q.      And stayed the same for all the time that you were

9    still an installer?

10   A.      That's correct.

11              MR. LIEBMAN:  Thank you.  Nothing further, Your

12   Honor.

13              THE COURT:  Okay.  Thank you, sir.  You can step

14   down.

15              MR. LIEBMAN:  Would Your Honor mind a short

16   recess, we'll decide if we're resting at this moment?

17              THE COURT:  Okay.  Take ten or 15 minutes.

18              (BRIEF RECESS.)

19              THE COURT:  Got anything else?

20              MR. LIEBMAN:  Your Honor, the defense rests.

21              THE COURT:  Okay.  Let me make sure, first of

22   all, do you have any rebuttal?

23              MR. PANTAS:  No, Your Honor.

24              THE COURT:  Let's make sure you've got in

25   evidence any exhibits you want in or think you have in.  The

1   plaintiff didn't offer any exhibits.

2            MR. PANTAS:  No, we won't, Your Honor.  The

3   affidavit is already part of the public record.  The other

4   was just the interrogatories and they're not real helpful.

5            THE COURT:  Okay.  And then defendant's, at least

6   my list says you've got in one through 15.

7            MR. LIEBMAN:  One through 15, yes, Your Honor.

8            THE DEPUTY CLERK:  And they identified 17 and 24.

9            THE COURT:  Okay.  You didn't offer 17 and 24.

10           MR. LIEBMAN:  No, Your Honor.

11           THE COURT:  Do you all feel that closings are

12   necessary?  I think I've already heard your argument.

13           MR. PANTAS:  I don't feel it necessary, Your

14   Honor.

15           THE COURT:  If you think you can embellish it or

16   if I can benefit from it, I'll entertain argument.

17           MR. PANTAS:  I request written closings.

18           THE COURT:  You want to file a written.

19           MR. LIEBMAN:  Your Honor, we've already filed our

20   trial brief and presented the law.  A short written brief, we

21   just remind the court that we heard testimony that said A, B,

22   C, D and the court, I'm sure the court heard all of that.

23           THE COURT:  If he's going to summarize what the

24   evidence is, you're probably going to want to tell me where

25   you disagree, so --

1          MR. LIEBMAN:  Yes.  So should we set a date and

2     time and file them simultaneously, or should he provide his

3     like he was going first and I went second with the closing

4     today?

5          THE COURT:  It doesn't matter really.  I don't

6     think there are any secrets here as to what the law is or

7     what the issues are.  Why don't we just file them

8     simultaneously?  Limit them to 20 pages.  How much time do

9     you need?

10          MR. PANTAS:  I've got one trial, Your Honor, so

11     I'd request ten days so I can have a little time after that

12     one trial.

13          THE COURT:  How about August 5?  Does that give

14     you enough time?

15          MR. PANTAS:  Yes, sir.

16          THE COURT:  Okay.

17          MR. LIEBMAN:  I'd rather do it right now.

18          THE COURT:  That's the best time to do it.

19          Okay.  Post trial memoranda no more than 20 pages

20     due August 5.

21          I don't know if you all intend on getting a

22     transcript first, but, if you do, you need to talk to Tony

23     about that.  You'd have to pay for it.  That's up to you all.

24     If you want a transcript, you need to let Tony know and he

25     can tell you when he can get it.  Would there be any trouble

1    with that date, Tony?

2              THE COURT REPORTER:  No, sir.

3              THE COURT:  All right.  Thank you all for your

4    presentations and I'll try to get something out as soon as I

5    can once I get the briefs and have an opportunity to review

6    everything.

7              Thank you.

8              (TRIAL CONCLUDED.)

9

10             I certify that the foregoing is a correct

11   transcript from the record of proceedings in the

12   above-entitled matter.

13

14                              *s/ Anthony Rolland*

15                              ANTHONY ROLLAND

16

17

18

19

20

21

22

23

24

25