UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANTONIO PARRILLA,
and others similarly situated,

                                          Case No.: 6:08-CV-1967-ORL-31GJK

        Plaintiff,

vs.

ALLCOM CONSTRUCTION &
INSTALLATION SERVICE, LLC.,

        Defendant,
_____/

## SUMMATION BRIEF AND MEMORANDUM OF LAW

      Plaintiff, ANTONIO PARRILLA (hereinafter referred to as "PARRILLA"), by and through his undersigned counsel, hereby files this Summation Brief and Memorandum of Law (hereinafter referred to as "Summation Brief"), and states:

### I.  PRELIMINARY STATEMENT

      Plaintiff and Defendant have now had an opportunity to present their evidence. Plaintiff files this Summation Brief to highlight the evidence that he believes is material to whether or not he was an employee of Defendant or an independent contractor in business for himself. Plaintiff believes that, while not all of the evidence weighs in his favor, the majority of the evidence presented at trial weighs in favor of finding that PARRILLA was an employee of Defendant, ALLCOM CONSTRUCTION & INSTALLATION SERVICE, LLC (hereinafter referred to as "ALLCOM").

## II. ALLCOM'S EVIDENCE AND ARGUMENT

### A. Evidence of PARRILLA's Intent.

The gravamen of the ALLCOM's evidence and argument at trial was that PARRILLA is not an "employee" because he, according to the ALLCOM, deliberately sought *not* to be an employee. (DOC. 60, 135:7-18; 157: 6-25; 158: and, 159:1-9).[1] That evidence and argument are irrelevant to the determination of whether or not PARRILLA was an employee or an independent contractor. *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1319 (S.D. Fla. 2001) ("Whether or not the parties intended to create an employment relationship is irrelevant."); *citing Donovan v. New Floridian Hotel*, 676 F.2d 468, 471 (11th Cir. 1982) and *Brennan v. Partida,* 492 F.2d 707, 709 (5th Cir.1974).

When examining whether there is an employment relationship, "the label the parties put on the relationship is not determinative, nor is it relevant whether the parties intended to create an employment relationship." *Molina v. S. Fla. Express Bankserv, Inc.,* 420 F.Supp.2d 1276, 1283 (M.D.Fla.2006) (citing *Rutherford Food,* 331 U.S. at 729). Instead, courts examine "the 'economic reality' of whether the putative employee is economically dependent upon the alleged employer." *Harrell v. Diamond A Entertainment, Inc.,* 992 F.Supp. 1343, 1348 (M.D.Fla.1997).

### B. Bright House Networks.

ALLCOM has emphasized that that many of its policies, practices, and requirements are attributable to Bright House Networks' requirements. For example: (1) the identification cards, magnetic truck signs and uniforms (DOC. 60, 69:24-25; 70; 71:1-15); (2) the quality control

---

[1] (DOC. 60, ____: ____) refers to the document number, page number and/or lines number(s) of the trial transcript.

requirements (DOC. 60, 85:13-25); the requirement that every installer have a background check, a documented workers' compensation exemption and an identification badge (DOC. 60, 149:7-23). Hence, ALLCOM's position is that it merely is caring out the requirements necessitated by its customer. However, "[a]ny employer's business is, in essence, dictated by the needs of its customers." *Molina,* 420 F.Supp.2d at 1284 n. 24. The fact that Bright House is ALLCOM's customer and has unique needs matters not. The key inquiry, rather, is how ALLCOM goes about meeting Bright House's needs, and to what extent the chosen methods operate to control the activities of ALLCOM's installation technicians and in turn restrict their autonomy.

### III. WAS PARRILLA AN EMPLOYEE OR AN INDEPENDENT CONTRACTOR?
#### C. The Economic Dependency Analysis.

The economic dependency analysis involves six factors which serve as guideposts: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business. *Harrell,* 992 F.Supp. at 1348 (citing *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir.1979)); *see also Molina,* 420 F.Supp.2d at 1283-84 (articulating similar factors) (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir.1998); *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981); *Usery v. Pilgrim Equip. Co., Inc.,* 527 F.2d 1308, 1312 (5th Cir.1976)). These factors are helpful to the economic dependency inquiry, but no one factor is controlling, and "the weight

of each factor depends on the light it sheds on the ... economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." *Antenor v. D & S Farms,* 88 F.3d 925, 932-33 (11th Cir.1996).

    **D. Degree of Control.**

    The following undisputed facts are material to this factor: (1) PARRILLA established his own corporation, Computer Solutions and Consulting, Inc., over which he had exclusive control (DOC. 60, 25:14-25; 26:16); (2) PARRILLA was paid by the piece (DOC. 60, 56:6-16); (3) PARRILLA owned his own cell phone (DOC. 60, 23:19-22); (4) PARRILLA usually worked six days per week (DOC. 60, 97:11-13); (5) ALLCOM provided PARRILLA with work orders that specified the work to be performed and the two hour time window within which the work was to be accomplished (DOC. 60, 39:20-24); (6) PARRILLA was required to attend mandatory weekly meetings at ALLCOM's offices in Apopka, Florida, office each Friday (18:21-25; 19:1-19); (7) PARRILLA was subject to discipline if he did not attend the mandatory Friday meetings (DOC. 60, 19:20-24); (8) ALLCOM provided PARRILLA with the supplies, equipment and materials for completing the work set forth in the work orders (DOC. 60, 121:4-25); (9) ALLCOM instructed PARRILLA on how to he should were his uniform (DOC. 60, 7:14-19); (10) ALLCOM inspected PARRILLA's vehicle to ensure that it met its standards on a weekly basis (8:22-25; 9:1-3); (11) PARRILLA was required to place a magnetic sign on his truck with ALLCOM and Bright House Network's names on it (DOC. 60, 8:8-10); (12) PARRILLA was threatened with discipline or termination if he failed to come in to work (DOC. 60, 11-13); (13) PARRILLA was threatened with discipline or termination if he failed to arrive at work at a particular time (DOC. 60, 7:1-4); (14) PARRILLA was subject to discipline or termination if he

did not have the required magnetic sign on his vehicle (DOC. 60, 8:14-18); (15) PARRILLA was subject to discipline or termination if he failed to maintain his vehicle within the parameters dictated by ALLCOM (DOC. 60, 8:25; 9:1-3); (16) PARRILLA was threatened with discipline or termination if he refused to do a particular piece of work that was scheduled for him to do (DOC. 60, 13:6-15); (17) PARRILLA did not have the ability to negotiate whether or not he was treated as an employee or as an independent contractor (DOC. 60, 21:15-18; 114:3-13); (18) PARRILLA did not have the ability to negotiate the rates at which he would be paid for the work he performed for ALLCOM (DOC. 60, 114:14-16); (19) PARRILLA did not have the ability to negotiate whether he was paid for piecework rather that some other method of payment (DOC. 60, 114:17-23); (20) PARRILLA did not have the ability to negotiate when he was paid by ALLCOM (DOC. 60, 114:25; 115:1); (21) PARRILLA did not have the ability to negotiate anything when he was hired by ALLCOM (DOC. 60, 115:5-8); PARRILLA did not have the ability to pick and choose the jobs he was assigned by ALLCOM (DOC. 60, 115:2-4); (22) ALLCOM has a system in place where if quality control determined that PARRILLA had not done a good job, ALLCOM could back-charge PARRILLA the following pay period and take some, all or more than of what the job paid back 16:-25; 17; 18:1-2); (23) PARRILLA did not have the ability to dispute a particular back-charge that ALLCOM charged (DOC. 60, 17-2-5); (24) PARRILLA received training from ALLCOM (DOC. 60, 18:18-20); (25) PARRILLA trained new installation technicians for ALLCOM (DOC. 60, 9:9-19); (26) ALLCOM required PARRILLA to request time off (DOC. 60, 96:5-25; 97:1-10); (27) ALLCOM requested that PARRILLA be at work by 7:30 a.m. each workday (DOC. 60, 96:1-4); (28) ALLCOM denied at least one of PARRILLA's requests for time off (DOC. 60, 38:6-9); (DOC. 60, 104-11-15); (29) PARRILLA worked solely for ALLCOM (DOC. 60, 14:5-11); (30) PARRILLA was not allowed

to perform additional services for Bright House's customers without ALLCOM's permission (DOC. 60, 15:11-16); (31) PARRILLA was required to wear an identification card that said "Allcom Construction services" and Bright House's logo on it (DOC. 10:23-25; 11:1-4); (31) PARRILLA was instructed by ALLCOM to leave a particular job that he was already at and go to another job once or twice a week (DOC. 10:17-20); (32) PARRILLA could not refuse ALLCOM's directives to leave one job to go to another job (DOC. 10:21-22).

It is clear from the record that ALLCOM exerted a high degree of control over PARRILLA. "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that he stands as a separate economic entity." *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1312-13 (5th Cir.1976). Even though PARRILLA established Computer Solutions and Consulting, Inc., as his own corporation, it is clear that in reality, ALLCOM's relationship was with PARRILLA, not Computer Solutions and Consulting, Inc. ALLCOM exerted complete control over the work PARRILLA performed and the compensation he received.

### E. Relative Investments.

It is also clear from the record that ALLCOM's investment was significantly larger than PARRILLA's. The only expenses PARRILLA paid for himself were various hand tools, a meter, liability insurance, his cell phone, and his van, with the cell phone and van being used for personal as well as business purposes. Thus, any investment in his cell phone or van is somewhat diluted. *See Molina v. S. Fla. Express Bankserv, Inc.,* 420 F.Supp.2d 1276, 1285 (M.D.Fla. 2006). Moreover, while PARRILLA ultimately paid for his tools, the evidence at trial was that he had to obtain his tools through one of ALLCOM's vendors or directly from

ALLCOM and the cost of the tools would be deducted from the checks issued to PARRILLA. (DOC. 60, 20:8-16). ALLCOM provided all of PARRILLA's supplies, including set top converters for TVs, modems for Internet service, MTAs for phone service, connectors, cable and phone wire. (DOC. 60, 80:13-23).

### F. Opportunity for Profit or Loss.

While PARRILLA was paid on a per piece basis, he still had very little control over his profit and/or loss. He was provided with work orders and had no control over the type of work he was given. PARRILLA did not have the ability to pick and choose the work assignments given to him. (DOC. 60, 115:2-4). ALLCOM readily admits that PARRILLA was not able to negotiate whether or not he would be labeled an independent contractor or employee, the rates for the work he performed, whether he would be paid for piecework or on some other basis. In fact, ALLCOM's owner could not identify a single item that was negotiable by PARRILLA or any other cable technician. (DOC. 60, 114:10-25; 115:1-8). The most determinative factors of PARRILLA's profit or loss are piece rate and job assignment, both of which are under ALLCOM's control and not the control of PARRILLA. *See Molina,* 420 F.Supp.2d at 1286 n. 28 (stating that when a business controls the primary factors governing its workers' earnings, employee status is suggested).

ALLCOM argued at trial that PARRILLA had the ability to ask for more work or less work. (DOC. 60, 135:23-24). That fact is irrelevant. "The fact that an individual could request more work or re-negotiate his or her compensation is not indicative of independent contractor status, because any employee can do those things as well. *Halferty,* 821 F.2d at 266." *Molina,* 420 F.Supp.2d at 1286.

ALLCOM also argued at trial that if PARRILLA was more efficient, he would make more money and vice-versa. (DOC. 60, 135:24-25; 136:1). This argument assumes facts that are not in evidence. The argument assumes that ALLCOM has more work for PARRILLA that he could obtain merely by coming back to ALLCOM's offices and picking up the work orders. That assumption is not supported by the evidence. Bright Communicates to ALLCOM its particular work orders <u>for the day</u> (DOC. 60, 63:2-5). Then, those <u>daily</u> work orders are assigned to the installers. (DOC. 60, 63-13-18). There is no evidence in the record that suggests or hints that there are work orders left over after ALLCOM divides them up and assigns them to each installer. In fact, the evidence supports the assumption that there are no more work orders left over after they are assigned at the beginning of each day.

One of the single most important pieces of evidence regarding this element is ALLCOM's back-charge policy. The Fourth Circuit Court of Appeals has opined that "[a]n Installer's net profit or loss depends on his skill in meeting technical specifications, thereby avoiding backcharges." *Choa v. Mid-Atlantic Installation Services, Inc.*, 16 Fed. Appx. 104, 106-107 (4th Cir. 2001) (unpublished decision). While that may have been true based upon the facts of that decision, no installation technician could reasonably control his profit or loss under the terms of ALLCOM's policy. It is undisputed that ALLCOM back-charged PARRILLA an estimated fifty dollars ($50.00) to one hundred dollars ($100.00) **per week**. (DOC. 60, 15:21-25; 161-2). The decision to impose back-charges is <u>solely</u> under ALLCOM and Bight House's control. (DOC. 60, 16:5-25). PARRILLA did not have the ability to dispute any back-charges or negotiate the rate at which he would be back-charged. (DOC. 60, 17:1-16). Back-charges could be for the entire amount to be paid for the job or <u>a fee that could exceed the amount that was to be paid for the job</u>. (DOC. 60, 17:17-25; 18:1-17). Further, an installation technician's

technical proficiency does not even come into the picture if a Bright House customer calls and complains that one of their services is not working. Whether or not the installation technician performed the installation correctly doesn't matter -- if he is the last technician to visit the customer, he receives a back-charge merely because a service call was generated. (DOC. 60, 16:16-24). Hence, the installation technician is back-charged whether or not it is determined to be a problem with the installation service he performed or a totally separate and new problem.

### G. Skill and Initiative Required.

PARRILLA was required to have minimal specialized skills. During the trial, Mr. Vigus testified that someone who didn't know anything about cable installation could be trained on the basics for a couple of weeks and then the more they do it, the better they get. (DOC. 60, 95:21-24). Further, he testified:

> When I started in this business I was trained for two weeks, rode with somebody, and was put in the field and developed the skill, and the skill of cable installations through on the job training, it's a different business IN that every house that you go to is different. You know, if you're good with your hands and you like to work with tools, it doesn't require a lot of training for the video portion. The Internet portion with the computers and the phone portion is a little bit more technical. It's a, you learn as you go in this business. (DOC. 60, 95:11-20).

"[E]ven if an individual has specialized skills, that is not indicative of independent contractor status where the individual does not use those skills in an independent fashion. *Baker,* 860 F.Supp. at 776." *Molina,* 420 F.Supp.2d at 1286. PARRILLA was installing cable solely for ALLCOM under its exclusive contract with Bright House Cable. The evidence before this Court is that ALLCOM operates under the requirements of its contract with Bright House and was required to follow certain guidelines provided by Bright House. ALLCOM in turn required

its installation technicians to those same guidelines. (DOC. 60, 6:4-7; 20:25; 21:1-14; 38:10-18; 61:8-9; 71:7-15; 149:2-13). Because he was performing installations solely for Bright House, under Bright Houses' specifications, he was simply required to solely have knowledge in Bright House's specifications and requirements. This knowledge was provided by ALLCOM as well as the ongoing training ALLCOM provided to PARRILLA. (DOC. 60, 19:1-9; 94:15-23).

### H. Permanency of the Relationship.

The undisputed evidence before the Court at trial was that Plaintiff worked solely for Defendant from September of 2006 until January of 2008. (DOC. 60, 5:24-25; 6:1); (DOC. 60, 14:5-8). Independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them. Employees usually work for only one employer in continuous relationship of indefinite duration. *Harper v San Luis Valley Regional Medical Ctr.*, 848 F.Supp. 911) (D.C. Colo. 1994).

### I. Whether Plaintiff's Services Were Integral to Defendant's Business.

There can be do dispute that the Plaintiff's services were integral to Defendant's Business. ALLCOM is in the business of cable installation for Bright House Networks and PARRILLA's function was to perform the actual installations, exclusively. (DOC. 60, 61:8-14). Therefore, it is clear that his services were integral to ALLCOM's business.

### IV. CONCLUSION

Based upon the evidence presented at trial and the foregoing argument, Plaintiff respectfully requests that the Court render a decision finding that PARRILLA was at all times

material an employee of ALLCOM.

                        Respectfully submitted,

Dated: August 5, 2009                      */s/ K.E. Pantas*
                                           K.E. PANTAS, ESQ.
                                           Bar No.: 0978124
                                           PANTAS LAW FIRM, P.A.
                                           250 North Orange Avenue, 11th Floor
                                           Orlando, Florida 32801
                                           Tel.: (407) 425-5775
                                           Fax.: (407) 425-2778
                                           E-Mail: Clerk@PantasLaw.com
                                           Trial Counsel for Plaintiff

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that I presented the foregoing to the Clerk of the court for filing and uploading to the CM/ECF system which will send a notice of electronic filing to the following: Mark O. Cooper, Esq., O'Neill, Liebma & Cooper, P.A., 2699 Lee Road, Suite 320, Winter Park, Florida 32879.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None, this 5th day of August, 2009.

                                             */s/ K.E. Pantas*
                                             K.E. PANTAS, ESQ.