**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**ANTONIO PARRILLA,**

        **Plaintiff,**

**-vs-**                                              **Case No. 6:08-cv-1967-Orl-31GJK**

**ALLCOM CONSTRUCTION &
INSTALLATION SERVICES, LLC,**

        **Defendant.**

_____

**MEMORANDUM OPINION AND ORDER**

This matter came before the Court after a one-day bench trial on the issue of whether Plaintiff, Antonio Parrilla ("Plaintiff"), was an independent contractor, and thus exempt from the overtime compensation requirements of the Fair Labor Standards Act (the "FLSA").[1]

**I. Overview**

Plaintiff brought suit on November 20, 2008, alleging, *inter alia*, that Defendant, Allcom Construction & Installation Services, LLC ("Defendant"), routinely failed to pay Plaintiff and other similarly situated individuals overtime pay in accordance with 29 U.S.C. §§ 207 and 215 (Doc. 1). Specifically, Plaintiff alleged that he and other employees routinely worked in excess of forty (40) hours per week but were compensated at a rate that was less than one and one-half times their regular rate of pay (Doc. 1, ¶ 10).

---

[1]*See generally* 29 U.S.C. §§ 201 to 209.

Defendant filed its Motion for Summary Judgment on June 1, 2009, contending that Plaintiff was an independent contractor in business for himself and thus exempt from the overtime pay requirements of the FLSA (Doc. 20). On June 17, 2009, the Court denied Defendant's Motion for Summary Judgment and entered its Order setting the employee/independent contractor issue for trial (Doc. 28).

The parties waived their right to a jury trial[2] (Docs. 28 at 2 and Doc. 35) and the Court held a bench trial on July 23, 2009 (Doc. 56). Pursuant to FED. R. CIV. P. 52(a), the Court makes findings of fact and conclusions of law as set forth, *infra*.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Background

Plaintiff worked for Defendant as a cable television, high-speed Internet, and Internet phone service[3] installation technician from approximately September 2006 through January 2008. Plaintiff was paid by the "piece"[4] for the work that he performed.

Defendant acts as one of Bright House Networks' ("Bright House")[5] installation providers in the northern part of the greater metropolitan area of Orlando, Florida. Specifically, Defendant is

---

[2] It is not clear, however, that either party had a right to a jury trial on this issue as the determination of employment status under the FLSA is a question of law. *See*, *e.g.*, *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).

[3] Unless otherwise stated, cable television, high-speed Internet, and Internet phone service are referred to collectively herein simply as "cable" or "cable services."

[4] When a company pays by the piece, it pays a fixed, pre-determined amount for the type of job performed (e.g., $75.00 to install a cable modem, $25.00 to install a set-top converter box, etc.) – not for the amount of time it takes to complete the job.

[5] Bright House is not a party to the instant litigation.

responsible for installing Bright House customers' cable services in an area stretching from Oviedo, Florida to Apoka, Florida. Defendant's overwhelming source of business consists of the cable installation work that it obtains from Bright House. Each day, Bright House sends the work orders that it receives from its customers to Defendant. Defendant, in turn, assigns these daily work orders to its installation technicians – the individuals, such as Plaintiff, who actually perform the installation work.

Before it will start assigning work orders to a technician, Defendant requires the technician to enter into an "Independent Contractor Agreement."[6] Pursuant to that agreement, the technician agrees to, *inter alia*, furnish all tools and equipment required to do the installation work; maintain his own general liability insurance; obtain or waive workers' compensation insurance, secure an occupational license; and indemnify Defendant from any losses arising out of the technician's work (Doc. 19-2 at 2-4). In addition to the "Independent Contractor Agreement," Defendant also requires each of its technicians to form their own company.[7]

For unknown reasons, Plaintiff and Defendant never executed Defendant's "Independent Contractor Agreement."[8] However, Defendant paid Plaintiff's company, Computer Solutions and

---

[6]*See*, *e.g.*, Doc. 19-2.

[7] Rather than pay its technicians directly, Defendant pays its technicians' companies.

[8]Although Defendant introduced a copy of the "Independent Contractor Agreement" that had been prepared by or for Plaintiff (*see* Doc. 59-18), Defendant's owner, John Muller, testified that the agreement was never signed. No explanation, however, was ever given as to why the agreement was never signed.

3

Consulting, Inc. (which Plaintiff had formed prior to working for Defendant), for the installation work that Plaintiff performed.[9]

Defendant terminated its relationship with Plaintiff on January 18, 2008 because Plaintiff had allegedly billed for work that he did not actually perform (Doc. 59-16).

**III. Standard of Review**

In determining whether an individual is an employee or independent contractor, the United States Supreme Court has explained that lower courts must consider the "economic realities" of the parties' relationship – not the labels or formalities by which the parties characterize their relationship. *See generally Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947); *see also Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). The Eleventh Circuit has noted that the following factors guide this inquiry:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship; and
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

---

[9]When Plaintiff first started working for Defendant, Defendant initially made some payments directly to Plaintiff. However, the lion's share of payments were made to Defendant's company.

4

*Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006) (unpublished)[10] [hereinafter "*Freund*"] (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987)); *see also* 29 C.F.R. § 500.20(h)(4).

None of the foregoing factors are dispositive, however. Instead, courts must consider the totality of the circumstances. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976) ("No one of these considerations can become the final determinant, nor can the collective answers to all the of the inquires produce a resolution which submerges consideration of the dominant factor – economic dependence").

**IV. Findings of Fact and Conclusions of Law**

**A. Nature and Degree of Control Exerted by Defendant Over Plaintiff**

The testimony and record evidence in this case establishes that Defendant exerted significant control over Plaintiff. Specifically, Defendant controlled Plaintiff's daily work schedule, the type of work Plaintiff performed, the amount of time Plaintiff could take off from work, and the manner in which Plaintiff carried out his work.[11]

Defendant determined Plaintiff's daily work schedule, the resulting number of hours that Plaintiff worked, and the type of jobs that Plaintiff performed. Defendant required Plaintiff to arrive at its place of work at approximately 7:30 a.m. each day; Defendant would then hand

---

[10] Pursuant to 11th Cir. R. 36-2, "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."

[11] Defendant also required Plaintiff to wear a shirt and badge with Defendant's and Bright House's logos and required him to affix a magnetic sign with similar logos on his vehicle. Unlike the other limitations and controls that Defendant exerted over Plaintiff, these requirements are not significant and appear to be common in the industry.

5

Plaintiff a list of work orders to perform for the day. Plaintiff had no control over the work orders that he received, the types of jobs that he could perform or the order in which he carried out the work orders. Plaintiff could not, for instance, perform work orders relating only to Internet service. He had to carry out the work orders that Defendant gave him and in the order that Defendant specified. Furthermore, if a customer requested additional work, or work that differed from what was printed on an existing work order, Plaintiff could not accept the new work unless Bright House and Defendant's supervisors first approved the new work and Plaintiff received a new work order. Finally, Defendant did not permit Plaintiff to perform cable installation work for any other cable installation provider.

Plaintiff also had little control over when to perform the work orders or the order in which he choose to carry out the work orders. When Bright House customers schedule an appointment with a technician, they are given a two-hour window in which they must wait for the technician to arrive and start performing the work. To ensure that its technicians would be able to meet these windows, Defendant assigned its work orders based largely on geographical proximity. Plaintiff had no control over this assignment process and was required to meet Bright House customers' time windows. He could not re-schedule customer appointments. Furthermore, Defendant would sometimes instruct Plaintiff to leave a particular job (even if the job were not complete) and go to another job; Plaintiff did not have any meaningful discretion to refuse those instructions.

Defendant also controlled the amount of time, and the manner in which, Plaintiff could take time off. While there was conflicting evidence on this issue, the Court finds that the more credible evidence revealed that Defendant would penalize, or at least threatened to penalize,

technicians who frequently requested time off, failed to show up each morning at Defendant's office, or failed to attend Defendant's mandatory weekly meetings. Although Defendant appears to have made some allowances for doctors' appointments, family emergencies and vacations that were planned in advance, it would penalize or terminate technicians who simply decided that, for whatever reason, they did not want to work on a particular day. Indeed, Defendant's manager testified that its technicians needed to "request" time off.

Defendant also supervised, to a significant extent, the manner in which Plaintiff carried out his work. Defendant provided Plaintiff with specifications (that came mostly from Bright House) on how his work was to be performed. If Bright House informed Defendant that it was not satisfied with the manner in which Plaintiff performed an installation, Defendant would assess Plaintiff with fixed monetary penalties (or "charge-backs") based on the type of job performed (e.g., the penalty for an unsatisfactory modem installation might be $50, while the penalty on an unsatisfactory television installation might be $25). Defendant automatically deducted these charge-backs from the weekly payments it made to Plaintiff's company. In some instances, these penalties actually exceeded the total amount Plaintiff was supposed to be paid on a job. Plaintiff had no way of disputing or negotiating the amount of a particular charge-back. Finally, Defendant and Bright House sometimes sent supervisors to "spot-check" or monitor Plaintiff and other technicians after they completed a job or even during a job.

**B. Plaintiff's Opportunity for Profit or Loss Depending on His Managerial Skill**

The testimony and record evidence in this case establishes that Plaintiff's opportunity for profit or loss did not depend upon his managerial skill. Instead, Plaintiff's compensation was

7

based simply on the number and type of jobs that Defendant gave him and the quality and pace of Plaintiff's work.

Because Plaintiff was paid on a piece work basis, Plaintiff's opportunity for profit or loss was, in a simplistic sense, a function of the number of jobs he could complete in a finite time frame. Excluding charge-backs, the more jobs Plaintiff could quickly complete, the more Plaintiff stood to profit.[12]

As noted, *supra*, however, Plaintiff's profit was also a function of the *type* of work orders that Defendant assigned him (and the amount of charge-backs Plaintiff received). Because the types of jobs that Plaintiff performed each paid differently, notwithstanding the amount of time it took to complete those jobs, Plaintiff would experience days that were more profitable than others simply as a result of the type of work orders that Defendant assigned to him. For example, assuming cable modem installations paid more than television installations, if all the work orders Plaintiff received on a given day were for cable modem installations, Plaintiff would make more on that day, *ceteris paribus*, than if he had been assigned all television installations. Of course, if cable modem installations took twice as long as television installations, it might be the case that Plaintiff could earn the same amount (or more) by just doing television installations throughout the day. Importantly, though, Plaintiff had no control over the types of work orders that he was given and, in at least some instances, Defendant instructed him to leave particular jobs to perform other potentially less profitable jobs.

---

[12]This would also be true for an employee who was paid on a piece work basis.

Furthermore, Plaintiff was not permitted to install cable services for other cable installation companies. Nor was he permitted to provide additional services for Bright House customers without first obtaining a new work order authorized by both Bright House and Defendant.

No matter how quickly or efficiently Plaintiff worked, Defendant's charge-backs, the manner in which it assigned jobs, and the directives it gave to sometimes leave jobs prior to their completion obviated Plaintiff's ability to rely upon his own managerial skill.

### C. Plaintiff's Investment in Equipment or His Employment of Others

The testimony and record evidence in this case establishes that Plaintiff did not make any significant investment in capital or employ others.

Although Plaintiff provided most of the equipment necessary for performing installations on behalf of Defendant, Plaintiff's relative investment in that equipment was small. In total, the cost of the hand tools, cable fishing stick, crimper, hammer drill, cable meter, and ladder that Defendant required Plaintiff to purchase amounted to perhaps no more than $1,000 (the cable meter and hammer drill, for instance, cost $500 and $150, respectively). Bright House provided the actual cable, cable modems, digital video recorders and other material inputs required for the installations. While Plaintiff used his own vehicle (a mini-van) to drive to customer's houses, that vehicle was also for personal use.

Defendant ostensibly gave Plaintiff the option to hire others through his own company. But that option was illusory. With the exception of just one husband and wife team, none of Defendant's technicians, including Plaintiff, ever utilized or substituted others to carry out the work orders that Defendant assigned.

**D. Special Skills Required for Plaintiff's Services**

The testimony and record evidence in this case establishes that Plaintiff's work did not require the application of particularly special, or difficult to acquire, skills.

Although Plaintiff's work involved proper cable wiring, connecting and configuring Internet cable modems, the use of a cable meter, and answering customer's questions, Defendant's manager testified that those skills could be acquired in as little as two weeks of on-the-job training. In fact, Defendant often assigned experienced technicians to work with new technicians for a one or two week period in order to get new technicians up to speed. After this short training period, Defendant would start sending the new technicians out into the field.

**E. The Degree of Permanence and Duration of Plaintiff's Working Relationship With Defendant**

The testimony and record evidence in this case establishes that there was a high degree of permanence in Plaintiff's relationship with Defendant. As noted, *supra*, Plaintiff was not permitted to provide cable installation services for any other cable installation company while we worked for Defendant. Plaintiff was expected to show up at Defendant's office each morning, six days a week, and was given work orders that typically amounted to a full day's worth of work. This relationship continued for nearly one and a half years.

**F. The Extent to Which Plaintiff's Work Was Integral to Defendant**

The testimony and record evidence in this case establishes that Plaintiff's work was clearly integral to Defendant's business. In the absence of Plaintiff's work, and the work of Defendant's other installation technicians, Defendant would not succeed as an ongoing enterprise. Defendant conceded as much in its trial brief (Doc. 52 at 5) and later at trial.

10

**V. Conclusion**

Based on the totality of the circumstances, it is clear that Plaintiff was an employee – and not an exempt independent contractor – for purposes of the FLSA. Taken together, all six of the factors comprising the "economic reality" test overwhelmingly support the conclusion that Plaintiff was an employee who was economically dependent on Defendant.

Notwithstanding the foregoing, Defendant argued at trial that its "Independent Contractor Agreement" and its requirement that technicians form their own companies evidenced an intent to form an independent contractor relationship. This legal indicia, however, is of no moment and belies the economic reality of the parties' relationship. If anything, the fact that Defendant required its technicians to form their own companies only suggests that Defendant deliberately created a facade to mask the true nature of the parties' relationship. If Defendant's technicians were truly independent contractors, it would make no difference whether Defendant paid its technicians directly or paid their companies (which are presumably 'subchapter S' corporations that merely pass income through to the technicians).

Finally, Defendant argues that the *Freund* case should be controlling because its facts are "virtually identical" to the facts of this case (Doc. 52 at 5). *Freund*'s facts, however, bear little resemblance to this Court's findings.

In *Freund*, the District Court found, *inter alia*, that the plaintiff, a home satellite and entertainment systems installer, "solely determined the hours he spent at work;" was "at liberty to re-schedule any of his appointments with customers;" was "free to schedule as many work days and off-days as he desired;" was "free to perform installations for other companies;" and was not

11

subject to charge-backs or other significant limitations in terms of how he actually carried out his work. *See* Case No. 9:04-CV-80117-DTKH (S.D. Fla. June 10, 2005) (Doc. 41 at 2-3). Plaintiff clearly had none of these freedoms.

In sum, the "economic reality" of the parties' relationship makes clear that Plaintiff was Defendant's employee – not an independent contractor. Although Defendant may have intended to create an independent contractor relationship through its "Independent Contractor Agreement" and other requirements, Plaintiff was an independent contractor in name only. In reality, Defendant treated Plaintiff as an employee and exerted significant control over the type of work he could perform, when he worked, how he worked, for whom he worked, and how much he could earn.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Plaintiff was Defendant's employee and may, therefore, be entitled to overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

**DONE** and **ORDERED** in Chambers in Orlando, Florida on August 31, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE